# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| _____ | ) | |
| **In re: Evanston Northwestern Healthcare** | ) | **Master File No. 07 C 4446** |
| **Corporation Antitrust Litigation** | ) | |
| | ) | **Judge Lefkow** |
| | ) | |
| | ) | **Magistrate Judge Denlow** |
| _____ | ) | |
| | ) | |
| **This Document Relates To:** | ) | |
| | ) | |
| **All Actions** | ) | |
| _____ | ) | |

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT
## OF THEIR MOTION FOR CLASS CERTIFICATION

Dated: February 18, 2009

Mary Jane Fait
Theodore B. Bell
John E. Tangren
**WOLF HALDENSTEIN ADLER**
   **FREEMAN & HERZ LLC**
55 W. Monroe Street, Suite 1111
Chicago, IL 60603
Tel:   (312) 984-0000
Fax:  (312) 984-0001
*Interim Co-Lead Counsel for Plaintiffs*

Marvin A. Miller
Matthew E. Van Tine
Lori A. Fanning
**MILLER LAW LLC**
115 S. LaSalle Street
Suite 2910
Chicago, IL 60603
Tel:   (312) 332-3400
Fax:  (312) 676-2676
*Interim Co-Lead Counsel for Plaintiffs*

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................1

I.    BACKGROUND ........................................................................................1
    A.    Statement of Facts...............................................................3
    B.    Summary of FTC Findings and Remedy ...................................10

II.    ARGUMENT...........................................................................................12
    A.    Class Certification Standards.....................................................12
    B.    Class Certification is Appropriate..............................................15
        1.    The Requirements of Rule 23(a) Are Satisfied.............................15
            a.    The Class Is So Numerous That Joinder
                Is Impracticable.................................................15
            b.    There Are Numerous Questions of Law
                And Fact Common to the Class ........................15
            c.    Plaintiffs' Claims are Typical of the
                Claims of the Class Members ...........................18
            d.    Plaintiffs Will Adequately and Fairly
                Protect the Interests of All Class Members.......................19
        2.    The Requirements of Rule 23(b)(3) Are Satisfied........................20
            a.    Common Questions Predominate ....................20
                 i.    Impact and Damages Can Be
                    Proven Through Common Evidence....................21
                 ii    Market Definition Can Be
                      Proven Through Common Evidence....................23
                 iii.    Market Power Can Be
                      Proven Through Common Evidence....................24
             b.    A Class Action is Superior to Other Forms
                 Of Adjudication .................................................24

CONCLUSION...................................................................................................26

**TABLE OF AUTHORITIES**

*Agency Holding Corp. v. Malley-Duff & Assocs. Inc.,* 483 U.S. 143, 151 (1987) ............13

*Amchem Prods., Inc v. Windsor,* 521 U.S. 591, 625 (1997) .........................................20,25

*Arenson v. Whitehall Convalescent and Nursing Home, Inc.,*
164 F.R.D. 659, 666 (N.D. Ill. 1996) ......................................................................22

*In re Brand Name Prescription Drugs Antitrust Litig.,* 1994 WL 663590,
*5 (N.D. Ill. 1994) ..................................................................................................21

*In re Bromine Antitrust Litig.,* 203 F.R.D. 403, 407-08 (S.D. Ind. 2001) ...................13,17

*In re Carbon Black Antitrust Litig.,* No. 03-10191, 2005 WL 102966 at *22
(D. Mass. Jan. 18, 2005) .......................................................................................26

*In re Carbon Dioxide Antitrust Litig.,* 149 F.R.D. 229, 232 (M.D. Fla. 1993) ..........................14

*Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 767,
81 L. Ed. 2d 628, 104 S. Ct. 2731 (1984) .............................................................16

*Cumberland Farms, Inc. v. Browning-Ferris Indus., Inc.,* 120 F.R.D.
642, 645 (E.D. Pa. 1988) (same). ..........................................................................14

*De La Fuente v. Stokely-Van Camp, Inc ,* 713 F.2d 225, 232 (7th Cir. 1983).............18,22

*Deposit Guaranty Nat'l Bank v. Roper,* 425 U.S. 326, 339 (1980) ..................................14

*Esplin v. Hirsch,* 402 F.2d 94, 99 (10th Cir. 1968), *cert denied,* 394 U.S. 928 (1969)......14

*Federal Trade Commission v. Elders Grain, Inc.,* 868 F.2d 901 (7th Cir. 1989)..............16

*In re Fine Paper Antitrust Litigation* .................................................................................13

*Hartz  Mountain, supra,* 810 F.2d at 801.........................................................................16

*Hawaii v. Standard Oil Co. of Cal.,* 405 U.S. 251, 266 (1972).........................................13

*Hendricks Music Co. v. Steinway, Inc.,* 689 F. Supp. 1501, 1544 (N.D. Ill. 1988)...........16

*Henry v. Cash Today, Inc.,* 199 F.R.D. 566, 572 (S.D. Tex. 2000)...................................17

*See, e.g., Hnot v. Willis Group Holdings Ltd.,* 241 F.R.D. 204, 210-11
(S.D.N.Y. 2007) .....................................................................................................13

*Horton v. Goose Creek Indep. Sch. Dist.,* 690 F.2d 470, 487 (5th Cir. 1982),
   *cert. denied,* 463 U.S. 1207 (1983) ........................................................................14

*In re Initial Public Offering Securities Litigation,* 471 F.3d 24, 41 (2nd Cir. 2006).........13

*James v. City of Dallas,* 254 F.3d 551, 571 (5th Cir. 2001), *cert. denied,*
   534 U.S. 1113 (2002)........................................................................................18

*Keele v. Wexler,* 149 F.3d 589, 594 (7th Cir. 1998) ....................................................15,18

*In re Lorazepam & Clorazepate Antitrust Litig.,* 202 F.R.D. 12, 21 (D.D.C. 2001)....14,26

*Lucas v. GC Services L.P.,* 226 F.R.D. 337, 340 (N.D. Ind. 2005) (citations omitted).....15

*In re Magnetic Audiotape Antitrust Litig.,* 2001 WL 619305,
   *4 (S.D.N.Y. June 6, 2001)................................................................................23

*In the Matter of Evanston Northwestern Healthcare Corporation and
   ENH Medical Group, Inc., No. 9315* (Fed. Trade Comm'n,
   October 20, 2005,) ........................................................................................3,5,11

*In re Mercedes Benz Antitrust Litig.,* 213 F.R.D. 180, 184 (D.N.J.2003) ........................13

*Meyers v. Southwestern Bell Tel. Co.,* 181 F.R.D. 499, 505 (W.D. Okla. 1997) .............24

*In re NASDAQ Market-Makers Antitrust Litig.,* 169 F.R.D. 493, 527
   (S.D.N.Y. 1996)................................................................................................26

*In re Neopharm, Inc. Securities Litig.*, 225 F.R.D. at 568................................................25

*Olympia Equipment Leasing Co. v. Western Union Telegraph Co.,*
   797 F.2d 370, 373 (7th Cir. 1986), *cert. denied,* 480 U.S. 934,
   107 S. Ct. 1574, 94 L. Ed. 2d 765 (1987) ...........................................................16

*In re Playmobil Antitrust Litig.,* 35 F. Supp. 2d 231, 239 (E.D.N.Y. 1998).....................14

