# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |
|---|---|
| ) | |
| ) | |
| ) | |
| IN RE: ) | No. 07 CV 4446 |
| EVANSTON NORTHWESTERN ) | |
| HEALTHCARE CORPORATION ) | (consolidated with |
| ANTITRUST LITIGATION ) | No. 07 CV 4523, |
| ) | No. 07 CV 5275, |
| ) | No. 08 CV 2343, and |
| ) | No. 08 CV 2658) |
| ) | |
| ) | Judge Joan H. Lefkow |
| ) | |

## OPINION AND ORDER

Defendant, Evanston Northwestern Healthcare Corporation ("ENH"),[1] merged with

Highland Park Hospital on January 1, 2000. Plaintiffs, Amit Berkowitz, Steven Messner, Henry

Lahmeyer, and Painters District Council No. 30 Health & Welfare Fund ("Painters Fund")

(collectively, "plaintiffs"), filed a consolidated amended class action complaint on November 11,

2008, alleging two alternative counts under Section 2 of the Sherman Act, 15 U.S.C. § 2, for

unlawful monopolization or attempt to monopolize, and one count of unlawful monopolization

under Section 7 of the Clayton Act, 15 U.S.C. § 18. Before the court are plaintiffs' motion for

class certification [#240], plaintiffs' motion to strike the report of Dr. Monica Noether [#317],

and ENH's motion to strike the reply report of Dr. David Dranove [#321]. For the reasons set

forth below, plaintiffs' motion for class certification [#240] is denied. Plaintiffs' motion to

strike [#317] and ENH's motion to strike [#321] are both denied.

---

[1] ENH is now known as NorthShore University HealthSystem.

## FACTUAL BACKGROUND

ENH is a not-for-profit corporation that consists of three hospitals located in the suburbs just north of Chicago: Evanston Hospital, Glenbrook Hospital, and Highland Park Hospital. ENH merged with Highland Park Hospital on January 1, 2000. Since that date, ENH has operated the three hospitals as a single, integrated entity.

## I.      FTC Proceeding

On February 10, 2004, the Federal Trade Commission ("FTC") filed an administrative complaint against ENH, alleging that the merger between ENH and Highland Park Hospital substantially lessened competition and enabled ENH to raise its prices of inpatient services to private payers[2] above the prices that the hospitals would have charged absent the merger, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18. The complaint also alleged that the manner in which ENH contracted for physician services on behalf of its independent physicians constituted unfair methods of competition in violation of Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45.

On October 20, 2005, a FTC Administrative Law Judge ("ALJ") found ENH to be in violation of Section 7 of the Clayton Act and ordered ENH to divest the acquired assets of Highland Park Hospital. On appeal, the full Commission affirmed the ALJ's finding of liability, but reversed the divestiture order. *See In re Evanston Northwestern Healthcare*, No. 9315, 2007 WL 2286196 (F.T.C. Aug. 6, 2007) (order). Instead, the Commission ruled that a conduct remedy (rather than a structural remedy such as divestiture) was appropriate and ordered ENH to establish two separate and independent teams for negotiating contracts with payors – one team for Evanston Hospital and Glenbrook Hospital and another for Highland Park Hospital.

---

[2] In the FTC proceeding, "private payers" was limited to managed care organizations ("MCO") that contracted with ENH during the relevant time period. A MCO is an organization that combines the functions of health insurance, delivery of care, and administration.

## II.    Background to this Proceeding

Plaintiffs are direct purchasers of healthcare services from ENH.  There are four named plaintiffs: (1) Berkowitz, an individual who received outpatient services from ENH; (2) Messner, an individual who received outpatient services from ENH; (3) Lahmeyer, an individual who received outpatient services from ENH; and (4) Painters Fund, a not-for-profit trust established and maintained to provide comprehensive healthcare benefits to participants, including workers employed under various collective bargaining agreements, and to their dependents.   Plaintiffs allege that "[b]y virtue of [the merger] on or about January 1, 2000, ENH acquired monopoly power in the marketing of Healthcare Services in the relevant geographic market and has abused and continues to abuse that power to maintain and enhance its market dominance in the marketing and sale of Healthcare Services by unreasonably restraining trade, thus artificially and anti-competitively raising the price of Healthcare Services sold to Plaintiffs and the Class." Compl. ¶ 43.

Plaintiffs have moved for an order certifying this case as a class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure.  They seek to certify the following class:

> All persons or entities in the United States of America and Puerto Rico, except those who solely paid fixed amount co-pays, uninsureds who did not pay their bill, Medicaid and Traditional Medicare patients, governmental entities, defendant, other providers of healthcare services, and the present and former parents, predecessors, subsidiaries, and affiliates of defendant and other providers of healthcare services, who purchased or paid for inpatient hospital services or hospital-based outpatient services directly from NorthShore University Healthcare (formerly known as Evanston Northwestern Healthcare), its wholly-owned hospitals, predecessors, subsidiaries, or affiliates other than those acquired as a result of the merger with Rush North Shore Medical Center (the "Class") from at least as early as January 1, 2000 (the "Class Period").

*Id.* ¶ 17.

## LEGAL STANDARD

A party seeking to certify a class action must meet two conditions. First, the movant must show the putative class satisfies the four prerequisites of Rule 23(a): (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation. Fed. R. Civ. P. 23(a); *Oshana* v. *Coca-Cola Co.*, 472 F.3d 506, 513 (7th Cir. 2006); *Rosario* v. *Livaditis*, 963 F.2d 1013, 1017 (7th Cir. 1992). Second, the action must qualify under at least one of the three subsections of Rule 23(b). Fed. R. Civ. P. 23(b); *Rosario*, 963 F.2d at 1017; *Hardin* v. *Harshbarger*, 814 F. Supp. 703, 706 (N.D. Ill. 1993). Here, plaintiffs seek certification under Rule 23(b)(3), which requires a finding that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3).

Courts retain broad discretion in determining whether a proposed class meets the Rule 23 certification requirements. *Keele* v. *Wexler*, 149 F.3d 589, 592 (7th Cir. 1998). While the requirements of Rule 23 should be liberally construed to support the policy favoring the maintenance of class actions, *King* v. *Kansas City S. Indus.*, 519 F.2d 20, 25-26 (7th Cir. 1975), the moving party bears the burden of showing that the requirements for class certification have been met. *Hardin*, 814 F. Supp. at 706.

## ANALYSIS

The parties agree that plaintiffs have satisfied the requirements of numerosity and commonality.[3] They disagree, however, as to the remaining requirements of typicality, adequacy

---

[3] ENH does not agree that plaintiffs have established commonality but states that "whether Plaintiffs can establish commonality is not important because they cannot meet the higher standard of predominance." Def.'s Resp. at 11 n.4. As defendant does not offer any argument disputing commonality, the court finds plaintiffs have satisfied their burden with respect to this requirement. *See Vaughn* v. *King*, 167 F.3d 347, 354 (7th Cir. 1999) ("It is not the responsibility of this court to make arguments for the parties.")

of representation, predominance, and superiority. ENH argues that plaintiffs fail to establish each of the four remaining requirements and, as a result, that plaintiffs' motion for class certification must be denied.

## I.      Rule 23(a) Requirements

### A.      Typicality

To meet the typicality requirement, the named plaintiffs' claims or defenses must be typical of the class. Fed. R. Civ. P. 23(a)(3); *Keele*, 149 F.3d at 594. The typicality requirement focuses on the class representatives; indeed, "[a] plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory." *Keele*, 149 F.3d at 595 (citations omitted) (internal quotation marks omitted); *De La Fuente* v. *Stokely-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983) (citations omitted) (internal quotation marks omitted). "Typical does not mean identical, and the typicality requirement is liberally construed." *Gaspar* v. *Linvatec Corp.*, 167 F.R.D. 51, 57 (N.D. Ill. 1996). Factual distinctions between the named plaintiffs' claims and those of other class members do not necessarily undermine typicality. *De La Fuente*, 713 F.2d at 232; *Owner-Operator Indep. Ass'n, Inc.* v. *Allied Van Lines, Inc.*, 231 F.R.D. 280, 282 (N.D. Ill. 2005) (stating that the typicality requirement presents a "low hurdle . . . , which requires neither complete coextensivity or even substantial identity of claims.").

Plaintiffs argue that they have satisfied the requirement of typicality because the claims of the named plaintiffs arise from the same conduct – "ENH's common practice or course of conduct in charging inflated prices to various MCOs and their insureds for medical services" – and are based on the same legal theories – antitrust violations – as the claims of all class members. Pls.' Reply at 28.

ENH offers several arguments in response. First, ENH argues that plaintiffs cannot demonstrate typicality because none of the named plaintiffs is a MCO or "remotely resemble[s]" a MCO. Def.'s Resp. at 38. ENH notes that while MCOs engage in sophisticated contract negotiations to generate prices, none of the named plaintiffs participated in any pricing negotiations. As a result, ENH argues, the named plaintiffs do not have claims that are typical of those of any MCO. For support, ENH relies on *In re Graphics Processing*, 253 F.R.D. 478, 490 (N.D. Cal. 2008), an antitrust case involving a proposed class of individuals and wholesalers that purchased computer graphics products at allegedly inflated prices. Because each named plaintiff was an individual purchaser (and none was a wholesaler), the court found their claims to be atypical of the class. *Id.* ("[W]holesale purchasers [] came to the negotiating table in a fundamentally different position than the representative plaintiffs."). Indeed, while the individuals in *Graphics Processing* paid retail prices and the terms of their purchases were not negotiable, the wholesalers purchased products at a variety of prices on individually-negotiated terms. *Id.* at 489. As a result, the proof needed to establish the individuals' claims differed from the proof required for the wholesalers' claims. *See id.* at 490.

Plaintiffs argue that *Graphics Processing* is distinguishable from the case at bar because here, the named plaintiffs' claims are derivative of the MCO's claims because the prices charged to the named plaintiffs were determined by the pricing structures negotiated by the MCOs, whereas in *Graphics Processing*, the claims of (and prices charged to) the individual purchasers were entirely independent of the claims of (and prices charged to) the wholesalers. The court agrees. Unlike the circumstances in *Graphics Processing*, here, the named plaintiffs' claims are based on the same course of conduct as the claims of the MCOs. That is, the proof needed to establish the named plaintiffs' claims is the same proof needed to establish their MCO's claims.

For example, to prove that Painters Fund, a self-insured entity, paid an anti-competitive price for a given service, plaintiffs must prove that Blue Cross Blue Shield of Illinois ("BCBSI"), the MCO that passed on its negotiated rates to Painters Fund, was charged that same anti-competitive price.[4]  The fact that none of the named plaintiffs is a MCO does not, therefore, demonstrate that plaintiffs failed to establish typicality, as the MCOs and the named plaintiffs seek to hold ENH liable for the same allegedly inflated prices.

Second, ENH argues that the typicality requirement is not satisfied because self-insured entities do not have a legitimate named representative.  Although Painters Fund is a self-insured entity, ENH argues that its claims "cannot be typical of any member of the proposed class because it has no claim."  Def.'s Resp. at 38.  To support its argument that Painters Fund has no claim, it relies on a declaration of Joseph Arango, a BCBSI executive, stating that "[f]rom 1990 to the present, BCBSI paid [ENH] . . . fair and reasonable prices for health care services," that "BCBSI did not pay artificially inflated prices," and finally that "BCBSI declines to be included as a class member in any class that may be certified."  Arango Decl. at ¶¶ 1, 2, and 4.  Because Painters Fund's claim is derivative of BCBSI's, and because the Arango declaration states that BCBSI did not pay anti-competitive prices, ENH argues that Painter's Fund's claims are without merit and therefore cannot be typical of the class.