*Retired Chicago Police Ass'n v. City of Chicago,* 7 F.3d 584, 596 (7th Cir. 1993) ..........13

*Rohlfing v. Manor Care*, 172 F.R.D. 330 (N.D. Ill. 1997) .....................................16,21,22

*Rosario v. Livaditis,* 963 F.2d 1013, 1018 (7th Cir. 1992)..........................................15,19

*In re Rubber Chemicals Antitrust Litig.,* 232 F.R.D. 346, 350 (N.D. Cal. 2005)............... 14

*Scholes v. Stone, McGuire & Benjamin,* 143 F.R.D. 181, 186 (N.D. Ill. 1992) ...............19

*Sebo v. Rubenstein,* 188 F.R.D. 310, 313 (N.D. Ill. 1999) ...............................................17

*Simer v. Rios,* 661 F.2d 655, 672 (7th Cir. 1981), *cert. denied,* 456 U.S. 917 (1982)........20

*Swanson v. Am. Consumer Indus.,* 415 F.2d 1326, 1333 n.9 (7th Cir. 1969)...................15

*Sulfuric Acid,* 2007 WL 898600, at *7 ...........................................................................23

*Sulfuric Acid,* 2007 WL 898600, at *8 ...........................................................................23

*Sulfuric Acid,* 2007 WL 898600, at *6 ...........................................................................22

*Szabo v. Bridgeport Machs. Inc.,* 249 F.3d 672, 677 (7th Cir. 2001),
    *cert. denied,* 534 U.S. 951 (2001) ....................................................................13,24

*See In re Terazosin Hydrochloride Antitrust Litig.,* 220 F.R.D. 672, 696
    (S.D. Fla. 2004)................................................................................................23

*Transamerican Refining Corp. v. Dravo Corp.,* 130 F.R.D. 70, 76 (S.D. Tex. 1990) ......14

*United States v. Grinnell Corp.,* 384 U.S. 563, 570-71, 16 L. Ed. 2d 778,
    86 S. Ct. 1698 (1966) ..........................................................................................16

*In re Visa Check/MasterMoney,* 192 F.R.D. 68, 87 (E.D.N.Y. 2000),
    *aff d,* 280 F.3d 124 (2nd Cir. 2001), *cert. denied,* 536 U.S. 917 (2002)............23,24

*See also In re Vitamins Antitrust Litig,* 209 F.R.D. 251, 258 (D.D.C. 2002)...................... 14

*In re Warfarin Sodium Antitrust Litig.,* 391 F.3d 516, 528 (3d Cir. Del. 2004)................16

*Williams v. Chartwell Fin. Servs.,* 204 F.3d 748, 760 (7th Cir. 2000) ...............................20

**INTRODUCTION**

As demonstrated below, Plaintiffs satisfy each of the requirements for class certification. The central allegations underlying every Class member's claim include the following, which will be proven with class-wide evidence:

- the merger of Evanston Northwestern Healthcare ("ENH") and Highland Park Hospital gave ENH monopoly power over healthcare services in the relevant geographic market;

- the relevant geographic market consists of the geographic triangle formed by the locations of the three ENH hospitals; and

- ENH used its monopoly power to raise prices, thus injuring end payors for those services.

Moreover, the accompanying Expert Report of Dr. David Dranove Regarding Motion for Class Certification establishes that Plaintiffs have reasonable methods to establish class-wide impact and damages. Given similar evidence and circumstances, acting pursuant to Fed. R. Civ. P. 23(b)(3), courts have certified class claims brought under the federal antitrust laws because in such cases, as here, the predominant focus of the law and the courts is on the defendant's common course of conduct.

## I.    BACKGROUND

This lawsuit is brought as a class action on behalf of individuals and entities who paid for inpatient and hospital-based outpatient healthcare services directly from ENH, its wholly owned hospitals, predecessors, successors, or controlled subsidiaries and affiliates from at least as early as January 1, 2000 to the present (the "Class Period").

ENH, which last fall changed its name to NorthShore University Healthcare[1] after Northwestern University's Medical School withdrew its affiliation, is an Illinois corporation that provides healthcare services to the public through its wholly-owned hospitals, Evanston Hospital, Glenbrook Hospital and Highland Park Hospital.[2] Evanston Hospital is a 400-bed facility located in Evanston, Illinois. Glenbrook Hospital is a 125-bed facility located in Glenview, Illinois. Highland Park Hospital is located in Highland Park, Illinois and has approximately 150-200 beds. Consolidated Class Action Complaint ("Complaint"), ¶14. Prior to 2000, ENH consisted only of Evanston and Glenbrook Hospitals. These hospitals competed in the relevant geographic market for healthcare services with Highland Park Hospital. ENH acquired Highland Park Hospital on January 1, 2000 as a result of its merger with Lakeland Health Services, Inc. ("Lakeland Health"). Complaint at ¶31.

The Federal Trade Commission ("FTC") filed its complaint to challenge the merger on February 10, 2004. The FTC ultimately decided that the merger of these hospitals substantially lessened competition in the relevant market. Because of ENH's unlawful conduct, Plaintiffs and the Class paid artificially inflated prices for healthcare services[3] and, as a result, have suffered antitrust injury to their business or property. Complaint at ¶16.

---

[1]    To avoid confusion, NorthShore University Healthcare will be referred to as ENH in this memorandum.

[2]    On January 1, 2009, ENH merged with Rush North Shore Medical Center in Skokie, which is now called Skokie Hospital. Because Plaintiffs do not know how this merger will affect the prices at Skokie Hospital, Plaintiffs are presently excluding this facility from the scope of the class definition. However, if later discovery demonstrates that this facility should be included, Plaintiffs reserve their rights to move to amend the class definition.

[3]    "Healthcare services" refers to general inpatient and hospital-based outpatient services provided by ENH that are ordinarily provided by hospitals, including primary, secondary, and tertiary services. These include, but are not limited to, obstetrical and pediatric services, psychiatric care, neurosurgery, radiation therapy, cardiology services, orthopedics, trauma centers, diagnostic centers, cancer treatments, internal medicine, and general surgical services. Complaint at ¶ 8(a).

2

### A.    Statement of Facts

As early as 1994, Mark Neaman, then the newly appointed CEO for ENH and Ronald Spaeth, the CEO of Highland Park Hospital,  shared the view that hospitals should stand united in order to get better pricing and leverage against insurance companies and managed care organizations.  *In the Matter of Evanston Northwestern Healthcare Corporation and ENH Medical Group, Inc., No. 9315* (Fed. Trade Comm'n, October 20, 2005), *Initial Decision of Chief Administrative Law Judge Stephen J. McGuire* (hereinafter the "Initial Decision") (Public Version), Finding of Fact No. 29 (hereinafter, "FF __").[4]  Discussion of collaboration between them began not later than 1996.  FF 30.

Early efforts at coordination to achieve market power included formation in 1989 of the Northwestern Healthcare Network among hospitals already related to one another through a common affiliation with Northwestern University Medical School.  FF 35, 36.  The Network members, however, continued to compete with one another, undercutting each other's prices.  FF 66 (Complaint Counsel Trial Exhibit ("CX") 1768 at 3); Initial Decision at 198.   The Network dissolved in December 1999, due in part to its lack of success.  FF 73.