The issue of typicality requires the court to determine whether the named plaintiffs' claims are typical of those of the class, not whether their claims will ultimately be meritorious.  *See Loeb Indus., Inc.* v. *Sumitomo Corp.*, 306 F.3d 469, 480 (7th Cir. 2002) ("[A] court may not refuse to certify a class on the ground that it thinks the class will eventually lose on the merits.").  Accordingly, the court cannot say with certainty that BCBSI did not suffer injury, as it will not consider the Arango declaration to be conclusive evidence of this fact at this time.

---

[4] *See infra* at 30 for a discussion of the structure of a contract between a MCO and a self-insured entity.

Moreover, the Arango declaration does not indicate that Painters Fund's claims are atypical of claims of other self-insured entities within the proposed class. As a result, ENH's second argument is unavailing.

Finally, ENH argues that plaintiffs cannot demonstrate typicality because the named plaintiffs do not share "essential characteristics" of the proposed class, as proof of their claims would not prove the claims of any other class member. *See Retired Chi. Police Ass'n* v. *City of Chi.*, 7 F.3d 584, 596-97 (7th Cir. 1993). "For example, if Plaintiff Messner proved that he was overcharged for one visit under his Unicare plan, it would not prove that Plaintiff Lahmeyer was overcharged for any visits while he was covered by Cigna." Def.'s Resp. at 39.[5] ENH then, for the second time, analogizes this case to *Graphics Processing*, arguing that the "overwhelming disparities" separating named plaintiffs (individual patients) from MCOs and self-insured entities also demonstrate that their claims do not share the same "essential characteristics." *See Graphics Processing*, 253 F.R.D. at 490. They highlight the fact that of ENH's 6,200 outpatient services, Berkowitz received four, Messner received six, and Lahmeyer received five.[6]

Whether the named plaintiffs' claims have the same "essential characteristics" as the claims of other class members depends on whether all such claims arise from the same course of conduct and are based on the same legal theories. *See Retired Chi. Police Ass'n*, 7 F.3d at 569-97. Here, all class members' claims involve allegations that ENH charged anti-competitive prices for healthcare services. The fact that the named plaintiffs did not receive the same

---

[5] As discussed *supra*, the proof required to establish the named plaintiffs' claims will also serve to establish the claims of other class members. In other words, the proof required to establish that Messner was overcharged may not prove that another named plaintiff was overcharged, but it would prove that Unicare, the MCO through which he received healthcare coverage and a class member, was overcharged.

[6] Defendant further argues that "[t]he prices that [named] Plaintiffs paid to ENH depend on too many individualized facts to even determine if there was impact," including list prices of services, whether the service was covered by an individual's health plan, whether an individual carried coinsurance or was subject to a co-pay, an out-of-pocket maximum, or an annual deductible limit, or whether ENH improved quality of care for that service during the class period. Def.'s Resp. at 39. This is an argument pertaining to the requirement of predominance; the court will not consider it within the context of typicality.

services as all other class members does not render their claims atypical. Rather, all of the claims and allegations involve an evaluation of ENH pricing and arise from an alleged course of conduct in charging anti-competitive prices. The fact that a class member may have a claim concerning a service that no named plaintiff received, therefore, does not indicate a lack of typicality. *See Elias* v. *Ungar's Food Prods., Inc.*, 252 F.R.D. 233, 243-44 (D.N.J. 2008) (holding that claims of named plaintiffs were typical though they bought three of the five products included in the class definition).

For these reasons, the court finds that the claims of the named plaintiffs are typical of the claims of the proposed class.

### B.     Adequacy of Representation

To meet Rule 23's adequacy of representation requirement, "the representative must be able to 'fairly and adequately protect the interests of the class.'" *Keele*, 149 F.3d at 594 (quoting Fed. R. Civ. P. 23(a)(4)). Under Rule 23(a)(4), the adequacy determination has "two parts: 'the adequacy of the named plaintiff's counsel, and the adequacy of representation provided in protecting the different, separate, and distinct interest' of the class members." *Retired Chi. Police Ass'n*, 7 F.3d at 598 (quoting *Sec'y of Labor* v. *Fitzsimmons*, 805 F.2d 682, 697 (7th Cir. 1986) (en banc)). "A class is not fairly and adequately represented if class members have antagonistic or conflicting claims." *Rosario*, 963 F.2d at 1018 (internal citation omitted).

ENH does not contest that plaintiffs' counsel is adequate. ENH argues, however, that the named plaintiffs are not adequate representatives of the putative class because (1) Painters Fund cannot be a class representative; (2) the individual named plaintiffs cannot represent any class of inpatient claims; and (3) irreconcilable conflicts of interest exist within the proposed class.

First, ENH argues that Painters Fund "simply has no claim relating to the merger and cannot represent the proposed class [because] . . . . the Painters Fund health insurance plan contracted through Blue Cross."  Def.'s Resp. at 26; *see Robinson* v. *Sheriff of Cook County*, 167 F.3d 1155, 1157 (7th Cir. 1999) ("If when class certification is sought it is already apparent . . . that the class representative's claim is extremely weak, this is an independent reason to doubt the adequacy of his representation.").  As discussed *supra*, the question of whether BCBSI and, by association, Painters Fund, suffered injury is left undecided.  It is not clear, however, that BCBSI did *not* suffer injury such that the court should doubt the ability of Painters Fund to provide adequate representation.

Second, ENH argues that "[o]nce Painters Fund is set aside, Plaintiffs lack a class representative not only for any entities that are not individual patients (including self-insured), but also for any claims related to inpatient services."  Def.'s Resp. at 28.  Because the court will not disqualify Painters Fund as a class representative, and further because Painters Fund offered an insurance plan covering inpatient and outpatient services, however, ENH's argument is moot.

Finally, ENH argues that "several" inconsistencies between the interests of the named plaintiffs and the members of the proposed class render the named plaintiffs inadequate representatives.  Def.'s Resp. at 28.  First, ENH states that the claims of the named plaintiffs are antagonistic to those of individuals who received services that improved in quality as a result of the merger.  It argues that these individuals suffered no antitrust impact because they actually benefitted from the merger.  Due to the fact that some putative class members benefitted and some were harmed by the merger, ENH argues, the claims of the proposed class members necessarily conflict and prohibit this court from certifying the proposed class.  ENH relies on several cases, all of which stand for the proposition that class certification is inappropriate where

10

some class members derived benefit from the allegedly wrongful conduct. *See, e.g.*, *Bieneman* v. *City of Chi.*, 864 F.2d 463, 465 (7th Cir. 1988) (affirming denial of class certification in airport noise case where some putative class members "undoubtedly" benefitted from increased airport traffic in the form of increased land value and business opportunities). Plaintiffs agree that case law prohibits certification where class members were both helped and harmed by the relevant conduct, however, they argue that here, ENH cannot demonstrate that any class members, even those who received services of higher quality, benefitted from the merger. They argue that the improvement in the quality of services was not the result of the merger but, rather, due to other, non-merger-specific factors. As support, plaintiffs rely on the FTC's finding that "the quality improvements asserted by ENH are not properly credited as benefits of the merger because Highland Park could, and likely would, have made similar improvements without a merger." *In re Evanston Northwestern Healthcare*, 2007 WL 2286196, at *38.

At the class certification stage, it is plaintiffs' burden to come forward with evidence to demonstrate that all requirements for class certification are satisfied. *Oshana*, 472 F.3d at 513; *Retired Chi. Police Ass'n*, 7 F.3d at 596. Here, plaintiffs have met their burden. While the FTC's finding is not binding on this court, it is strong evidence that increases in the quality of services at ENH were not a consequence of the merger. Because ENH proffered no evidence to dispute or discredit this finding, the court is satisfied that the interests of the putative class members who received services of increased quality after the merger will not conflict with the interests of those individuals who paid higher prices for services of pre-merger quality. Further, even if the increase in quality for some services was attributable to the merger, it is not clear that this fact would put the interests of putative class members into conflict. Unlike *Bieneman*, where some putative class members "undoubtedly" benefited from the alleged wrongful conduct

11

such that they likely would have opposed the class action, here, the court is not convinced that class members who received services of increased quality due to the merger would oppose the instant action. *See Bieneman*, 864 F.2d at 465.

Finally, ENH states that the named plaintiffs' interests will likely conflict with those of the MCOs covered by the class definition because of the "inherent conflict of interest between insurer and insured." Def.'s Resp. at 30-31 ("Wherever there is cost-sharing among purported class members, there will be conflict."). ENH states that this conflict will emerge at the damages allocation stage of the litigation, as each party will want to demonstrate that it bore the brunt of the overcharge. As a final point, it highlights the difference between MCOs – "sophisticated businesses motivated by generating profits" – and typical patients – "more motivated by receiving quality health care" – and argues that these differences defeat adequacy. *Id.* at 31. Plaintiffs argue that this alleged conflict is an insufficient reason to deny certification because it pertains to the allocation of damages, an issue that is not proper to consider at the class certification stage. *See Kohen* v. *Pac. Inv. Mgmt. Co.*, 244 F.R.D. 469, 476 (N.D. Ill. 2007), *aff'd*, 571 F.3d at 677 ("Inquiry into matters of damage is not ordinarily made at the class certification stage."); *Katz* v. *Comdisco, Inc.*, 117 F.R.D. 403, 412 (N.D. Ill. 1987) ("Traditionally . . . the courts have not allowed individual questions of damages to prevent class certification.").

The legal principles cited by plaintiffs are not specific to the adequacy requirement. Nonetheless, the court agrees that because a conflict between insurers and insured individuals will arise (if at all) at the damages allocation stage, it does not preclude a finding of adequacy. The adequacy requirement evaluates whether the claims and interests of the named plaintiffs conflict with the claims and interests of other putative class members. *See Rosario*, 963 F.2d at

1018. Though insurers and insured individuals may disagree as to the calculation of damages, their respective claims and interests are exactly aligned. Both insurers and insured individuals seek to hold ENH liable under the same antitrust laws for charging the same anti-competitive prices for the same healthcare services. Moreover, the relationship between insurer and insured is governed by contract – whatever disagreement the parties may have over damage allocation can be resolved with reference to the relevant contractual provisions.

For the reasons discussed above and because the court finds plaintiffs' counsel to be adequate, plaintiffs have satisfied the adequacy of representation requirement.

## II.      Rule 23(b)(3) Requirements

Rule 23(b)(3) provides that a class can be maintained if "questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and . . . a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). To determine whether predominance and superiority are satisfied, courts examine "the substantive elements of plaintiffs' claims, the proof necessary for those elements, and the manageability of trial on those issues." *Reed* v. *Advocate Health Care*, No. 06-c-3337, 2009 WL 3146999, at *4 (N.D. Ill. Sept. 28, 2009) (citing *Simer* v. *Rios*, 661 F.2d 655, 672-73 (7th Cir. 1981)).

### A.      Predominance

"Although related to Rule 23(a)'s commonality requirement, 'the predominance inquiry is far more demanding . . .' To satisfy this aspect of Rule 23(b)(3), 'the plaintiff must show that common issues not only exist but outweigh the individual questions. The common questions must be central to all claims.'" *Pavone* v. *Aegis Lending Corp.*, No. 05-c-1529, 2006 WL 2536632, at *4 (N.D. Ill. Aug. 31, 2006) (citing, *inter alia*, *Amchem Prods., Inc.* v. *Windsor*,

13

521 U.S. 591, 623-24, 117 S. Ct. 2231, 2250, 138 L. Ed. 2d 689 (1997)).  Indeed, "[i]f proof of

the essential elements of the cause of action requires individual treatment, then class certification

is unsuitable."  *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 311 (3d Cir. 2008)

(citing *Newton* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 172 (3d Cir.

2001)).

      To prevail on each of their claims, plaintiffs must prove (1) a violation of antitrust law;

(2) individual injury, or impact, caused by that violation; and (3) measurable damages.  *Reed*,

2009 WL 3146999, at *5 (citing *Hydrogen Peroxide*, 552 F.3d at 311; *Cordes & Co. Fin. Servs.,

Inc.* v. *A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 105 (2d Cir. 2007)).  For class certification,

plaintiffs need only show that common proof will predominate with respect to each element of

their claims.  *Id.*  Each party advances several arguments with respect to the predominance

requirement.  These arguments focus on whether plaintiffs can prove with common evidence two

elements of their antitrust claims: (1) a violation of antitrust law and (2) impact.