In late 1998 or early 1999, discussions began that resulted in the merger between ENH and Highland Park.  FF 78.  They entered into a letter of intent on July 1, 1999 (FF 81), and the merger agreement itself was executed by October 1999.   FF 83.   In January 2000, ENH completed the merger with Highland Park.   FF85.

There are no other hospitals located between the Highland Park, Glenbrook and Evanston hospital campuses.  FF 92 (Respondents' Trial Exhibit ("DX") 8173, map).  They form a triangle along Chicago's North Shore.  FF 93.  At a Highland Park strategic planning retreat, senior executives acknowledged that the merger between HPH and Evanston would produce an entity

---

[4]    The cited materials are contained in the accompanying Appendix.

with the greatest negotiation strength with payors. CX 1869, FTC Trial Transcript ("TR") 350-51 (Newton); also CX 2072 at 1 (Bain Consulting concluded the merger would permit the new entity to "negotiate contracts with payors from a stronger position."); CX 19 at 1, TR 1036-37 (Neaman) (goal of the transaction was to strengthen their negotiating positions with managed care organizations).

ENH's and Highland Park's administrators recognized that control of the only three hospitals in that geographic area would give them market power when negotiating with insurance companies. Expert Report of Deborah Haas-Wilson, September 21, 2004 (as revised October 8, 2004) (the "Haas-Wilson Report") at 61, n. 75. Ronald Spaeth, the President and CEO of Highland Park Hospital at the time of the merger, said, "I think it would be real tough for any of the Fortune 40 companies in this area whose CEOs use this place [Highland Park] or that place [Evanston Hospital and Glenbrook] to walk from Evanston, Highland Park, Glenbrook and 1700 of their physicians." CX 4 at 2; Haas-Wilson Report at 62, & n. 76; CX 1 at 3.

Prior to the merger, managed care representatives[5] described Evanston and Highland Park as each other's main competitors or primary alternative; the two hospitals' competitive relationship permitted managed care organizations to trade off one for the other, or work them against each other in contract negotiations. FF 229. Prior to the merger, Evanston and Highland Park viewed each other as their primary competitors. FF 243 (CX 1868 at 3).

After ENH acquired Highland Park, it rapidly increased the prices it charged to Managed Care Organization customers to the higher of Evanston's or Highland Park's pre-merger rate for a particular service. FF 348-54. Prices escalated with no evidence of an improvement in patient

---

[5] Specifically cited in the ALJ's and full Commission's opinions were testimony by Patrick Neary, Director of Network Development and Provider Relations, One Health/Great West Health Care of Illinois (FF 232), Jane Ballengee, Regional Vice President for Network Development at Private Health Care Systems (FF 231, 233); Robert Mendonsa, General Manager responsible for sale and network contracting for Aetna (FF 230); Lenore Holt Darcy, Regional Vice President for Unicare (FF 234).

care quality. Expert Report of Patrick S. Romano, M.D. M.P.H. In the Matter of Evanston Northwestern Healthcare Corporation and ENH Medical Group (the "Romano Report") at 44.[6] After the merger, ENH was able to increase prices at a rate higher than similarly situated hospitals. Haas-Wilson Report at 41. There was no increase in quality of hospital services offered to explain the larger than usual price increases. *Id.*

Mark Neaman, President and CEO of ENH, wrote in his October 2, 2000 memo to the Board of Directors that the merger integration effort from January 1, 2000 to October 2, 2000 had resulted in "$24 million of revenue enhancements [] achieved – mostly via managed care negotiations . . . *none of this could have been achieved by either Evanston or Highland Park alone*." Haas-Wilson Report at 62 & n. 77 and 79; FF 464-65. Mr. Neaman emphasized, "The 'fighting unit' of our three hospitals and 1600 physicians was instrumental in achieving these ends.'" FF 465; CX 17 at 1-2., *In the Matter of Evanston Northwestern Healthcare Corporation and ENH Medical Group, Inc., No. 9315* (Fed. Trade Comm'n, August 6, 2007), *Opinion of the Commission* (hereinafter the "Commission Opinion") at 17. He attributed gains of $2-3 million to each of the renegotiated managed care contracts with United Healthcare of Illinois, Inc., Aetna, Inc., Blue Cross Blue Shield of Illinois, CIGNA Healthcare of Illinois, Humana Health Plan, Inc. and Private Healthcare Systems over that 10 month period. *Id*.

According to the Federal Trade Commission, after the merger was consummated, "ENH negotiated uniform prices for the three hospitals as a single system and raised prices at all three locations." FF 355-66*.* The FTC contended (and the ALJ found) that the price increases were

---

[6]     The FTC asked Professor Romano to analyze the effect of the merger of Evanston and Highland Park Hospitals on the quality of care at both hospitals, and to ascertain whether the transaction resulted in any meaningful quality improvements. Romano Report at 3. Prof. Romano concluded that the quality of care remained the same at both, and possibly deteriorated, and that Evanston did not successfully export its excellent quality of care or benefits of being a university affiliated teaching hospital to Highland Park. Further, he saw no benefits to either hospital other than the business managers' bottom line. Romano Report at 44.

large, beyond price increases achieved by comparable hospitals during the same time period, and were in fact enabled by the merger. FF 326.

The FTC trial record showed that ENH "exercised its market power, attained through the merger, to raise prices. At least six mechanisms were employed to raise prices: (1) utilizing the higher Evanston or Highland Park rate until new contracts were negotiated; (2) moving managed care organizations to one contract for all three hospitals; (3) in renegotiating contracts, demanding the higher of Evanston or Highland Park rates plus a premium and discount off rates; (4) increasing discount off charges arrangements; (5) adopting the higher of the Evanston or Highland Park chargemaster prices; and (6) increasing ENH's chargemaster[7] prices four times in 2002 and 2003. Initial Decision at 47; *see also* F 348-391. Across managed care plans, ENH's price increases exceeded those implemented by other hospitals by 11 to 18%. Initial Decision at 2. ENH estimated a $3 million dollar gain in profitability from 5 of the 6 major MCOs with whom it contracted. Haas-Wilson Report at 62. ENH's economist found "larger higher than predicted average merger-coincident net price increases for inpatient and hospital based outpatient services combined (11% or 12%), than he did for inpatient services alone (9 or 10%). Commission Opinion at 57.

Hospital competition is local.[8] Suburban residents rarely travel from their general area of residence for shopping, business and health care services. FF 251. The merger provided ENH market leverage with class members in the area, including employers and managed care organizations. FF 249. The primary price negotiations for hospital inpatient and outpatient

---

[7]   The chargemaster is the hospital's price list.
[8]   According to a Lake Forest customer survey report, consumers are willing to travel, on average, up to 16 minutes for emergency care, 28 minutes to a primary care physician for routine care, 31 minutes for outpatient services, and 35 minutes to a hospital for an overnight stay. FF 257.

services occur between hospitals and insurers.[9]   FF 107.  Hospitals sell their services to insurers like managed care organizations, FF 107, as well as to the public.