### 1.      Violation of Antitrust Law

      ENH argues that plaintiffs cannot establish a violation of antitrust law with common

evidence because individualized issues predominate with respect to the applicability of (1) the

alternative dispute resolution ("ADR") provisions contained in the insurance contracts of several

putative class members and (2) ENH's statute of limitations defense.

### a.      Alternative Dispute Resolution Provisions

      ENH first argues that plaintiffs cannot establish predominance because "nearly all" of the

MCOs within the proposed class have ADR provisions in their contracts with ENH, the

applicability of which requires individualized analysis.  Def.'s Resp. at 24 ("The individual

issues implicated by determining the extent to which each purported MCO class member has a

claim that is arbitrable predominates over any common issues."). Specifically, ENH argues that the presence of materially different contract provisions (such as dispute resolution provisions) across class members defeats a finding of predominance, relying on *Christie Clinic* for this proposition. *See Christie Clinic, P.C.* v. *MultiPlan, Inc.*, No. 08-c-2065, 2009 WL 175030, at *11 (C.D. Ill. Jan. 26, 2009) ("This court concludes that Defendants have conclusively shown that the contracts between [defendants] and the proposed class members are materially different from the contract between [defendants] and [named] Plaintiff. Therefore, . . . the issues common to the class members do not predominate.").

Plaintiffs argue that the enforceability of the ADR provisions is an issue of fact and law common to the class and therefore that the presence of such provisions does not defeat a finding of predominance. They also argue that ENH's reliance on *Christie Clinic* is unavailing, as the ADR provisions here are not materially different, but materially the same. Finally, they rely on this court's decision to reserve ruling on arbitrability until after the class certification decision as evidence that the issue of arbitrability does not threaten to predominate over common issues in this matter.

Whether the ADR provisions are enforceable is an issue common to all MCOs that have such provisions in their contracts. Further, it is an issue that can be resolved with the same evidence for every affected MCO. Indeed, in its motion to compel arbitration, ENH moved to compel arbitration for *all* MCOs. It did not make individualized arguments regarding any MCO or specific contract; rather, it stated that "[t]hough the specific language may vary, in general, the arbitration clauses cover all controversies, disputes, or claims 'arising out of or relating to' the private payor's agreement with ENH. . . . . In substance, *all* contemplate the arbitration of the type of claims in this suit." Def.'s Mot. to Compel Arb. at 4. This statement undermines ENH's

reliance on *Christie Clinic*, which found a lack of predominance where individual class members had materially *different* contracts. *See Christie Clinic*, 2009 WL 175030, at *11.

In fact, *Christie Clinic* helps to illustrate why the presence of these ADR provisions do not undermine predominance. *Christie Clinic* involved, in relevant part, a breach of contract claim. The proposed class was comprised of individuals who each had a different contract with the defendant and, as a result, the court found that individual issues with respect to their claims predominated. Here, by contrast, the viability of plaintiffs' claims do not rest on specific (or different) contractual provisions. Rather, the viability of plaintiffs' claims (and the issues underlying those claims) is entirely separate from the contractual ADR provisions at issue.

Because the applicability of the ADR provisions is an issue divorced from plaintiff's substantive claims and can be determined for all affected potential class members with common evidence, the court finds that the possible arbitration of some class members claims does not destroy predominance in the case at bar. *See Lerner* v. *Haimsohn*, 126 F.R.D. 64, 66 (D. Colo. 1989) ("[T]he possible arbitration of some class members claims will not, by itself, defeat class certification."); *Shankroff* v. *Advest, Inc.*, 112 F.R.D. 190, 194 (S.D.N.Y 1986) (same).

### b.      Statute of Limitations

ENH next argues that an evaluation of its statute of limitations defense will require individualized, claim-by-claim analysis and that, as a result, individual issues predominate in the instant case. It states that "Rule 23(b)(3) prohibits certification in cases where individual statute of limitations determinations are required," Def.'s Resp. at 31, relying on *Broussard* for support. *See Broussard* v. *Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331(4th Cir. 1998). In *Broussard*, the Fourth Circuit held that "when the defendant's 'affirmative defenses (such as . . . the statute of limitations) may depend on facts peculiar to each plaintiff's case,' class

certification is erroneous." *Id.* at 342 (quoting *In re N. Dist. of Cal. Dalkon Shield IUD Prods. Liab. Litig.*, 693 F.2d 847, 853 (9th Cir. 1982)).[6] Plaintiffs, by contrast, argue that ENH's statute of limitations defense does not automatically prohibit class certification. They rely on *Waste Mgmt. Holdings, Inc.* v. *Mowbray*, 208 F.3d 288, 296 (1st Cir. 2000), which rejected the Fourth Circuit's holding in *Broussard*, stating that "to the extent that [*Broussard*] purports to establish a per se rule, [the holding] contradicts the weight of authority and ignores the essence of the predominance inquiry." *Id.* They further argue that, contrary to ENH's assertion, an evaluation of its statute of limitations defense involves a determination of several issues of fact and law common to the class.

Though the Seventh Circuit has not opined on the issue, the First Circuit, in *Waste Mgmt. Holdings*, held that individualized statute of limitations determinations do not automatically preclude class certification:

> [T]he mere fact that such concerns may arise and may affect different class members differently does not compel a finding that individual issues predominate over common ones. As long as a sufficient constellation of issues binds class members together, variations in the sources and application of statutes of limitations will not automatically foreclose class certification under Rule 23(b)(3).

*Id.* at 296; *see also In re Linerboard Antitrust Litig.*, 305 F.3d 145, 162 (3d Cir. 2002) ("Challenges based on the statutes of limitations . . . have usually been rejected and will not bar predominance satisfaction because those issues go to the right of a class member to recover, in contrast to underlying common issues of the defendant's liability."). The Northern District of Illinois has also adopted this reasoning. *See Saltzman* v. *Pella Corp.*, 257 F.R.D. 471, 486 (N.D.

---

[6] ENH also argues that "[e]ven if the Court entertains such individualized evidence, the record will show that no MCO or self- or fully-insured entity has an actionable claim. Moreover, none of the Named Plaintiffs have a claim." Def.'s Resp. at 31. This argument conflates the issue of whether common issues predominate the merits decision with the merits decision itself. *See Loeb Indus., Inc.*, 306 F.3d at 480; *Hydrogen Peroxide Antitrust Litig.*, 552 F.3d at 311-12. Accordingly, the court will not consider either party's arguments with respect to the merits of ENH's statute of limitations defense.

Ill. 2009) ("[T]his Court has rejected the per se prohibition against certification based upon statute of limitations differences . . . .") (citing *Sparano* v. *Southland Corp.*, No. 94-c-2098, 1996 WL 681273, at *4 (N.D. Ill. Nov. 21, 1996) ("[T]he presence of unresolved individual issues of compliance with the statute of limitations does not prevent class actions from proceeding.") (citation omitted)).

In light of this case law and because an examination of the parties' respective arguments indicates that common issues (supported by common evidence) underlie a determination of the applicability of ENH's statute of limitations defense, the presence of ENH's statute of limitations defense does not defeat a finding of predominance. ENH's primary argument in support of its defense is that plaintiffs' claims accrued as a matter of law on January 1, 2000, the date on which the merger was finalized, more than four years before plaintiffs filed this suit. It argues that all putative class members had knowledge – actual, imputed or constructive – of the merger either on or before that date. Specifically, it argues that (1) MCOs, self-insured, and fully-insured entities had actual knowledge because ENH sent letters to these organizations announcing the merger; (2) the entities' knowledge is imputed to all insured individual class members under principles of agency law; and (3) all class members had constructive notice of the merger as a result of its large amount of coverage in the media. In response, plaintiffs argue that (1) ENH engaged in a continuing violation of antitrust law such that the statute of limitations begins to run anew with each injury; (2) there are only three dates on which individual plaintiffs could have learned of their injury and all three are within the statute of limitations period; and (3) ENH engaged in fraudulent concealment such that the statute of limitations should be tolled.

Underlying these arguments are issues of fact and law common to all class members. These common issues include (1) whether the statute of limitations was triggered by knowledge of the merger or at some other time; (2) whether ENH engaged in a continuing violation of antitrust law; (3) whether the letters sent from ENH to various entities put them on notice of the merger; (4) whether such letters provide evidence of fraudulent concealment; (5) whether the knowledge of a MCO, self-insured entity, or fully-insured entity can be imputed to insured individuals under the principles of agency law.

Despite the presence of these common issues, ENH argues that an individual class member would have to resort to highly individualized evidence to challenge any of its arguments and that, as a result, individual issues predominate. For example, to challenge ENH's contention that a MCO's knowledge is imputed to its insured customers, a customer would have to present "highly-individualized evidence – e.g., evidence concerning the scope of a particular agent's duties to its principal." Def.'s. Resp. at 35. This argument is unsound. The applicability of the statute of limitations will turn on the resolution of the above-described common issues and will not likely be affected by any such (highly unlikely) individualized evidence.

## 2. Antitrust Impact and Damages

The Third Circuit recently articulated the standards for the element of antitrust impact and the requirements imposed on plaintiffs at the class certification stage of litigation:

> [I]ndividual injury (also known as antitrust impact) is an element of the cause of action; to prevail on the merits, every class member must prove at least some antitrust impact resulting from the alleged violation. In antitrust cases, impact often is critically important for the purpose of evaluating Rule 23(b)(3)'s predominance requirement because it is an element of the claim that may call for individual, as opposed to common, proof. Plaintiffs' burden at the class certification stage is not to prove the element of antitrust impact, . . . [rather, it] is to demonstrate that the element of antitrust impact is capable of common proof at trial through evidence that is common to the class rather than individual to its members.

*Hydrogen Peroxide*, 552 F.3d at 311-12. "[W]here [impact] cannot be established for every class member through proof common to the class, the need to establish antitrust liability for individual class members defeats Rule 23(b)(3) predominance." *Bell Atl. Corp.* v. *AT&T Corp.*, 339 F.3d 294, 302 (5th Cir. 2003).

Here, with respect to the issue of impact, the parties have presented competing opinions of expert economists. Plaintiffs have submitted two reports prepared by Dr. David Dranove, Ph.D., a health industry management professor at Northwestern University's Kellogg School of Management. Dranove concludes that the Difference-in-Difference ("DID") methodology can demonstrate impact on a classwide basis, and plaintiffs rely on his conclusion to support their position that common issues predominate the impact analysis.

ENH's expert is Dr. Monica Noether, an executive vice president at Charles River Associates International, a consulting firm that offers economic, financial, and business expertise. Noether disagrees with Dranove's conclusion. ENH relies on her report to support its arguments that plaintiffs cannot prove classwide impact because (1) the proposed class includes several members who were not impacted at all; (2) Dranove's method impermissibly relies on averages; and (3) Dranove's method relies on an invalid control group.[7]

Before evaluating plaintiffs' proposed method for proving classwide impact, the court will summarize the contents of the three expert reports as well as the expert testimony given during oral argument, which took place on February 23, 2010.

---

[7] In its response, ENH also argues that plaintiffs' proposed method for demonstrating impact does not satisfy the "rigorous analysis" requirement of Rule 23(b)(3). It argues that Dranove's report contained mere promises to perform an analysis. *See* Def.'s Resp. at 20-24. In his reply report, however, Dranove does perform his own analysis. In ENH's motion to strike Dranove's reply report or in the alternative, to file a sur-response, ENH requested that his new analysis be stricken, as it was presented for the first time on reply. The court denied the motion, but held oral arguments to allow ENH to respond to the new analysis. Accordingly, ENH's arguments regarding Dranove's failure to perform an analysis are moot.