Market power is the ability of a firm to control output or affect price in a relevant market. The FTC asked Kenneth G. Elzinga,[10] Professor of Economics at the University of Virginia, to assess whether the FTC needed to calculate ENH's market share in evaluating the monopolization claim given ENH's price increases.  Elzinga Report at ¶¶ 1-2.  He concluded that inferential evidence of market power, for example by calculating market shares in a relevant market, was redundant where "direct evidence of market power [such as the price increases here] truncates the need to use geographic market delineation tests."  *Id*.

The FTC asked economist Deborah Haas-Wilson to analyze the effect of the merger on prices, and to ascertain whether the merger created or enhanced the hospitals' market power— specifically their ability to maintain prices above competitive levels and if so, whether or not they exercised that power.  Professor Haas-Wilson concluded that they had.  Haas-Wilson Report at 1-2.   Professor Haas-Wilson examined whether the evidence supported the hypothesis that, following the merger with Highland Park Hospital, ENH found it profitable to unilaterally elevate price.  Haas-Wilson Report at 17.  She found price increases across the board that could not be explained by significant changes in quality of care (*id*. at 41) or any explanation other than increased market power gained through the merger.

---

[9]   "The most common type of private health insurance today is managed care.  Managed care includes those health insurance plans that use tools, such as selective contracting and preauthorization rules, to control access to health care providers and treatments with the goals of reducing unnecessary utilization of services, lowering the costs of providing healthcare to members of the health plan, and increasing the quality of care received by members of the health plan."  Haas-Wilson Report at 4.  "Many employers who contract with companies we think of as health insurers are in fact self-insured, meaning they assume all or a significant part of the financial risk for the costs of their employees' health care.  In such a case, the employer is essentially buying administrative services, such as claims processing and utilization review, and access to insurers' provider networks from the insurance companies."  Haas-Wilson Report at 3.
[10]   Elzinga Report at ¶¶ 1-2.

In 2002, United Health Care ("United") was the second largest managed care organization in the Chicago area, with affiliates including Share, Metropolitan Life, Chicago HMO, Travelers and MetraHealth. FF 393. That year, United stated that the merger had enabled ENH to dominate Chicago's North Shore, providing the only hospital locations between Evanston and Highland Park, as well as a significant stretch of territory moving inland, noting the strategic importance of ENH's geographic exclusivity. FF 398. Even at the time of the FTC trial, with Lake Forest, Rush North Shore, St. Francis and other neighboring hospitals in their network, United believed it could not satisfy its customers without ENH. FF 408.

Private Health Care Systems ("PHCS") develops networks of hospitals, doctors, and other ancillary services, and markets these networks to insurance companies, third-party administrators, and employers. Commission Opinion at 18. It found the best scenario for its customers, strictly looking at dollars, was to eliminate ENH from its network, and redirect enrollees to the surrounding hospitals. FF 413. It concluded however, that its customers did not want to contract with its network if ENH were not in it. FF 414 The full Commission found that the PHCS testimony supported "the conclusion that Evanston and Highland Park were close substitutes that likely constrained each other's pricing." Commission Opinion at 19. "The fact that PHCS retained ENH after it substantially raised prices at a rate that exceeded the average rate increase of other hospitals, rather than drop ENH and use other hospitals, also supports the finding that, for PHCS, competition from these other hospitals was not sufficient to constrain ENH from exercising market power." *Id.*

One Health, now known as Great West Healthcare, was also forced to accede to ENH's inflated terms. After no agreement was reached in its initial attempt to renegotiate its contracts with ENH, One Health accepted ENH's notice of termination and excluded ENH from its

network. FF 424. In the months following the termination of the ENH contract, One Health's monthly membership reports began to reflect a loss of membership, and it determined it must have ENH in its network to stop continuing membership loss. FF 428.

Another insurer, Aetna, Inc. ("Aetna"), found it could not walk away from ENH and ENH's strategy of requiring negotiations for all three ENH hospitals as a group. FF 434, 446. At trial, Aetna's general manager responsible for sales and network contracting testified he was concerned about the merger "because it had resulted in 'three extremely important hospitals negotiating together in a very important geography' and because it would 'severely compromise[]' Aetna's ability to sell its plans without the three hospitals." Commission Opinion at 20 (citations omitted). Shortly after the merger, ENH threatened termination of its pre-merger contract. By June 2000, Aetna had been forced to renegotiate with ENH leading to price increases of 45% to 47% over a three year period. *Id.* (citations omitted).

Unicare representatives reported that ENH increases were above what was expected or reasonable. FF 451. Despite that assessment, Unicare could not exclude ENH from its network because ENH was now a key provider in the North Shore. FF 456. Unicare agreed to substantial, greater than normal, price increases after the merger because "not to have ENH in the network could have caused major employers, such as Kraft to select other health plans." Commission Opinion at 23.

Even Blue Cross Blue Shield of Illinois ("BCBS"), the largest of the managed care organizations, paid higher post-merger price increases for outpatient care for its PPO plan, relative to control hospitals. Haas-Wilson Report at 51. BCBS *per case* post- merger net price increased by as much as 10%-27%. Commission Opinion at 17, 64.

### B.  Summary of FTC Findings and Remedy

The FTC issued a three count complaint on February 10, 2004.  The first count alleged that the merger violated Section 7 of the Clayton Act.  The Commission sustained that count. Count II charged that the transaction violated the Clayton Act because it enabled ENH to raise its prices to private payors above the prices that the hospitals would have charged absent the merger.  This Count was dismissed as moot.  Count III alleged price fixing but that count was resolved by a consent agreement which became final on May 17, 2005.  Commission Opinion at 5-6.

The FTC action moved through three procedural stages.   The first stage consisted of an eight week trial before the Honorable Stephen J. Maguire, Chief Administrative Law Judge.  In his October 17, 2005 opinion, Judge Maguire found that ENH's acquisition of its nearest competitor, Highland Park Hospital ("Highland Park"), violated Section 7 of the Clayton Act, 15 U.S.C. § 18.  He recommended ENH divest itself of Highland Park.

Judge Maguire found that the Complaint Counsel had demonstrated that ENH exercised its enhanced, post-merger market power and obtained post-merger price increases substantially above its pre-merger prices and significantly larger than price increases obtained by other comparison hospitals.  Initial Decision at 209 (Conclusion of Law ("CL") 17).  The evidence established that the price increases were achieved as a result of market power and not because of learning about actual prices in the marketplace (referred to as the learning about demand defense) or improvements in quality of care.  CL 18.  The evidence also demonstrated that at the time of the merger, Highland Park was able to meet its financial obligations, was not in danger of bankruptcy, had other options available to it than merger with ENH, and was not in danger of exiting the market in the foreseeable future.  CL 23.