### a. First Dranove Report

Dranove opines that DID regression analysis provides a reliable method of proving classwide impact. DID regression "examines the change in an outcome of interest for a group of individuals or firms affected by an event such as a merger (the 'treatment' group) while controlling for the contemporaneous change in outcome for an otherwise similar group that was not affected by that event (the 'control' group)." Expert Report of David Dranove, Feb. 12, 2009, at 23 (hereinafter "Dranove Rep."). DID analysis has two steps: (1) compute the difference in the outcome before and after the event for both the control and treatment groups; and (2) compute the difference between the differences across the two groups (the "DID estimate"). A researcher will also often include additional control variables to account for other factors that may affect the outcome. The DID estimate indicates whether there is any additional difference in the outcome for the treatment group beyond what occurred for the control group.

Dranove indicates that he will perform DID analysis for each insurer that contracted with ENH during the relevant time. He explains that here, the "outcome" is the price of healthcare services, the treatment group is the three ENH hospitals, and the control group is a set of hospitals that did not merge during the relevant time period but that are otherwise similar to ENH. He also explains that he will implement additional control variables to account for, *inter alia*, changes in patient medical conditions and in hospital characteristics (*i.e.* teaching status). The DID estimates will represent the increase (if any) in the price of healthcare for the average ENH patient covered by a given insurer. Dranove refers to this estimate as the amount of "overcharge." He acknowledges that, in theory, an increase in average price charged an insurer does not imply that all patients covered by that insurer paid higher prices for healthcare services; he states, however, that the nature of contracting between ENH and insurers allows for this

conclusion. Indeed, his review of the healthcare industry and of the structure and nature of contracts between insurers and hospitals shows that "if [ENH] overcharged an insurer by a certain percentage, all or substantially all class members covered by that insurer will be overcharged by approximately the same percentage. This is equally true across all types of fully and self-funded plan sponsors covered by an insurer, and it also applies to those uninsured who paid their hospital charges in full or approximately in full." *Id.* at 2.

## I.  Pricing Methodologies Used in ENH Contracts

Dranove first reviews the three pricing methodologies used by ENH to charge for inpatient care, outpatient care, and uninsured individuals. He then describes how each set of methodologies allows for a finding of common impact from increases in average prices.

### A.  Inpatient Services

ENH implements three pricing methodologies within its contracts for inpatient services: (1) case rate pricing, (2) per diem pricing, and (3) discount-off pricing. Case rate pricing calculates the price of services by using the Diagnosis Related Group ("DRG"), which is both a descriptor of and a numerical value assigned to a patient admission. Computer software assigns patients to DRGs based on diagnosis, comorbidities, age, applicable procedure(s), and discharge status.[8] For each contract, there are also "relative value weights" assigned to each DRG, which measure the cost of treating a particular patient relative to the cost of an average patient within that DRG nationwide. An average value weight is 1, and values range from .15 to 23.67. Each patient who is admitted to a hospital is assigned to a DRG and is assigned a relative value weight. The DRG value and the relative value weight are multiplied to generate the "DRG

---

[8] For example, DRG 135 represents "Cardiac Congenital & Valvular Disorders Age > 17 [With complicating Condition];" DRG 136 represents "Cardiac Congenital & Valvular Disorders Age > 17 [Without complicating Condition];" and DRG 137 represents "Cardiac Congenital & Valvular Disorders Age 0-17." Dranove Rep. at 29 n.73.

weight" for that admission.  To derive the price of an admission, a patient's DRG weight is multiplied by a base rate, which is determined during contract negotiations.  Case rate prices are therefore a function of two variables: (1) DRG weight and (2) an insurer's negotiated base rate.

Dranove states that as a consequence of this pricing structure, any negotiated price increase takes the form of an increase in the base rate because DRG weights do not fluctuate.  He states that it is possible to determine the increase in the base rate charged an insurer by looking at the overall increase in average payments from that insurer.  If DID analysis demonstrates that the base rate charged an insurer increased at a statistically significant rate (compared to increases in base rates at control hospitals), Dranove states that this will allow for a conclusion that prices for all or substantially all patients covered by that insurer increased by a significant amount. Dranove therefore concludes that the DID method is able to determine, for case rate contracts, whether an insurer and all of its customers were commonly impacted by price increases.

Per diem pricing requires patients to pay a fixed price for each day spent in the hospital. Prices are therefore a function of the length of a patient's stay.  Some per diem contracts specify a uniform per diem rate applicable to all inpatient care, while some specify different rates based on the kind of inpatient admission.  Because of this pricing structure, Dranove concludes that an increase in per diem rates charged an insurer will result in a common percentage increase in the price of services for all patients covered by that insurer.  He will calculate whether per diem rates increased for an insurer by examining the overall increase in average payments from that insurer.  If DID analysis demonstrates that an increase in an insurer's per diem rates was statistically significant, Dranove concludes that this will prove common impact across all or substantially all individuals covered by that insurer.

Discount-off pricing calculates price by taking a fixed percentage discount from a service's list price.[9]  Price increases can take several forms; the two most common are a decrease in the negotiated discount and an across-the-board increase in list prices.[10]  Dranove concludes that common impact is inherent in this pricing structure because if list prices increase by a certain percentage, the price charged each patient will increase by that same percentage. Similarly, if an insurer's discount rate decreases by a certain percentage, each patient covered by that insurer will pay the same increased price for services across the board.  Dranove notes that he will be able to determine whether such price increases occurred for an insurer by looking at the overall increase in average payments from that insurer.  If DID analysis indicates that average payments from an insurer increased by a statistically significant amount, Dranove concludes that this will prove common impact – that all patients covered by that insurer were impacted by the price increase.

### B.     Outpatient Services

The most common methodology used for outpatient care contracts is discount-off pricing, which is described above.  According to Dranove, common impact is inherent in this system because if list prices increase or an insurer's discount rate decreases, prices for all patients covered by that insurer will increase by the same percentage.  Dranove will rely on DID analysis to determine if there is a statistically significant increase in payments for outpatient services.

---

[9] Hospitals refer to their price lists as chargemasters.
[10] There is no meaningful mathematical distinction between a decrease in discount and an increase in price.

24

### C.    Uninsured Individuals

Uninsured patients are typically billed at full list prices.[11]  Dranove will perform DID analysis on actual payments by the uninsured to determine whether these patients paid statistically significant higher prices.  Because he believes that common impact is inherent for all discount-off contracts, he states that he can demonstrate common impact across uninsured individuals, whom he treats as using a discount-off pricing system in which the discount is zero.

### ii.    Potential Variations in Pricing Methodologies

Dranove acknowledges that some of ENH's contracts may contain variations of the above-described pricing methodologies.  He specifically considers "whether a departure from the most basic forms of implementation could reasonably undermine [his] finding of common impact.  For example, it is possible that a lack of common impact would result from [ENH's] raising prices for one set of inpatient services but not another."  *Id.* at 33.  Dranove concludes that such disparate effects will not likely pose a problem because (1) ENH most commonly adopts payment rules across the board, and rules apply to all or nearly all inpatient and outpatient services; (2) research shows that hospitals do not limit their exercise of market power to certain inpatient services or ailments; and (3) DID analysis can be adjusted to calculate damages at a contract-specific level and can include "dummy variables" to control for these adjustments.

Dranove first considers the possibility that ENH increased list prices for different services at substantially different rates, which would affect his analysis of discount-off contracts.  If this occurred,[12] he concludes that ENH's exercise of market power would still have a common

---

[11] In many cases, uninsured individuals do not pay their hospital bills.  These individuals are excluded from the class definition.  Dranove believes that those who do pay (in full or approximately in full) can be "readily identified by data that either are or are likely to be available."  *Id.* at 25.

[12] To determine whether ENH increased list prices in its chargemaster at substantially different rates for different services, Dranove indicated that he would need to perform "a review of [ENH]'s strategic documents, contracts with insurers, and the chargemaster itself."  *Id.* at 35.  At the time he authored his first expert report, he had not conducted any such analysis.

impact on class members but notes that the magnitude of that impact (*i.e.* the amount of damages) could differ across class members. Dranove indicates that he would take the following steps to address and calculate such variance: "(1) identify the service classes subject to different percentage increases by reviewing ENH billing documents that report charges and DRGs, (2) include in the DID analysis dummy variables for those services that faced a differential increase, and (3) obtain an estimate of the overcharges that reflects the differential increase." *Id.* at 35.

Second, he considers the possibility that a contract employed multiple per diem rates, all of which increased at different rates. If this occurred,[13] he concludes that ENH's exercise of market power would still have a common impact on class members, but notes that the magnitude of the overcharge may differ across patients. To calculate differential overcharges, Dranove will conduct a DID analysis using dummy variables to account for differing classes of service.[14]

Third, Dranove considers the possibility that a contract used multiple pricing methods. If prices increased by the same percentage, he concludes that the combination of multiple methods would not affect DID analysis, as increases would still be evenly distributed across services and customers. If percentage increases differed, Dranove will account for the differentiation by including suitably defined dummy variables.[15] He states that "[t]his approach generalizes in a straightforward fashion to encompass more complicated possibilities," including the possibility

---

[13] Dranove states that if a particular contract employed multiple per diem rates and ENH increased such rates by substantially different amounts, "any such differential increase will be readily apparent in both the relevant contracts and in [ENH]'s billing data ([ENH]'s billing data records the payment and the length of stay, so the per diem rate can be recovered directly)." *Id.* at 35-36.

[14] Dranove explains how dummy variables will correct for variation in price increases: "The applicable contract will likely identify the classes of services that should have a dummy variable. For example, if a contract specifies one per diem rate for maternity stays and another for general medical/surgical stays, then a dummy variable that equals one if the patient is a maternity patient will suffice to estimate any differential effect for these patients. The most likely basis upon which to define classes of service is the patient's [DRG]." *Id.* at 36 n. 82.

[15] "In this case, including a dummy variable that equals 1 for all classes of services that are reimbursed under a per diem rate will identify the differential overcharges under the two systems." *Id.* at 36.

of a single contract with all three pricing methods.  *Id.*  For more complicated possibilities, he will incorporate dummy variables to control for variations in the data.

Fourth, Dranove considers the possibility of outlier payments.  Outlier provisions specify that when list charges associated with a patient exceed a predetermined threshold, payment will be made on a discount-off basis rather than a per diem or case rate basis.  Conceptually, this is very similar to the possibility of the mixed-methodology scenario; however, the difference is that in the mixed-methodology scenario, the form of payment is determined by the class of service, whereas with outlier payments, the form of payment is determined by the level of list charges. Dranove will use dummy variables to control for outlier provisions as they appear.[16]

Finally, Dranove considers the possibility that pricing methods in a contract will change over time.  Because DID analysis focuses on price rather than form of payment, the only required adaptation is that the analysis be performed at the level of services, rather than the insurer level.

### iii.    Summary of Findings

In short, Dranove's initial report states that DID analysis provides a reliable framework to determine impact on a classwide basis.  His research shows that the impact of overcharges is intrinsically common to all categories of private healthcare payers, so that any overcharges would result in impact to all or substantially all class members, regardless of the pricing methodology used in the relevant contract.  DID analysis reports overcharges as percentage increases, which form the basis for all damage calculations for all class members.  If a contract contains variations on the standard pricing methodologies, such variations are readily

---

[16] "Incorporating a dummy variable into the DID analysis that equals 1 if list charges exceed the outlier threshold will estimate any differential overcharge for outlier patients."  *Id.* at 38.

identifiable and DID analysis can easily accommodate them. Finally, he believes that the data he needs for his DID analysis is either already available or is likely to be available.

### b. Noether Report

In support of its response, ENH filed its own expert report authored by Monica Noether. Noether disputes many of Dranove's conclusions and offers four main responses: (1) it is not possible to define a class with members who were all impacted by ENH's actions without performing substantial analysis of the circumstances facing each individual member; (2) several individuals within the proposed class did not suffer impact; (3) Dranove's proposed DID analysis cannot demonstrate impact across all (or even most) class members; and (4) the named plaintiffs are not typical or adequate members of the proposed class.