10

The parties cross-appealed the ALJ's decision to the full Commission. In April 2008, the full Commission affirmed the ALJ's decision, in nearly all respects but disagreed that divestiture was the appropriate remedy in this instance. The Commission also found that that the ALJ's definition of the geographic market was too broad, and it limited it to the triangle formed by the three ENH facilities.[11] Commission Opinion at 64. It found that the post-merger negotiation strategy with Managed Care Organizations was highly successful: it negotiated a single contract for all three hospitals with substantial price increases and converted a number of its contracts from per diem (charging per day for a bucket of services based on diagnosis) to an a la carte discount off list price structure, as well as increased its chargemaster rates four times. Commission Opinion at 16. The FTC also found that the inclusion of hospital-based outpatient services in the relevant product market would not have altered the outcome of the case before the FTC. Commission Opinion at 57. The third stage was the remedy proceeding before the full Commission. The FTC ordered ENH to establish separate and independent negotiating teams in order to allow Managed Care Organizations to negotiate separately with each hospital, thus reinjecting competition between them, for the business of MCOs. *In the Matter of Evanston Northwestern Healthcare Corporation and ENH Medical Group, Inc.*, No. 9315 (Fed. Trade Comm'n, April 28, 2008), *Opinion of the Commission on Remedy* (hereinafter the "Remedy Opinion") at 90. Specifically, *inter alia*, ENH was required to

- Commence separate negotiations when contacted by a payor to negotiate a managed care contract.

- Offer the opportunity to re-open and renegotiate contracts under the terms of the Commission's Order.

---

[11] The ALJ had considered hospitals outside the triangle such as Lutheran General and Lake Forest Hospital to be part of the geographic market. Initial Decision at 200.

- Cease sharing competitively sensitive information between ENH and HPH negotiating teams.

- Deliver written reports to the Commission every 60 days, and provide an annual report, as well as to identify who participated on the negotiating teams for each entity.

Remedy Opinion at 5-6, 9.

Thus, the evidence at the FTC merger trial demonstrated that (a) Evanston and Highland Park sought market power from the merger; (b) ENH sought to increase prices through contract negotiations and chargemaster increases; (c) managed care testimony confirmed price increases; and (d) ENH highlighted the managed care price increases as a merger accomplishment. Their merger allowed the two hospitals to stop competing with each other.

## II. **ARGUMENT**

Plaintiffs seek certification under the provisions of Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure of a class defined as:

> All persons or entities in the United States of America and Puerto Rico, except those who solely paid fixed amount co-pays, uninsureds who did not pay their bill, Medicaid and Traditional Medicare patients, governmental entities, defendant, other providers of healthcare services, and the present and former parents, predecessors, subsidiaries and affiliates of defendant and other providers of healthcare services who purchased or paid for inpatient hospital services or hospital-based outpatient services directly from NorthShore University Healthcare (formerly known as Evanston Northwestern Healthcare), its wholly-owned hospitals, predecessors, subsidiaries, or affiliates other than those acquired as a result of the merger with Rush North Shore Medical Center (the "Class") from at least as early as January 1, 2000 to the present (the "Class Period").

### A. **Class Certification Standards**

To maintain a class action, Plaintiffs must satisfy all four elements of Rule 23(a): numerosity, commonality, typicality, and adequacy of representation. In addition, because

12

Plaintiffs are seeking certification under Rule 23(b)(3), they must also demonstrate predominance and superiority.

In making its determination whether these requirements have been met, a district court has broad discretion. *Retired Chicago Police Ass'n v. City of Chicago,* 7 F.3d 584, 596 (7th Cir. 1993). The court should "look beneath the surface of a complaint to conduct the inquiries identified in [Rule 23] and exercise the discretion it confers." *Szabo v. Bridgeport Machs. Inc.,* 249 F.3d 672, 677 (7th Cir. 2001), *cert. denied,* 534 U.S. 951 (2001).

At the same time, the need to determine certain factual issues should not turn the class certification hearing into a "mini-trial of substantial portions of the underlying litigation." *In re Initial Public Offering Securities Litigation,* 471 F.3d 24, 41 (2nd Cir. 2006). In particular, to the extent the parties' experts disagree as to whether Plaintiffs will be able to establish a particular element of their claim on the merits, the court should not decide which expert is more persuasive, but instead must limit the focus to the requirements for satisfying Rule 23. *See, e.g., Hnot v. Willis Group Holdings Ltd.,* 241 F.R.D. 204, 210-11 (S.D.N.Y. 2007); *In re Bromine Antitrust Litig.,* 203 F.R.D. 403, 407-08 (S.D. Ind. 2001).

The Supreme Court has specifically recognized that class actions play a particularly important role in enforcing the nation's antitrust laws. *Hawaii v. Standard Oil Co. of Cal.,* 405 U.S. 251, 266 (1972); *Agency Holding Corp. v. Malley-Duff & Assocs. Inc.,* 483 U.S. 143, 151 (1987). As the court stated in *In re Fine Paper Antitrust Litigation,* the deterrence purpose of antitrust laws "cannot effectively function if potential violators conclude that large numbers of potential claimants will not be afforded an efficient and cost-effective method of vindicating their claims." 82 F.R.D. 143, 155 (E.D. Pa. 1979), *aff'd,* 685 F.2d 810 (3d Cir. 1982), *cert. denied,* 459 U.S. 1156 (1983) *In re Mercedes Benz Antitrust Litig.,* 213 F.R.D. 180, 184

(D.N.J.2003). In general, the federal courts favor class actions as an effective means of adjudicating numerous similar claims because, without the class action device, the harms suffered will not be redressed. *Deposit Guaranty Nat'l Bank v. Roper,* 445 U.S. 326, 339 (1980).

Consequently, "courts have repeatedly found antitrust claims to be particularly well suited for class actions." *In re Lorazepam & Clorazepate Antitrust Litig.,* 202 F.R.D. 12, 21 (D.D.C. 2001). Indeed, "because of the important role that class actions play in the private enforcement of antitrust actions, courts resolve doubts in favor of certifying the class." *In re Playmobil Antitrust Litig.,* 35 F. Supp. 2d 231, 239 (E.D.N.Y. 1998); *Transamerican Refining Corp. v. Dravo Corp.,* 130 F.R.D. 70, 76 (S.D. Tex. 1990) (certifying class alleging antitrust conspiracy, stating: "If the question is close judges should err in favor of class certification ... [to] protect[] the judicial system from repetitive litigation ... [and because otherwise] it is possible that many claims will not be pursued because litigation costs will exceed the claim for damages "); *see also Horton v. Goose Creek Indep. Sch. Dist.,* 690 F.2d 470, 487 (5th Cir. 1982), *cert. denied,* 463 U.S. 1207 (1983) ("[J]udges should err in favor of certification."); *Esplin v. Hirschi,* 402 F.2d 94, 99 (10th Cir. 1968), *cert. denied,* 394 U.S. 928 (1969) ("if there is to be an error made, let it be in favor and not against the maintenance of the class action."[12]

As demonstrated below, class certification is appropriate in this case. The requirements of Fed. R. Civ. P. Rules 23(a) and 23(b)(3) are satisfied. In fact, it is only through a class action that the affected consumers and end payors can obtain redress. In such circumstances, federal courts favor class actions. *Deposit Guaranty Nat'l Bank v. Roper,* 425 U.S. 326, 339 (1980).

---

[12] *See also In re Vitamins Antitrust Litig,* 209 F.R.D. 251, 258 (D.D.C. 2002) (courts resolve doubts in favor of certification in antitrust actions); *In re Rubber Chemicals Antitrust Litig.,* 232 F.R.D. 346, 350 (N.D. Cal. 2005) (same); *In re Carbon Dioxide Antitrust Litig.,* 149 F.R.D. 229, 232 (M.D. Fla. 1993) (same); *Cumberland Farms, Inc. v. Browning-Ferris Indus., Inc.,* 120 F.R.D. 642, 645 (E.D. Pa. 1988) (same).