### i. MCO Contracting With ENH is Complex and Requires Individualized Analyses to Determine Impact

Noether's examination of ENH contracts with MCOs leads her to conclude that payment terms are "substantially more heterogeneous" than Dranove assumes. Expert Report of Monica Noether, June 9, 2009, at 5 (hereinafter "Noether Rep."). She finds that contracts often use multiple pricing mechanisms, contain multiple "price terms" (*i.e.* multiple discounts), and employ multiple carve-out and stop-loss provisions. She further finds that contract terms are often modified according to unique, contract-specific rules. Her report identifies potential variations across the standard payment methods for inpatient services and highlights additional complexities that arise within MCO-entity and entity-employee contractual relationships.

### A. Pricing Methodologies for Inpatient and Outpatient Services

Noether points out that case rate contracts often contain multiple pricing methodologies that may apply multiple base rates to a single stay and may not increase base rates by uniform

percentages or simultaneously.  She further notes that per diem contracts often apply multiple

per diem rates that may not increase uniformly over time.  With respect to discount-off contracts,

Noether notes that (1) payors negotiate a variety of discounts for different services that may

change over time; (2) it is common to have multiple discounts in a single contract; (3) changes in

list prices vary across services;[17] and (4) there are other complexities in the ways in which MCOs

reimburse hospitals, including contractual terms such as stop-loss provisions, which cover

varying percentages of total charges and may only apply to certain services, and carve-out

provisions, which exempt services from a given pricing method.  Finally, with respect to pricing

for outpatient services, Noether states that contracts often employ multiple pricing

methodologies.

      To illustrate the complexities in a given contract, Noether reviews a ▮▮▮▮▮ contract,

which she describes as fairly typical.  The contract employs per diem, case rate, and discount-off

pricing for inpatient services.  There are ▮ inpatient services subject to per diem pricing and ▮

unique per diem amounts.  There are ▮ inpatient services subject to case rate pricing and ▮

unique base rates.  There are ▮ inpatient services subject to carve-out provisions and ▮ unique

carve-out prices.  There are ▮ inpatient services subject to discount-off pricing.  There are ▮

outpatient services subject to case rate pricing with ▮ unique prices.  Within these services exist

▮ subcategories of services that are subject to carve-out provisions, and within those

subcategories, there are ▮ unique prices.  Finally, there are ▮ outpatient services subject to

discount-off pricing.  These ▮ services have subcategories subject to carve-out provisions;

subcategories are subject to unique discount percentages and one is subject to a maximum

---

[17] Noether's analysis found that in a given year at ENH, most chargemaster prices did not change.  For the prices that did increase, she found the pattern of increase to be highly varied.  *See* Noether Rep. at 17-18.

payment cap. Noether concludes that Dranove is incorrect to assume that payment terms were most commonly adopted across-the-board by ENH.

### B.    Relationship Between a MCO and its Customers

Noether explains that contracts between MCOs and their customers are "complex and varied" and states that Dranove "overlook[s] these contract features and their impact on class definition and damage allocation entirely." *Id.* at 11. She explains that a group can either self-insure or purchase a fully-insured contract and opines that the distinction bears directly on the viability of plaintiffs' class definition and the issue of damage allocation.

If an entity self-insures, it bears the risk for all medical costs and a MCO will act as a third party administrator ("TPA"). The MCO negotiates pricing with ENH, pays ENH for any healthcare services used by the entity, and then passes those charges along to the entity. The entity fully reimburses the MCO for the services it consumes and pays an administrative fee, which is either flat or varied depending on the discount rate negotiated by the MCO. Noether states that MCOs acting as TPAs "would not generally have been harmed" by a price increase because they pass along costs to the self-insured groups. *Id.* at 11.

If an entity is fully-insured, it pays a MCO a premium, which covers medical costs, administrative costs, and the cost of bearing the risk associated with the uncertainty of the entity's medical claims. Noether states that it is difficult to determine how the premium is calculated, but notes that "it is likely that at least the majority of the medical cost increases that affect all MCOs are passed on to the MCO's customers." *Id.* at 12. She explains that "[w]hile during the life of existing contracts with fully-insured customers a MCO probably cannot pass on provider cost increases, when those contracts come up for renewal, it is likely to pass on most or all of any cost increases." *Id.* at 21.

Finally, Noether states that the available ENH data (on which Dranove intends to rely) does not identify which payments were made on behalf of self-insured entities and which were made on behalf of fully-insured entities. The ENH data only identifies the direct payor (the MCO) of a particular service. To determine which payments came from which entities, Dranove would have to investigate every single contract from each MCO and Expectation of Benefit ("EOB") forms, which list transaction prices, for each visit by a covered individual. This would require plaintiffs to issue discovery (at least) on every self-funded entity whose members received services at ENH.

### C. Relationship Between Employers and Covered Employees

Noether also examines the relationship between an entity and its enrollees and states that benefit packages "vary along a number of dimensions that affect the impact any anti-competitive activity could have had on different individual members of the proposed class." *Id.* at 12. She argues that the variety of factors to be considered implies that any assessment of impact must be done on an individual basis, as no single model can accommodate all relevant factors.

She first notes that many individuals are subject to cost-sharing provisions such as co-pays and coinsurance. Coinsurance generally covers a percentage of a bill and thus generally can be expected to rise proportionately with the bill. Coinsurance rates, however, can vary across different services within a given plan. Noether also points out that both co-pays and coinsurance are further affected by deductibles and out-of-pocket maximums. She states that there is variation in the way deductibles are applied, as some services may be exempt, while others may be subject to a separate deductible. She notes that individuals enrolled in a plan as part of a family likely share a deductible amount with other family members. With respect to out-of-pocket maximums, she notes that some services may be exempt and that maximums are shared

within families.  In light of these complexities, Noether concludes that substantial individual

analysis is needed to determine whether any individual patient suffered impact.

### ii.    "No-Impact" Class Members

Noether criticizes (1) plaintiffs' proposed class definition, because it includes individuals

and entities that were not impacted by ENH price increases, and (2) Dranove's proposed method

of determining impact, because it provides no mechanism to exclude class members who did not

suffer impact.  These "no-impact" class members include (1) MCOs acting as TPAs; (2) rental

networks; (3) self-insured entities with stop-loss coverage; (4) individuals subject to out-of-

pocket maximums or supplemental or secondary insurance; (5) Blue Cross Blue Shield of

Illinois ("BCBSI"); (6) individuals who received services that were (a) not subject to price

increases, (b) of increased quality proportionate to any price increase, and © administered after

the FTC remedy, which was designed to restore competitive pricing; and (7) uninsured

individuals who paid for services using ENH's charity care policy.

### A.    MCOs Acting as TPAs and Rental Networks

Noether states that MCOs acting as TPAs "would not generally have been harmed" by a

price increase because they pass along costs to self-insured entities.[18]  *Id.* at 11.  She makes a

similar point with respect to rental networks, such as Preferred Healthcare Systems ("PHCS"),

which assemble provider networks by negotiating rates with a set of payers in the area and then

"rent" such networks to self-insured employers, TPAs, and other MCOs.  Because rental

networks fully pass on medical costs for an administrative fee, Noether argues that they could

not have been injured by ENH price increases.

---

[18] Noether also appears to argue that MCOs not acting as TPAs also might be no-impact members.  She
notes that "it is likely that at least the majority of the medical cost increases that affect all MCOs are
passed on to the MCO's [fully insured] customers."  *Id.* at 12.  "While during the life of existing contracts
with fully-insured customers, a MCO probably cannot pass on provider cost increases, when those
contracts come up for renewal, it is likely to pass on most or all of any cost increases."  *Id.* at 21.

### B. Self-Insured Entities with Stop-Loss Coverage; Individuals with Out-of-Pocket Maximums or Supplemental Insurance

Noether states that individuals subject to cost-sharing provisions such as co-pays[19] and coinsurance were likely not impacted by ENH price increases because these provisions likely precluded individuals from paying out-of-pocket for healthcare services. She further states that once a patient reaches an out-of-pocket maximum or an entity reaches its stop-loss threshold, neither can be harmed by an ENH price increase.

### C. Blue Cross Blue Shield of Illinois

Noether relies on the Arango declaration (stating that BCBSI suffered no impact and paid reasonable prices) to demonstrate that BCBSI did not suffer impact.

### iii. Dranove's Proposed Method Cannot Adequately Address Individual Damages

Noether identifies two main flaws in Dranove's proposed DID analysis: (1) there is no appropriate control group and (2) his analysis impermissibly relies on averages.

### A. No Appropriate Control Group

Noether states that for DID analysis to be reliable, the control group must be "identical to the merging facilities in all dimensions that affect prices both before and after the merger." *Id.* at 25. "The methodology relies critically on the ability to define an appropriate comparison or control group that is matched in every way with the studied firm except the merger." *Id.* Noether argues that because hospitals are "all unique" in terms of service quality, range of services, medical staff, locations, amenities, and market, "it is not possible to identify an ideal control group, and therefore it is not possible to be certain that the results of a DID analysis can

---

[19] She states that individuals with fixed co-pays could not have been harmed by ENH price increases. Plaintiffs concede this and have excluded such individuals from their class definition. *See infra* at 3.

in fact be attributed to the merger." *Id.* at 26. She states that because Dranove did not identify a method for selecting a control group, it is not certain whether his DID analysis will be reliable.

### B.    DID Analysis Impermissibly Relies on Averages

Next, she states that DID analysis is not a reliable method because it is unable to account for the specific circumstances of a given plaintiff. "The most that even the ideal DID analysis can measure is the average change in prices over time." *Id.* at 27. To reliably assess impact and allocate damages, Noether states that "at the very least, the impact of the alleged anti-competitive price increases should be expected to vary across payors, type of plan (HMO/PPO), patient cost-sharing arrangements, and type of service. It is not possible to design a DID analysis that comprehensively reflects all these sources of variation." *Id.* Though Dranove will correct for variations across pricing methodologies and price terms by conducting the DID analysis at the service-level if necessary, Noether states that this still ignores other sources of variation and could require Dranove to conduct over 18,000 separate analyses.[20]

Noether next argues that Dranove's analysis rests on an assumption that when average prices increased, the price of each service increased by the same amount for each patient. She notes that Dranove performed no analysis to test or support this assumption and conducts her own DID analysis to discredit it. She again uses the ███████ contract as an example. Her DID analysis indicates that average prices for the contract increased at a higher rate than average prices at control hospitals across all DRGs, while the prices of several individual DRGs either decreased or did not increase at a statistically significant rate.[21]

---

[20] She notes that there are over 18 MCOs that contract with ENH, that many MCOs have two or three different plans, and that there are over 500 DRGs applicable to admissions at ENH.

[21] ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

Noether further notes that DRGs are not homogeneous.  Dranove assumes that all patients within a DRG experience the same price increase because (1) under a discount-off plan, the discount percentage is uniform, and (2) price increases in the chargemaster occur across the board.  Though ENH does not retain data on individual list items, Noether states that the underlying composition of list items within a DRG varies widely.  She further states that there is also enormous variation in the amount of billed charges within a single DRG.  She states that "[s]ince changes to ENH chargemaster prices are not uniform or common, whether a specific patient is impacted by an increase to some ENH chargemaster prices will depend on which chargemaster items were included in the patient's bill.  However, even observationally equivalent patients (same DRG, same year) are billed for very different combinations of chargemaster line items.  The impact from changes in ENH chargemaster prices is not common across all class members who paid based on these prices." *Id.* at 31.