14

B.    **Class Certification Is Appropriate**

1.    **The Requirements Of Rule 23(a) Are Satisfied.**

a.    **The Class Is So Numerous That
Joinder Is Impracticable.**

There is no magic number to satisfy the numerosity requirement. As few as forty members may be sufficient. *Swanson v. Am. Consumer Indus.,* 415 F.2d 1326, 1333 n.9 (7th Cir. 1969). "The exact number of class members need not be known... [i]nstead, the plaintiff can offer 'good faith estimates of class size...and the court may use 'common sense assumptions' to determine the validity of those estimates.'" *Lucas v. GC Services L.P.,* 226 F.R.D. 337, 340 (N.D. Ind. 2005) (citations omitted).

In this case, the ENH's data produced so far indicates that there are tens or even hundreds of thousands of potential class members. *See* Expert Report of Dr. David Dranove Regarding Motion for Class Certification ("Dranove Report") at 68-69 (Exhibits 11-13).   There is no question that numerosity is satisfied here.

b.    **There Are Numerous Questions of Law
and Fact Common to the Class**

This element, commonality, requires only that there exist questions of law *or* fact common to the class. *Keele v. Wexler,* 149 F.3d 589, 594 (7th Cir. 1998). "'A common nucleus of operative fact is usually enough to satisfy the commonality requirement of Rule 23(a)(2).'" *Id.* (quoting *Rosario v. Livaditis,* 963 F.2d 1013, 1018 (7th Cir. 1992), *cert. denied,* 506 U.S. 1051 (1993)). Courts recognize that there may be factual differences between class members but the existence of such variations will not necessarily defeat the class aspect of the action. *Rosario,* 963 F.2d at 1017.  Antitrust cases have often been found to satisfy the commonality requirement because the focus of the proof is on the defendant's actions, not on the plaintiffs':

The offense of monopolization under § 2 of the Sherman Act requires proof of

15

monopoly power "plus conduct designed to maintain or enhance that power improperly." *Olympia Equipment Leasing Co. v. Western Union Telegraph Co.*, 797 F.2d 370, 373 (7th Cir. 1986), *cert. denied*, 480 U.S. 934, 107 S. Ct. 1574, 94 L. Ed. 2d 765 (1987). The offense of attempted monopolization, also made unlawful by § 2, requires a showing of (1) a specific intent by the defendant to destroy competition (meaning an intent to restrain competition unreasonably, not merely an intent to prevail over one's rivals), (2) predatory or anti-competitive conduct undertaken by the defendant to accomplish that unlawful purpose and (3) a dangerous probability of success. *Hartz Mountain*, *supra*, 810 F.2d at 801. Section 2 reaches the conduct of a single firm and is unlawful only where actual monopolization is threatened. *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 767, 81 L. Ed. 2d 628, 104 S. Ct. 2731 (1984).

*Hendricks Music Co. v. Steinway, Inc.*, 689 F. Supp. 1501, 1544 (N.D. Ill. 1988). Similarly, § 7 of the Clayton Act prohibits mergers and other acquisitions that may lessen competition or tend to create a monopoly. *Federal Trade Commission v. Elders Grain, Inc.,* 868 F.2d 901 (7th Cir. 1989). Thus, in *Rohlfing v. Manor Care*, 172 F.R.D. 330 (N.D. Ill. 1997), the Court found that monopolization claims are well-suited to class treatment:

> § 2 of the Sherman Act . . . requires the plaintiffs to prove: "(1) the [defendants'] possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71, 16 L. Ed. 2d 778, 86 S. Ct. 1698 (1966). The question of whether Manor Care engaged in a "willful acquisition" of monopoly power is, like the question of whether it engaged in a conspiracy in restraint of trade, common to all members of the class because of its susceptibility to common proof or disproof.

*Rohlfing v. Manor Care*, 172 F.R.D. at 337. *Accord*, *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 528 (3d Cir. 2004) (claims under § 2 of the Sherman Act "naturally raise several questions of law and fact common to the entire class and which predominate over any issues related to individual class members, including the unlawfulness of [defendants'] conduct under federal antitrust laws . . ., the causal linkage between [defendants'] conduct and the injury suffered by the class members, and the nature of the relief to which class members are entitled."). Similarly, courts have repeatedly found that the existence of a conspiracy to affect

16

prices necessarily gives rise to common questions of law and fact. *E.g., In re Bromine Antitrust Litig.,* 203 F.R.D. 403, 408-09 (S.D. Ind. 2001); *Henry v. Cash Today, Inc.,* 199 F.R.D. 566, 572 (S.D. Tex. 2000); *Sebo v. Rubenstein,* 188 F.R.D. 310, 313 (N.D. Ill. 1999).

This case should be no different since ENH's actions to increase and abuse its market power arise from a common nucleus of operative facts, and members of the putative class have been similarly victimized by the same acts. Thus, proof of the representative Plaintiffs' claims will focus overwhelmingly on ENH's documents and ENH's conduct, and commonality is easily satisfied. In particular, the following questions of fact and law are a summary of such questions common to all Class members:

a.   Whether ENH has exercised monopoly power in the sale of healthcare services in the relevant geographic market.

b.   Whether ENH's alleged conduct violates Section 2 of the Sherman Act;

c.   Whether ENH's alleged conduct violates Section 7 of the Clayton Act;

d.   Whether the conduct of ENH, as alleged in this Complaint, caused injury to the business and property of the Plaintiffs and the other members of the Class;

e.   The effect of ENH's exercise of monopoly power on the prices of healthcare services sold by ENH and its wholly-owned hospitals during the Class Period; and

f.   The appropriate measure of damages sustained by Plaintiffs and the other members of the Class.

In addition, Plaintiffs have viable means of proving antitrust injury and damages through common proof.

17

### c. Plaintiffs' Claims are Typical of the Claims of the Class Members

A claim "is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory." *De La Fuente v. Stokely-Van Camp, Inc ,* 713 F.2d 225, 232 (7th Cir. 1983) (citation and internal quotation omitted). A sufficient nexus is established where, as here, the claims of the Class and the Class Representatives arise from the same event or pattern or practice and are based upon the same legal theory. *James v. City of Dallas,* 254 F.3d 551, 571 (5th Cir. 2001), *cert. denied,* 534 U.S. 1113 (2002). Typicality is closely related to commonality, *Keele,* 149 F.3d at 595, and, as in the case of commonality, factual distinctions between the claims of class members will not necessarily defeat a claim of typicality. *De La Fuente,* 713 F.2d at 233.

There are four named Plaintiffs in this action: Amit Berkowitz, an individual residing in Evanston, Illinois; Steven J. Messner, an individual residing in Northfield, Illinois; Henry W. Lahmeyer M.D., S.C., an Illinois corporation formed under the Medical Corporation Act, 805 ILCS 15/1 *et seq.*, located in Northfield, Illinois; and Painters District Council No. 30 Health & Welfare Fund, located in Aurora, Illinois, a not-for-profit trust established and maintained to provide comprehensive health care benefits to participants-workers who are employed under various collective bargaining agreements and to their dependents. Complaint ¶¶ 9-12.