### C. Dranove's Methodology Cannot Account for the Complex Relationships Among Class Members

Noether states that Dranove's proposed methodology is insufficient because it cannot account for the interrelationships between different class members and that, as a result, it will not be able to reliably allocate damages across class members.  She notes that Dranove does not explain how, for example, he plans to assess the damages that have accrued to a self-funded employer-sponsored plan from an increase in average MCO contract prices.  "One cannot assume that a self-funded plan will experience the same percentage change in prices as the average percentage change in prices experienced by the MCO/TPA of that self-funded plan." *Id.* at 39.  In a given year, a self-funded plan will only consume a few services, whereas a MCO will

consume many. It is Noether's position, therefore, that whether and by how much a self-insured

entity was affected will depend critically on which services its members received.

Noether also notes that in the context of the MCO/TPA-self-insured entity relationship,

"additional administrative fees distort the simple relationships between what the MCO/TPA pays

and what the self-funded group pays." *Id.* Indeed, the formula for calculating administrative

fees, which affects the total price that a self-insured entity pays a MCO, differs across contracts.

Therefore, she reasons, "the impact of changes in the ENH contract price with a MCO/TPA will

not be common to the self-funded employer groups who contract with that MCO/TPA." *Id.*

### iv.     Named Plaintiffs are Not Typical of the Proposed Class

Finally, Noether opines that "[t]he claims of the named class members, and economic

proof of these claims, is not typical of the claims of the broader proposed class." *Id.* at 40. She

states that the vast majority of plaintiffs' claims are on behalf of MCOs that directly negotiated

with ENH, and finds problematic the fact that none of the named plaintiffs is a MCO. She

further notes that the individual named plaintiffs received a narrow range of services and that

none of them received any outpatient services. Finally, she states that Painters Fund is "very

different" from a MCO because it never actually negotiated with ENH and notes that it could not

have suffered impact because of its contractual relationship with BCBSI. *Id.* at 41.

### v.      Summary of Conclusions

In short, Noether's report states that Dranove's proposed method for proving classwide

impact is fatally flawed. She highlights the complexity and diversity of payment arrangements

between MCOs and hospitals, on the one hand, and between MCOs and their customers, on the

other, to argue that a highly specific and individualized analysis of each ENH customer's unique

circumstances is required to reliably assess impact and damages. She states that because

Dranove did not analyze any MCO contracts, he incorrectly concluded that pricing terms within such contracts are relatively uniform and ignored all complexities associated with contractual cost-sharing arrangements. As a result, Dranove further incorrectly concluded that DID analysis would produce a reliable estimate of the damages suffered by each individual class member and that it would be able to easily identify "no-impact" class members. Finally, she opines that even with the requisite data, which could only be obtained through extensive and costly discovery, Dranove's proposed methodology would still be unreliable.

### vi.   Plaintiffs' Motion to Exclude the Noether Report

Plaintiffs have moved to exclude Noether's report on the grounds that it does not satisfy the standards for admissibility of expert opinion under Federal Rule of Evidence 702 and *Daubert* v. *Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993).[22] Rule 702 governs the admissibility of expert witness testimony. *See Daubert*, 509 U.S. at 588; *Kumho Tire Co.* v. *Carmichael*, 526 U.S. 137, 147, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999). To admit expert testimony, the court must find that (1) the expert is proposing to testify to valid scientific, technical, or other specialized knowledge, and (2) her testimony will assist the trier of fact to understand or determine a fact in issue. *Durkin* v. *Equifax Check Servs., Inc.*, 406 F.3d 410, 420 (7th Cir. 2005) (citing *Ammons* v. *Aramark Unif. Servs., Inc.*, 368 F.3d 809, 816 (7th Cir. 2004)). In the court's view, as discussed *infra*, Noether's report does include some misleading information and analysis. In its analysis below, the court gives Noether's report the weight it believes it is due. Accordingly, the court will not undertake a *Daubert*

---

[22] They specifically argue that Noether's report suffers from "a number of fatal flaws:" (1) it contains irrelevant and misleading analysis of the structure of MCO contracts; (2) its analysis of changes to the ENH chargemaster is incomplete and inaccurate; (3) it "erroneously claims numerous class members . . . were not injured without conducting any economic analysis;" (4) it asserts, without support, that ENH never exercised market power; (5) it offers legal conclusions; and (6) it contains DID analysis that is "fundamentally defective, thus invalidating her opinions." Pls.' Mot. to Strike at 2.

analysis at this procedural juncture. *See Reed*, 2009 WL 3146999, at *65-66. Moreover, plaintiffs had two opportunities – in their reply brief and at oral argument – to respond to the conclusions contained in Noether's report; the court understands its limitations. Accordingly, plaintiffs' motion to exclude Noether's report is denied.

### c. Second Dranove Report

Plaintiffs submitted a second report authored by Dranove in support of their reply. In his reply report, Dranove responds to each of Noether's four points.

### I. Contract Complexity is Irrelevant to Common Impact

Dranove acknowledges that ENH contracts generally employ a variety of pricing methods, however, he states that his review of such contracts demonstrates that prices increase at the same rate across nearly all services, regardless of such complexities. It is his opinion that "ENH almost invariably increases prices at the same rate for all or nearly all service categories." Expert Reply Report of David Dranove, Dec. 8, 2009, at 2 (hereinafter "Dranove Reply Rep.").

### A. Contract Examination and Analysis

Dranove examined ENH contracts with seven major MCOs. His results, outlined in Appendix D of his report, indicate that the majority of contracts consistently apply a common price increase across all or substantially all service categories.[23] For example, with respect to the ▇▇▇▇▇ contract highlighted by Noether, Dranove's results indicate that the prices of ▇▇▇ ▇▇▇ service categories increased at the same rate.[24] Appendix D contains a chart for each MCO stating the percentage of prices in a given contract that increased at a uniform rate within a

---

[23] Dranove also reviewed communications (letters, business documents) between ENH and the seven MCOs. From this review, he concluded that the norm was to speak of a single price increase

[24] Each of these ▇▇▇ services experienced either a ▇▇▇▇▇▇▇ price increase. Dranove "do[es] not view there being a material difference in rates of increase of ▇▇▇▇▇ This difference appears to be the result of rounding, because the contract specifies whole dollar amounts." *Id.* at 11 n.46

given year. As an example of Dranove's analysis, below is the chart describing price increases

within the relevant ██████████ contracts.



This chart indicates that the prices in the ████████ contracts increased at a uniform rate for all (100% of) outpatient services.  It further indicates that all ████████ contracts increased the prices of all inpatient services at a uniform rate.  Finally, it indicates that between 2000 and 2003, all ████████ contracts increased the prices of all inpatient services at a uniform rate.  Between 2003 and 2004, price increases were not entirely uniform.  Dranove has derived a method to adjust DID analysis to accommodate for variable price increases, however, as discussed below.

In light of these uniform price increases across services, Dranove concludes that the estimate of average price increases for an insurer is also a valid and reliable estimate of the price increases applicable to every patient covered by that insurer.  In turn, he concludes that DID analysis, which relies on and calculates average price increases, provides a valid and reliable method for proving classwide impact.

### B. DID Analysis Can Accommodate Variable Price Increases

If the evidence eventually demonstrates that prices did not increase at a uniform rate for a MCO or a particular contract, Dranove reiterates that he can perform DID analysis at the service level.  For a mixed-model contract with individualized price increases, for example, he will identify all service categories included in the contract and organize them by the rate at which their prices increase.  If Dranove determines that there are 10 different rates of increase, he will conduct 10 separate DID analyses.  He explains that category-level analysis works because by contract, ENH receives the same reimbursement for all patients in an appropriately defined service category.  To the extent that the average patient visit within a service category faced an overcharge, he believes all patient visits within the service category faced the same overcharge.

40

Dranove acknowledges that "[t]here are exceptions to the rule that ENH contracts exhibit identical or nearly identical price increases across all service categories. These exceptions arise, on occasion, when ENH contracts redefine service categories." *Id.* at 20. He notes an "industry-wide pattern of periodically restructuring payment systems" and states that it is "a mistake to conclude that differential price changes of this sort are evidence of a lack of common impact from the exercise of market power. The correct conclusion is that ENH restructured price increases (in some instances) *independently of* its exercise of market power." *Id.* at 22-23.

To demonstrate impact for price increases that result from restructuring, Dranove will perform DID analysis at the service level. He relies on an underlying assumption (borne out of his conclusion that ENH increases prices at a uniform rate and across services) that price changes due to the merger would be distributed uniformly across all categories, regardless of variance in individual service pricing. To prove impact, he proposes a four-step calculation: (1) calculate the average price increase across all variable categories; (2) calculate what the price for each service would have been but for the merger (divide the new contract price by 1 plus the average price increase); (3) subtract the "but-for-merger price" from the new price to get the dollar amount by which ENH increased prices due to the merger; and (4) from this dollar amount, calculate how much the percentage increase in price was due to the merger. Dranove opines that this percentage provides a reliable estimate of the overcharge to all patients who received services that experienced variable price increases.

### ii. DID Method is Reliable and Establishes BCBSI Impact

Dranove vigorously disputes Noether's assertion that his proposed DID analysis is not a reliable method of proving impact. To prove otherwise, he conducts a DID analysis of recently

produced data from BCBSI to demonstrate that (1) DID analysis is a reliable method of proving common impact and damages and (2) BCBSI suffered impact as a result of the merger.

First, Dranove reiterates his position that from the available data sources, he can conduct a reliable DID analysis. In his list of available data sources in his reply report, however, he includes a new data source. The "BCBSI PPO" data set, which BCBSI provided to plaintiffs after ENH filed its response, contains (for BCBSI PPO plans) counts of inpatient and outpatient cases per year, total contractual payments, total discounts, total inpatient days, average case mix index, length of stay, and yearly gross payments per diem and per case.

Dranove performs a DID analysis on the BSBCI PPO data using the control group and time period used by ENH's expert in the FTC proceeding. His analysis demonstrates that BCBSI was injured; specifically, that BCBSI paid a ███ overcharge for outpatient services, a ███ overcharge for inpatient services, and a ███ overcharge overall. When Dranove extended the analysis through 2008, the analysis demonstrates that BCBSI paid a ███ overcharge for outpatient services, a ███ overcharge for inpatient services, and an ███ overcharge overall.

Dranove performs one additional round of DID analysis on the BCBSI PPO data using his own control group. He disagrees with Noether's assertion that a reliable control group must contain hospitals that are identical to ENH. He states that "[t]he economics profession has long understood that exact matching is not remotely necessary for a reliable DID regression analysis, as evidenced by even a cursory examination of the published literature." *Id.* at 5. Accordingly, he developed his own "systematic method" to select control hospitals. *Id.* at 42. First, he applies five exclusion criteria. He excludes hospitals that (1) are located outside of Cook, DuPage, and Lake counties, because market conditions outside these areas will likely differ from those that face ENH; (2) have less than 100 beds, because small hospitals face different supply and demand

conditions; (3) are state and county-owned or are navy or veteran's affairs hospitals; (4) do not have comparable shares of inpatient charges to those of ENH; and (5) were party to a merger or acquisition that took place around the same time as the ENH merger. Next, he conducts a statistical test to select and validate control group hospitals.[25] Using a control group of 21 hospitals, Dranove's DID analysis demonstrates that BCBSI paid a ▇▇▇ overcharge for outpatient services, a ▇▇▇ overcharge for inpatient services, and a ▇▇▇ overcharge overall.

Summarizing his results, Dranove states that he is "not claiming that there is common impact solely because prices to BCBSI increased *on average* as a result of ENH's merger with [Highland Park Hospital]. . . . To be entirely clear, [there are] two distinct sets of analyses that establish both common impact and injury." *Id.* at 49. The analysis that establishes impact is that which relates to contract structure: "A review of ENH's contracts shows that, with minor variations, ENH increases its inpatient and outpatient prices across the board. . . . [W]hen the average price of inpatient services increases, . . . the prices to insurers and patients" will increase by that same percentage. *Id.* at 50. The analysis that establishes injury (or damages) is the DID analysis. That is, according to Dranove, common impact is a consequence of contract structure, and damages are quantified through the use of the DID analysis. He will calculate damages by first computing overcharges and then multiplying actual payments by the overcharge percentage.