During the Class Period, Plaintiffs purchased or paid for healthcare services directly from one or more of the hospitals owned by ENH. Complaint ¶ 13. Plaintiffs accordingly paid artificially inflated prices to ENH for healthcare services as a result of ENH's anticompetitive conduct. *Id.* Plaintiffs' claims are based on the same legal and remedial theories applicable to the entire Class and will focus on common facts in proving ENH's violation of the antitrust laws. Plaintiffs' claims are therefore typical of the claims of Class members.

18

**d. Plaintiffs Will Adequately and Fairly
Protect the Interests of All Class Members**

This requirement entails a two-part inquiry, *viz.,* whether the named plaintiffs will protect the putative class and whether plaintiffs' counsel can adequately represent the interests of the class. The requirement that the plaintiffs adequately protect the interests of the class means they cannot have claims which are antagonistic to or conflict with the claims of the class. *Rosario,* 963 F.2d at 1018. Moreover, it must appear that the named plaintiffs will "vigorously pursue the litigation on behalf of the class" and their attorneys must be "qualified, experienced and able to conduct the litigation." *Scholes v. Stone, McGuire & Benjamin,* 143 F.R.D. 181, 186 (N.D. Ill. 1992).

Plaintiffs here meet both prongs. The Class is ably represented by the proposed Class Representatives. The Representatives have already dedicated time and effort in pursuing this litigation. They are well-aware of their responsibilities as class representatives.

The claims of the named Plaintiffs are the same as those of the class. The attorneys for the named Plaintiffs have thoroughly explained to them the potential advantages and disadvantages of pursuing their claims as a class action and the duties they have undertaken by agreeing to act on behalf of the proposed class. Plaintiffs are unaware of any matter which could possibly put their interests in conflict with those of any other member of the class.

Plaintiffs' selected proposed class counsel, which this Court has already appointed [Dkt. #117] as Interim Co-Lead Class Counsel, without objection from ENH, have shown that they possess the skill, expertise and have the necessary resources and commitment to represent the interests of the Class and prosecute this action vigorously. See the firm r9sum9s of Wolf Haldenstein Adler Freeman & Herz LLC and Miller Law attached as Exhibits A and B respectively to the accompanying Motion.

19

The Court should accordingly appoint both firms to serve as Co-Lead Class Counsel pursuant to Rule 23(g)(1).

## 2. The Requirements Of Rule 23(b)(3) Are Satisfied.

In addition to meeting the requirements of Rule 23(a), the proposed Class's claims meet the standards of Rule 23(b)(3). Rule 23(b)(3) requires that "common questions of law and fact predominate over questions involving individual members, and that a class action is superior to other forms of adjudication." *Williams v. Chartwell Fin. Servs.,* 204 F.3d 748, 760 (7th Cir. 2000).

### a. Common Questions Predominate

As the Seventh Circuit has stated, the "inquiry into the predomination analysis must take two steps." *Simer v. Rios,* 661 F.2d 655, 672 (7th Cir. 1981), *cert. denied,* 456 U.S. 917 (1982). In the first step, the "focus must be on the substantive elements of plaintiffs' cause of action and inquire into the proof necessary for the various elements." *Id.* Next, "after examining the proof necessary we must inquire into the form that trial on these issues would take." *Id.*
Plaintiffs have alleged that ENH increased its market power by merging with Highland Park Hospital, and then abused that market power by raising prices to supracompetitive levels. The Supreme Court has stated that "[p]redominance is a test readily met in certain cases alleging . . . violations of the antitrust laws ... ." *Amchem Prods., Inc v. Windsor,* 521 U.S. 591, 625 (1997).

Plaintiffs allege a uniform course of conduct by ENH, and that ENH's course of conduct affected all members of the Class similarly. These allegations of ENH's common course of harmful conduct demonstrate that common questions will predominate.

### i.     Impact and Damages Can Be Proven Through Common Evidence.

Common issues concerning impact, damages, relevant market, and market power, in addition to the common issue of monopolization, greatly predominate over any individual issues and can be shown at trial by common proof and class- wide evidence.

The question of fact of injury is susceptible to class treatment in this case because Plaintiffs have alleged a common course of conduct toward all class members. *See Rohlfing,* 172 F.R.D. at 337. As Judge Coar recognized in *Sulfuric Acid,* variations in the product, its market, and its price as well as difficulties inherent in determining class-wide impact and damages need not defeat a finding of predominance. 2007 WL 898600, at *5-9.  In addition, "[w]ith respect to the determination of damages, Plaintiffs need only establish that they have 'realistic methodologies for establishing damages on a classwide basis." *Id.* (quoting *In re Brand Name Prescription Drugs Antitrust Litig.,* 1994 WL 663590, *5 (N.D. Ill. 1994)).  Plaintiffs' expert, Dr. David Dranove, has supplied such realistic methodologies.

Dr. Dranove is a recognized economic expert in the healthcare field.  Dr. Dranove has reviewed the expert reports submitted in the FTC proceeding, as well as data and other evidence from that proceeding.  Dranove Report at 13.  As a result of this review, he has opined that common economic and econometric methodologies exist for proving impact and damages in this case.  *Id*. at 3-4.  In particular, Dr. Dranove has stated that he can use the "difference in difference" method, the same method used in the FTC proceeding by both the government's expert and by ENH's expert, to demonstrate impact and estimate damages.  Under the difference in difference method which Dr. Dranove will use, the percentage change in ENH's prices between the pre- and post- merger periods will be compared to the percent change in prices at a control group of local hospitals during the same period.  If the percentage change at ENH is

higher than the change at the control group by a statistically significant amount, impact can be demonstrated. The same method can then be used to estimate overcharge percentages for class members.[13] *Id.* At 25-30.

Difficulties in determining damages that may result from individual variations are commonplace in antitrust actions and do not generally preclude a predominance finding. "[S]uch complications are to be expected where the other efficiencies of Rule 23 come into play in a private antitrust action, and for that reason courts have generally refused to let the difficulty of damages determinations stand in the way of class certification." *Sulfuric Acid,* 2007 WL 898600, at *6; *accord De La Fuente,* 713 F.2d at 233 ("It is very common for Rule 23(b)(3) class actions to involve differing damage awards for different class members"); *Rohlfing,* 172 F.R.D. at 337 ("The fact that particular individuals may have suffered varying degrees of injury does not overcome [the] general proposition [that antitrust cases should be certified as class actions].

If it is feasible to prove that the plaintiff class has been injured by the defendant's monopoly, then the class may be certified even though individual damage questions remain to be resolved at a later stage of the proceedings. *Arenson v. Whitehall Convalescent and Nursing Home, Inc.,* 164 F.R.D. 659, 666 (N.D. Ill. 1996) ("It is well established . . . [that] the presence of individualized damages does not render the class unsuitable for certification").