### iii. Noether's DID Analysis is Highly Flawed

Dranove states that Noether's DID analysis is "uninformative as a test of common impact" due to two conceptual errors and several technical errors. *Id.* at 52. The first conceptual

---

[25] Inpatient prices at a control hospital should respond to changes in market factors in ways similar to ENH. If changes in length of stay or case mix have a similar effect on pricing at ENH and a potential control hospital, this suggests that the process generating pricing at the two hospitals is similar. Dranove will use a F-test to statistically test whether a candidate's pricing and ENH's pricing respond in a similar manner.

error is that she failed to account for contract restructuring in her analysis, which led her to "misleadingly conclude" that prices for some services decreased over time. *Id.* He again notes that variable price increases were likely the result of routine contract restructuring separate from the merger. He further notes that including such variable changes in a calculation of averages (such as the DID analysis) will skew the results.

Noether's second conceptual error is that she conducted her analysis at the DRG level, without reference to the relevant contract structures. For example, even if a contract specified a single per diem rate across all DRGs, Noether performed her analysis at the DRG level. As a result, many of her analyses were performed on very few admissions and generated statistically insignificant results. Depending on the payer, between 32% and 78% of the individual DRGs she analyzed had three or fewer admissions in either the pre- or the post-merger period. Further, between 6% and 36% of the DRGs she analyzed had more than ten admissions in either the pre- or post- merger periods (or both). Dranove states that "[t]his is a thin basis upon which to identify statistically significant price changes, whether negative or positive." *Id.* at 54.

### iv. Noether's "No-Impact" Class Members

Lastly, Dranove takes issue with Noether's conclusion that several members of the proposed class suffered no impact as a result of the ENH merger. With respect to BCBSI, he states that Noether's reliance on Arango's declaration is unwarranted because Arango is not an economist and because Dranove's own analysis demonstrates that BCBSI suffered impact.

With respect to MCOs acting as TPAs, Dranove states that "[a]lthough [he] [is] not an expert in the law, [he] understand[s] that considerations associated with pass-on and pass-through are not relevant in this matter." *Id.* at 59. With respect to individuals with supplemental

insurance,[26] individuals subject to out-of-pocket maximums,[27] and entities with stop-loss insurance,[28] Dranove states that the issue of whether these individuals and entities were injured "involves claims allocation and does not affect the total amount of incurred damages." *Id.* at 60.

### v.       Summary of Conclusions

Throughout his report, Dranove disputes Noether's main argument that complexities within ENH's contracts and within the relationships of the potential class members preclude the application of DID analysis to prove common impact. He states that such complexities do not preclude the use of a common framework to study the rate at which prices increase over time. Because contracts between insurers and hospitals consistently apply uniform price increases, and because prices that change at variable rates usually do so as a result of contract restructuring, Dranove opines that all customers covered by a given insurer will be impacted in the same way. He reiterates his thesis from his initial report that DID analysis is a reliable method to calculate the amount of damages incurred by commonly-impacted customers and relies on his recent DID analysis of BCBSI claims as evidence of this fact.

### vi.      ENH's Motion to Exclude the Dranove Reply Report

ENH has moved to exclude Dranove's reply report because it contains new analysis not included in his original report. *See TAS Distrib. Co.* v. *Cumming Engine Co.*, 491 F.3d 625, 630-31 (7th Cir. 2007). ENH argues that by including new analyses in the reply, plaintiffs deprived ENH of its right to respond to all of their arguments. Because the court afforded ENH an

---

[26] Dranove also points out that the majority of individuals who purchase secondary coverage are traditional Medicare patients, who are excluded from the class. Further, his analysis of ENH contracts demonstrates that 1% of all non-government patients at ENH involve multiple commercial insurers.

[27] Dranove's analysis of ENH contracts demonstrates that out-of-pocket maximums affect 2% of visits

[28] Dranove states that economic theory "suggests that if a self-funded group reached its stop-loss threshold in a given year, an event made more probable by an ENH price increase, the cost to that group of obtaining stop-loss insurance would increase." *Id.* at 60.

opportunity to respond at oral argument and with Noether's supplemental report, however, ENH's argument is moot and its motion to exclude Dranove's reply report is denied.

### d.  Oral Argument

The court held oral argument on February 23, 2010 to allow ENH to respond to the new issues and analyses contained in Dranove's reply report, specifically Dranove's examination of ENH contracts, his DID analysis of BCBSI data, and his method for selecting a control group.

### I.  Noether's Testimony

Noether testified to three main conclusions: (1) Dranove's DID analysis cannot identify "no-impact" class members; (2) Dranove's contract review is incomplete because it focuses on price changes *within* contracts rather than changes *across* contracts; and (3) Dranove's analysis of BCBSI's injury is unreliable because his control group is unreliable.

Noether's testimony regarding "no-impact" groups repeated the conclusions contained in her response report.  Regarding Dranove's contract analysis, she testified that it was incomplete because it only examined price changes *within* contracts, which are usually attributable to escalator clauses, rather than price changes *across* contracts, which are more likely to be due to, *inter alia*, an exercise of market power at the time of contract renegotiation.  Tr. 67:1-5.  She testified that each of the MCOs examined by Dranove went through at least one contract renegotiation, and that many went through several, during the relevant time period.  *Id.* 77:17-20.

Noether further testified that she performed her own contract examination to assess the validity of Dranove's conclusion with respect to changes across contracts.  She testified that her examination indicated there were "several examples" of variable price increases after a contract renegotiation.  *Id.* 84:17.  Specifically, she noted that a "large proportion of the contract renewals that [she] looked at showed non-uniform changes in prices from one contract to the next.  It's

really quite common. . . . [It] [cannot] be ignored." *Id.* 85:2-15. She highlighted three examples. First, she noted the difference between the ███████████████ contracts. In ██████ the prices of the nine cardiac services listed in the contract increased and decreased at seven different rates. Second, she noted the differences between the three ███████ contracts. The second ███████ contract instituted uniform price increases across all services, but the third contract had different price increases for each of the ten included services. Finally, she examined the relevant ██████ contracts. She first noted that Dranove's analysis of the contracts only identified price increases within contracts; that is, he reported on the effects of escalator clauses, which are usually uniform and apply across services. She then noted that she actually "looked at what happened when contracts were renewed . . . . [T]he patterns were, as varied as they are, for the ENH contracts." *Id.* 89:9-13. Based on these three examples and her overall examination of MCO contracts, Noether testified that "by focusing exclusively on within contract price changes, Dr. Dranove was unable to find the fairly widespread variation in price changes when contracts were renewed and therefore his conclusion that a use of average in his [DID] methodology is . . . not correct." *Id.* 89:21-90:1.

Noether also testified about the viability of Dranove's control DID analysis, focusing on his analysis of BCBSI's purported injury. She testified that she performed her own analysis to test the reliability of his control group, whereby she "did a simple switch of each hospital in the control group with ENH . . . . to see what [Dranove's] model would do if [she] pretended that one of his control group hospitals was the hospital of interest." *Id.* 90:14-18. Her analysis indicated that of the 21 control hospitals, for inpatient services, 17 of them had overcharges in at least one year during the relevant time period and that 9 had overcharges in at least as many years as ENH did. *Id.* 92:10-18. She testified that the results were similar for outpatient services

and that such results cast "great suspicion on [Dranove's] model because . . . it's suggesting that these . . . control group hospitals in fact also had market power and [were] . . . overcharging." *Id.* 92:21-24.  She testified that his model generated a lot of "false-positives," which occur when a test "indicates that something of interest has happened even when it really hasn't."  *Id.* 93:21-22.  Noether concluded that Dranove's control group is "inadequate" because it "isn't really measuring what it was supposed to be measuring."  *Id.* 99:10-12.

### ii.      Dranove's Testimony

Dranove offered two rebuttal points.  First, he testified that he "did, in fact, look at both within contract changes and changes across contracts."  *Id.* 103:24-25.  He stated that two of the three contracts highlighted by Noether help prove his thesis that, on the whole, ENH increased prices at uniform rates across services.  For the ███████ contract, he pointed out that the prices of the eight non-cardiac services in the contract increased at a uniform rate of ██████ For the ██████ contract, he noted that the first renegotiation produced a uniform price increase across all services.  More generally, he testified that across the contracts he examined, there was "at least a 75 percent commonality in price increase across the elements.  So at least 75 percent of the services had exactly the same price increase."  *Id.* 105:8-12.  He noted that for several MCOs, the percent of common price increases was even higher than 75.

Dranove further testified his control group is valid.  He stated that Noether's analysis and argument regarding his control group would allow her to conclude that all published research using DID analysis is wrong, "which suggests that either the entire field has got it wrong or there's something wrong with what Dr. Noether has done that requires a little further inquiry." *Id.* 106:4-8.  He reiterated the purpose of DID analysis: to compare the pricing at ENH against the average pricing of a large control group.  Each of the hospitals in the control group is

supposed to provide "some representation of what would have happened [at ENH] but for the merger." *Id.* 106:12-13. He testified that "naturally in a group of 20 hospitals, they're not all going to have exactly the same price increase . . . . [P]rices tend to increase by different amounts at different hospitals. And naturally, one of those hospitals is going to have the biggest increase versus the other 19." *Id.* 106:17-23.

He testified that Noether's analysis proved only that "in a group of 20, some hospitals grew faster than average and others grew less fast[]." *Id.* 107:2-3. He criticized Noether of engaging in "ex-post data picking," stating that "if [she] want[ed] to single out [a hospital] for testing, [she] better have a reason before [she] looked at the data to do that. [Noether] offered no such reason." *Id.* 107:6, 16-19. He explained that his control group is "calibrated to match the economic environment that ENH was facing." *Id.* 109:12-13. As a final point, he stated that "DID analysis is a very, very commonly used methodology," and that "[t]he notion that DID methodology is unreliable would be surprising to someone in mainstream economics who uses this as a matter of course." *Id.* 111:2-3, 9-11.

### e.    Noether's Supplemental Report

On March 4, 2010, ENH submitted a supplemental report prepared by Noether supporting her testimony that variable price increases were common at ENH. Subsequent to oral argument, Noether completed an analysis of price changes across contracts, which led her to conclude that "[i]n *every instance* during the class period where a contract between ENH and a MCO was renegotiated, a majority of the price changed at a non-uniform rate." Supplemental Report of Monica Noether, March 4, 2010, at 2 (hereinafter "Noether Supp. Rep."). Her report states that Dranove's contract analysis focused almost exclusively on price changes within

contracts, "effectively ignoring nearly all instances of contract renegotiations . . . . [and] exaggerat[ing] substantially the extent of uniformity of price changes over the class period." *Id.*

Noether examined the same contracts that Dranove examined in his Appendix D and determined that during the class period, 56 contract renegotiations took place. In her report, she performs an analysis of the prices contained in the relevant contracts before and after each renegotiation. For each renegotiation, she identifies the services that were included in both the old and new contracts ("comparable services") and then calculates the corresponding percentage change in price for each comparable service. She next calculates the percentage of services with prices that changed at a uniform rate and, for each contract, reports her results in a table.[29] Her results indicate that "in 55 of the 56 renegotiations[,] prices change non-uniformly," the lone exception being the ▮▮▮▮▮▮▮▮ contract highlighted at oral argument. *Id.* at 3-4.