The relevant question for the predominance inquiry of the class certification determination is not whether there were variations in price stemming from variations in the product itself or its market; "[t]he relevant question is whether any given price that was charged . . . was higher than it would have been in the absence of the alleged [violation], so that Plaintiffs will succeed so long as they can prove all putative class members suffered an injury and that the

---

[13]   It is possible that the damage estimates will need to be done by insurer because the experts in the FTC proceedings estimated different overcharge percentages for different insurers.

injury resulted from anti-competitive harms to the market as a whole." *Sulfuric Acid,* 2007 WL 898600, at *7. In making this inquiry, the Court should not engage in a "battle of the experts" or "launch into an extensive analysis of the facts or weighing of the merits." *Id.* at *8. "At this point, this Court must simply consider the likelihood that Rule 23 is the most appropriate means of approaching those issues. At the class certification stage, the Court, without trenching on the merits, must consider only whether plaintiffs have made a threshold showing that what proof they will offer will be sufficiently generalized in nature that . . . the class action will provide a tremendous savings of time and effort." *Id.* (citations and quotation marks omitted).

It is important to note that the question for class certification purposes is not whether Plaintiffs' expert's "proposed mechanism [for determining class-wide impact and damages] will ultimately be successful in convincing a fact-finder." *Sulfuric Acid,* 2007 WL 898600, at *8. "[O]n a motion for class certification, the Court only evaluates whether the method by which plaintiffs propose to prove class-wide impact could prove such impact, not whether plaintiffs in fact can prove class-wide impact." *In re Magnetic Audiotape Antitrust Litig.,* 2001 WL 619305, *4 (S.D.N.Y. June 6, 2001).

**ii.    Market Definition Can Be
Proven Through Common Evidence.**

Antitrust law regulates the conduct of market participants within "relevant markets." Regardless of whether Defendant agrees with Plaintiffs as to how the relevant market is defined, either side's view of the *market* will necessarily involve evidence that applies to all players in that market. In other words, the market definition inquiry is necessarily an analysis that is common to all class members, and is addressed by evidence common to all Plaintiffs. *See In re Terazosin Hydrochloride Antitrust Litig.,* 220 F.R.D. 672, 696 (S.D. Fla. 2004); *In re Visa Check/MasterMoney,* 192 F.R.D. 68, 87 (E.D.N.Y. 2000), *aff'd,* 280 F.3d 124 (2nd Cir. 2001),

23

*cert. denied,* 536 U.S. 917 (2002); *Meyers v. Southwestern Bell Tel. Co.,* 181 F.R.D. 499, 505 (W.D. Okla. 1997) .

### iii.    Market Power Can Be Proven Through Common Evidence.

As with market definition, the Defendants' market power can be proven through common evidence, as the inquiry addresses the market, which inherently encompasses all Plaintiffs. *See In re Visa Check/MasterMoney,* 192 F.R.D. at 87 (market power is class-wide issue); *Meyers,* 181 F.R.D. at 505 (issues of market power and relevant market common to all class members).

The question of market power addresses whether the Defendant has the ability to control prices. Evidence of market power includes data regarding the Defendant's market share which gives the seller — here, ENH — market power. Moreover, evidence that Defendant's actions had the intended effect of raising prices is also evidence of sufficient market power.

In this case, substantial evidence was adduced before the FTC demonstrating ENH's market power. Not only did ENH own all of the hospitals within the relevant geographic market, but ENH intended to, and was successful in, raising the prices it received for its services. *See supra* at 6-14.

Thus, the proof that any Plaintiff would use to establish market power would be the same as that offered by any other Plaintiff. Market power can therefore be demonstrated through common proof.

### b.    A Class Action Is Superior To Other Forms Of Adjudication.

In addition to the predominance of common questions, Rule 23(b) (3) requires a finding that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." *See Szabo,* 249 F.3d at 676. Such a conclusion is warranted where damages

24

make it impractical for class members to bring individual suits and where potential plaintiffs may not be aware of their rights or be able to hire competent counsel. *Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 617 (1997).

The "superiority" requirement is readily satisfied in cases such as this where there are members of the Class who are likely to have "relatively small claims making it expensive to seek recovery through individual litigation," and, hence, where a "class action would be the most efficient use of judicial resources in resolving common issues." *In re Neopharm, Inc. Securities Litig.*, 225 F.R.D. at 568. Rule 23(b)(3) provides that matters pertinent to a finding of superiority include: "(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the difficulties likely to be encountered in the management of a class action." Fed. R. Civ. P. 23(b)(3).

In this case, members of the Class do not have an interest in individually controlling the prosecution of separate actions given the complexity of this case and the likely resources that would be engendered by such separate litigation versus the potential recovery. Since the record demonstrates that there are thousands of members of the Class whose identities are readily known from ENH's records, there is no doubt that certifying this litigation as a class action is superior to the alternatives for the fair and efficient adjudication of the causes of action. Such treatment will permit those thousands of payors for hospital-based healthcare services provided by ENH who are similarly situated to the Plaintiffs to have their common claims prosecuted in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would entail. Furthermore, since the identities of the members of

25

the Class are known, there will not be any difficulty with providing individual notice to them of these proceedings. Plaintiffs are unaware of any issues affecting only individual Class members.

This case meets the standards for superiority as outlined in Rule 23(b)(3). Every member of the Class has an interest in proving ENH's common course of conduct as outlined in the Complaint. It would be enormously inefficient — for both the Court and the parties — to engage in multiple trials in individual actions on the same liability issues. *See, e.g., In re Carbon Black Antitrust Litig.,* No. 03-10191, 2005 WL 102966 at *22 (D. Mass. Jan. 18, 2005); *In re NASDAQ Market-Makers Antitrust Litig.,* 169 F.R.D. 493, 527 (S.D.N.Y. 1996); *In re Lorazepam & Clorazepate,* 202 F.R.D. at 31.

In this case, the critical and identical factual issues require substantial discovery, expert testimony and a trial. There is no reason to have these identical issues developed repeatedly in each separate case by individual claimants, even if they could afford to do so. Because it would be economically unreasonable for the class members to adjudicate their separate claims individually, the superiority of a class action is evident.

## **CONCLUSION**

For the reasons stated above, Plaintiffs respectfully request that this Court: (i) certify this case for class treatment pursuant to Fed. R. Civ. P. 23 (b)(3); (ii) appoint Plaintiffs as the representative Plaintiffs of the Class; (iii) appoint Plaintiffs' counsel as counsel for the Class pursuant to Fed. R. Civ. P. 23(g); and (iv) grant such other and further relief as this Court may find just.

Dated:  February 18, 2009             Respectfully submitted,

By:   /s/ Mary Jane Fait
        Mary Jane Fait
        Theodore B. Bell
        John E. Tangren
        **WOLF HALDENSTEIN ADLER**
        **FREEMAN & HERZ LLC**
        55 West Monroe Street, Suite 1111
        Chicago, IL  60603
        Telephone: (312) 984-0000

        Marvin A. Miller
        Matthew E. Van Tine
        Margaret M. Weems
        **MILLER LAW LLC**
        115 South LaSalle Street, Suite 2910
        Chicago, IL  60603
        Telephone:  (312) 332-3400

        ***Interim Co-Lead Counsel for Plaintiffs***

27

<u>**CERTIFICATE OF SERVICE**</u>

       I, John E. Tangren,one of the attorneys for plaintiffs, hereby certify that on February 18, 2009, service of the foregoing document was accomplished by ECF and by email upon the following:

Duane Drobny
ddrobny@winston.com
David Dahlquist
ddahlquist@winston.com
Winston & Strawn
35 W. Wacker Drive
Chicago, Illinois


                                   /s/  John E. Tangren
                                   John E. Tangren

28