Her report highlights the ▮▮▮▮▮▮ contract, which both she and Dranove address in their reports. *See* Noether Rep. at 16; Dranove Reply Rep. at 11. Dranove's analysis indicates that prices for 92 of the 93 inpatient services increased at a uniform rate; however, Noether states that his analysis fails to analyze the change between the prices in the ▮▮▮ contract and the prices in the previous contracts and instead focuses solely on price changes within contracts. Noether performs this analysis, which indicates that "prices changed a very non-uniform rates between the previous contract and the contract that Dranove analyzed, with many prices declining." Noether Supp. Rep. at 5. Indeed, her comparison of the ▮▮▮▮▮▮▮ contract

---

[29] Noether excluded from her analysis services that were priced using discount-off or case rate pricing, classifying these services as having non-uniform price increases. *See* Noether Supp. Rep. at 9 ("[E]ven if the discount or base rate changes uniformly . . . the price . . . does not change uniformly because changes in DRG weights and charges are not uniform."). She also excluded services that were subject to different pricing methodologies in the new and old contracts, classifying such services as having non-uniform price increases as well. *See id.* ("[I]t is completely reasonable to assume that these price changes are non-uniform, since it would be completely fortuitous if changing methodologies led to uniform increases across services.").

and the ███████ contract indicates that the ██ comparable inpatient services each increased at a unique rate. *Id.* at Table 8a. Her comparison of the ████████ contract and the ████ ‑ ███ contract indicates that the █ comparable inpatient services also each increased at a unique rate. *Id.* at Table 8b.

Noether's report also highlights the ███████████ contracts, which she addressed at oral argument. The report indicates that of the ██ comparable services, the prices for ██ of them increased at non-uniform rates; this stands in contrast to Dranove's conclusion that all prices increased as a uniform rate. *See supra* at 40-41, Dranove Reply Rep. at Appendix D. It further states that the percentage of uniform changes across these two contracts was ████. Her ██████ chart is replicated below:



Based on her findings, Noether concludes that Dranove's analysis could not have looked at changes across contracts, but rather, only at changes within contracts. She is able to find only two examples of changes across contracts within his analysis and claims that both examples are deficient: "One of these examples is well outside of the relevant class period, and is for a very minor payor . . . . [while] [t]he other example is for PHCS, which is exclusively a [TPA], which as Plaintiffs now acknowledge, cannot be a member of the class." *Id.* at 6. Accordingly, she concludes that Dranove's analysis "does not contain *any* example of price changes between contracts for any class member" and that, as a result, it grossly exaggerates the number of uniform price increases within the relevant contracts. *Id.*

### f. Common Impact Analysis

In the antitrust context, "impact is often critically important for the purpose of evaluating Rule 23(b)(3)'s predominance requirement because it is an element of the claim that may call for individual, as opposed to common, proof." *Hydrogen Peroxide*, 552 F.3d at 311 (citing, *inter alia*, *Bell Atl. Corp.* v. *AT&T Corp.*, 339 F.3d 294, 302 (5th Cir. 2003)). Here, plaintiffs argue that Dranove's proposed method for proving impact – a combination of his conclusions about contract structure and his proposed DID analysis – can establish classwide impact by using evidence common to the class. The viability of his method turns on four issues: (1) whether Dranove's control group is reliable; (2) whether ENH increased prices at a uniform rate across services; (3) whether the data needed to perform Dranove's analysis exists; and (4) whether Dranove's method can identify and exclude class members that were not impacted.

### i. Dranove's Control Group

ENH argues that Dranove's method is flawed because, *inter alia*, his control group is unreliable. As support, ENH relies on the analysis in Noether's report and on her testimony,

both of which indicate that the majority of the hospitals in Dranove's control group had overcharges during the relevant time period. ENH argues that these "false-positives" prove that Dranove's control group is unreliable. Plaintiffs rely on Dranove's responsive testimony that Noether's analysis and accompanying arguments, if accepted, would invalidate the majority of published DID analysis. Specifically, they rely on his testimony that, within every control group, there will be hospitals that grow at a faster rate than others. He testified that this fact does not undermine the validity of a control group, which is designed to generate an average growth rate.

The court finds Dranove's responsive testimony persuasive. The control group exists to provide a measure of the average growth rate of prices at hospitals similar to ENH. The fact that prices at a large number of Dranove's control hospitals grew at a rapid rate may have the effect of increasing the average growth rate, but it does not invalidate the average.

Noether's analysis and ENH's corresponding argument rest on an assumption that the control hospitals must be virtually identical to ENH. *See* Noether Rep. at 25 (stating that the control group must be "identical to the merging facilities in all dimensions that affect prices both before and after the merger"). This assumption, however, is inconsistent with the purpose and design of DID analysis. At the most basic level, DID analysis is a comparison of averages – the average prices at ENH are compared with the average prices hospitals similar to ENH. If DID analysis required control hospitals to be identical to ENH, it would not make sense to have more than one hospital in the control group, as they would all provide the exact same data. Of course, the court acknowledges that the control group must be composed of hospitals sufficiently similar to ENH. Because the court is satisfied that here, Dranove's five exclusion criteria and test for robustness are able to identify such hospitals, it finds his control group to be valid and reliable.

Finally, to the extent Noether's analysis and supporting testimony attacks the soundness of DID analysis as a statistical method, the court finds it to be incredible. DID analysis is a respected statistical regression model that, in the current context, will provide a reliable estimate of the difference (if any) between the *average* price increases at a treatment hospital and the *average* price increases at a control hospital. Nevertheless, as discussed below, the court cannot rely on DID analysis to prove classwide impact in the instant case, as neither Dranove nor plaintiffs have demonstrated that an increase in average prices at ENH is also a reliable estimate of the price increases (if any) that each individual class member faced.

### ii. Price Increases at ENH

Dranove's method of proving classwide impact – a combination of his conclusions about contract structure and DID analysis – rests on an assumption that ENH increased prices at a uniform rate across services. *See* Dranove Reply Rep. at 50 ("[Dranove] [is] not claiming that there is common impact solely because prices . . . increased *on average* as a result of ENH's merger . . . . Instead, the compelling evidence of common impact stems from [his] separate analyses of contracts between ENH and insurers."). The parties agree that the viability of his method depends on this assumption, however, they disagree as to its correctness. Plaintiffs argue that ENH did increase prices at a uniform rate across services, relying on the contract analysis in Appendix D of Dranove's reply report as evidence of this fact. Dranove testified that his analysis shows that for each contract, at least 75% of the prices increased at a uniform rate. He further testified that this conclusion was with respect to changes within contracts and across contracts.

By contrast, ENH argues that the majority of ENH's price increases were non-uniform. It relies on Noether's testimony and supplemental report, which both claim that Dranove's

analysis focuses only on price changes within contracts rather than changes across contracts, to discredit Dranove's analysis. Noether testified that ENH had the opportunity to exercise market power not within a contract period, but only at the time of renegotiation. She further testified that any price increases within a contract were not due to an exercise of market power, but rather were the result of escalator clauses. As a result, she testified that Dranove's analysis, which focuses on within-contract price changes, greatly exaggerates the frequency of uniform price increases. Noether's supplemental report corroborates her testimony; it indicates that across contracts, the majority of price increases were non-uniform.

"Resolving expert disputes to determine whether a class certification requirement has been met is always a task for the court – no matter whether a dispute might appear to implicate the 'credibility' of one or more experts, a matter resembling those usually reserved for a trier of fact." *Hydrogen Peroxide*, 552 F.3d at 324; *see also Reed*, 2009 WL 3146999, at * 21 (rejecting plaintiffs' argument that "the battle of the experts is strictly for the jury.") (internal quotation marks omitted). While both Dranove's Appendix D and Noether's supplemental report rely on assumptions that are, in the court's opinion, of questionable validity,[30] both reports evaluated the prices of the same 18 services within the ████████ contract, a contract that the court also had the opportunity to review.

Dranove's analysis indicates that between the years ████████████████ contract listed 18 prices, all of which increased at the same rate. It further indicates that between the

---

[30] For example, Dranove's Appendix D "excludes contracts that restructure payment categories from prior contracts." Dranove Reply Rep. at 6. While the court understands his point with respect to restructuring, it is not convinced that *every* variable price increase was due to restructuring such that it should have been excluded from the analysis. Additionally, Noether's supplemental report classifies services that were subject to (1) case rate pricing, (2) discount-off pricing, and (3) different pricing methodologies across contracts as being subject to non-uniform price increases because they are not capable of comparison. *See* Noether Supp. Rep. at 9. The court is not convinced that no reliable comparison can be drawn between these services such that an automatic classification as being subject to non-uniform price increases is warranted.

years 2002 and 2003, each of these 18 prices again increased at a uniform rate. By contrast, Noether's analysis indicates that on September 22, 2002, a new contract went into effect and, as a result, 10 of the 18 prices increased at variable rates. The court's own examination of the contract indicates that of the 18 prices listed in the renegotiated September 22, 2002 contract, 6 increased at a uniform rate, 9 increased at variable rates, and 3 changed pricing methodologies from the previous contract, making it difficult to draw a comparison.

Despite the weaknesses of Noether's presentation in other respects, Noether's analysis here does cast doubt on Dranove's representation that his contract analysis encompassed both within and across contract price changes. If he had examined both within and across contract price changes, he could not have reported a 100% uniform price increase across all 18 services between 2002 and 2003. Indeed, even a cursory examination of the ▮▮▮▮▮▮ contract and the ▮▮▮▮▮▮▮▮▮▮▮ contract makes clear that the prices of some services changed at a variable rate. This fact, coupled with the assertions in Noether's supplemental report, suggest to the court that Dranove's analysis focused primarily on price changes within contracts – changes that are usually attributable to escalator clauses. Indeed, both the old and the new ▮▮▮▮ contracts contained escalator clauses, which increased prices by a certain percentage each year the contracts were in effect. Accordingly, the court cannot accept Dranove's contract analysis contained in Appendix D as credible evidence that ENH increased prices across contracts at uniform rates across services.

The court acknowledges that in his reply report, Dranove presents a method for adjusting DID analysis to accommodate variable price increases. Dranove outlines a two-step approach: (1) calculate the average percentage increase (or decrease) across all variably priced services and (2) calculate how much of a service's new price (if any) was the result of this average increase.

He acknowledges, however, that this calculation rests on an assumption that any price increase due to the merger was distributed evenly across services, which is borne out of an assumption that ENH increased prices at uniform rates across services.  *See* Dranove Reply Rep. at 23 ("[A] uniform increase is not the exception but rather the rule . . . . [T]his is compelling evidence that a price change that is due to the merger would be distributed uniformly over all service categories.").  Because plaintiffs have not put forth credible evidence to validate these assumptions, the court does not find this two-step approach to be a reliable method of proving classwide impact in those instances where ENH increased prices at a variable rate.

At the class certification stage, the burden of proof rests with plaintiffs.  *See In re Sulfuric Acid Antitrust Litig.*, No. 03-c-4576, 2007 WL 898600, at *1 (N.D. Ill. March 21, 2007) (citing *Gen. Tel. Co.* v. *Falcon*, 457 U.S. 147, 166, 102 S. Ct. 2364, 72 L. Ed. 2d 740 (1982)).  With respect to the issue of predominance, therefore, plaintiffs must present affirmative evidence to demonstrate that there is a method of proving classwide impact.  Because plaintiffs' proposed method relies on an assumption that they have not been able to validate, the court finds that they have failed to meet this burden.[31]  As a result, plaintiffs fail to establish predominance and cannot meet the requirements for class certification.  Plaintiffs' motion, therefore, must be denied.

---

[31]Because plaintiffs have not shown that ENH increased prices at a uniform rate across services, the court need not consider the parties' arguments with respect to the two remaining issues.  Furthermore, because plaintiffs fail to establish predominance, the court need not undertake an analysis of whether they have satisfied superiority, the second requirement of Rule 23(b)(3).

## CONCLUSION AND ORDER

For the reasons discussed above, plaintiffs' motion for class certification [#240] is denied.  Plaintiffs' motion to strike the report of Dr. Monica Noether [#317] and ENH's motion to strike the reply report of Dr. David Dranove [#321] are also denied.


Dated: March 30, 2010                    Enter: _____
                                                JOAN HUMPHREY LEFKOW
                                                United States District Judge