# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| In re: Evanston Northwestern Healthcare Corporation Antitrust Litigation | ) ) ) | Master File No. 07 C 4446 |
|  | ) | Judge Edmund E. Chang |
| This Document Relates To: | ) ) |  |
| All Actions | ) ) | |

## PUBLIC REDACTED VERSION OF PLAINTIFFS' CORRECTED COMBINED MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AND *DAUBERT* MOTIONS AND RESPONSE IN OPPOSITION TO NORTHSHORE UNIVERSITY HEALTHSYSTEM'S MOTION FOR SUMMARY JUDGMENT AND *DAUBERT* MOTIONS

**PREVIOUSLY FILED UNDER SEAL AND RELATED TO DOCKET #932**

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| _____ | ) | |
| In re: Evanston Northwestern Healthcare | ) | **Master File No. 07 C 4446** |
| Corporation Antitrust Litigation | ) | |
| _____ | ) | **Judge Edmund E. Chang** |
| | ) | |
| This Document Relates To: | ) | |
| | ) | |
| All Actions | ) | |
| _____ | ) | |

**PLAINTIFFS' CORRECTED COMBINED MEMORANDUM
OF LAW IN SUPPORT OF ITS MOTION FOR
SUMMARY JUDGMENT AND *DAUBERT* MOTIONS AND RESPONSE IN
OPPOSITION TO NORTHSHORE UNIVERSITY HEALTHSYSTEM'S
<u>MOTION FOR SUMMARY JUDGMENT AND *DAUBERT* MOTIONS</u>**

# TABLE OF CONTENTS

ARGUMENT ............................................................................................................4

I.     Plaintiffs Are Entitled To Summary Judgment on Liability ...................................4

    A.  There Is No Genuine Issue Of Material Fact That After
         The Merger Enh Raised Prices To Anticompetitive
         Levels Based Upon Market Power Obtained From The
         Merger ..........................................................................................................4

    B.  The Federal Trade Commission Finding That ENH Raised Its Prices
         In An Anticompetitive Manner is *Prima Facie* Evidence ...................................7

    C.  ENH's Own Documents Show That ENH Raised Its Prices Using Its
         New-Found Market Power ...................................................................................9

    D.  ENH Could Not Have Raised Its Prices Without The Merger And
         NorthShore's Learning About Demand Defense Fails ........................................10

        1.  The Bain Documents Tie The Ability To Raise Prices
            To The Merger ........................................................................................12

        2.  ENH'S Executives Testified That They Effectively Negotiated
            With MCOs Before The Merger ..............................................................13

        3.  Prices At Different Hospitals Cannot Be Directly Compared .............14

        4.  Dr. Willig's Pricing Analysis Is Inadmissible .........................................16

    E.  Dr. Vogt Properly Found Market Power From Direct Evidence Obviating
         The Need To Define A Georgraphic Market, But If One Must be Defined,
         It Is The Triangle Formed By Three Hospitals .................................................17

        1.  ENH Gained Market Power Through The Merger ..............................18

        2.  Ms. Guerin-Calvert's Diversion Ratio Options Are Inadmissible ......21

        3.  Dr. Willig's Opinions Regarding Diversion Ratios Are Inadmissible 23

        4.  The Geographic Market From The Attempted Advocate Merger
            Is Not Proper ........................................................................................24

5. If A Geographic Market Must Be Defined, It Is The Triangle Formed By The Three Hospitals ............................................24

6. If A Product Market Must Be Defined, It Is General Acute Care In-Patient Services..........................................................25

**II.** **NorthShore's Affirmative Defenses Fail As A Matter Of Law.............................26**

A. NorthShore's "Quality of Care" Defense Fails ................................26

1. Quality Of Care Is Not A Recognized Defense.......................26

2. Dr. Meyer's Opinions Should Be Excluded For Failure To Comport With *Daubert* ........................................29

   a) Dr. Meyer's opinions are unreliable because they rest on the Post Hoc Ergo Propter Hoc Fallacy...........................29

   b) Dr. Meyer's testimony is also unreliable because his method for collecting qualitative date is unreliable and biased.........................................31

   c) Dr. Meyer's quantitive analyses are similarly flawed and must be excluded .....................................32

3. The Quality Of Care Testimony Of NorthShore's Economists Should Be Excluded ..................................34

4. Even if A Quality Of Care Defense Is Recognized, NorthShore Cannot Show Any Quality Improvements Were Merger Specific, Thus Summary Judgment Is Warranted .......................................34

B. NorthShore Statute of Limitations Defense Fails .............................37

**III.** **ENH Is Not Entitled To Summary Judgment ........................................39**

A. NorthShore's Motion For Summary Judgment As To Painters Fund And All Other Self-Insured Payors Should Be Denied And The Court Should Find That Painters And Other Self-Insured Payors Are Direct Purchasers As A Matter of Law ........................................40

1. The Primary Case On Which ENH Relies Is Unavailing ...................44

2. Case Law Instructs That Painters And All Other Self-Insured Payor Class Members Are Direct Purchasers ......................................45

3. All Other Self-Insured Payors Utilizing ASO Contracts Are Also Direct Purchasers ...................................................47

B. Plaintiffs Have Not Waived Damages Or Failed to Mitigate Damages After July 30, 2009 ......................................................47

IV. Defendants' Experts Proferred Testimony And Opinions Are Inadmissible.......52

A. Willig's Synthetic Control Analysis Is Inadmissible ........................53

V. ENH's *Daubert* Motion Against Plaintiffs' Experts Should Be Denied ...............53

A. Dr. Vogt ........................................................................53

B. Dr. Lamb ........................................................................56

C. Dr. Romano ...................................................................57

D. Legal Standard ...............................................................57

E. Plaintiffs' Experts Are Qualified ........................................59

F. Dr. Vogt's and Dr. Lamb's Use Of MCR Data Does Not Render Their Opinions Unreliable Or Irrelevant ...................................................60

G. Dr. Vogt's And Dr. Lamb's Opinions Based Upon ▮▮▮▮▮▮▮ Data Are Relevant ........................................................................65

H. Dr. Vogt's Opinions Regarding The Need To Define a Relevant Geographic Market and What The Geographic Market Definition Should Be Are Reliable ........................................................................66

I. Dr. Romano's Analysis of Whether The Merger Caused Quality to Improve Is Reliable ........................................................................69

VI. Dr. Vogt's and Dr. Lamb's Reference to Dr. Haas-Wilson's Testimony In The FTC Proceeding Should Not Be Excluded ...................................71

Conclusion ........................................................................72

# Cases

*Allstate Ins. Co. v. Seigel,*
312 F. Supp. 2d 260 (D. Conn. 2004) ............................................................ 46, 47

*Ammons v. Aramark Unif. Servs.,*
368 F.3d 809 (7th Cir. 2004) .......................................................................... 57

*ATA Airlines, Inc. v. Federal Exp. Corp.,*
665 F.3d 882 (7th Cir. 2011) .......................................................................... 70

*Ball Memorial Hosp., Inc. v. Mutual Hosp. Ins., Inc.,*
784 F. 2d 1325 (7th Cir. 1986) ....................................................................... 41

*Bigelow v. RKO Radio Pictures, Inc.,*
327 U.S. 251 (1946) ....................................................................................... 65

*Brown Shoe v. United States,*
370 U.S. 294 (1962) ....................................................................................... 27

*Burton v. Board of Regents of University of Wisconsin Sys.,*
2017 WL 1032628 (7th Cir. Mar. 17, 2017) .................................................. 37

*C.W. ex rel. Wood v. Textron, Inc.,*
807 F.3d 827 (7th Cir. 2015) .......................................................................... 33

*Coleman v. Lane,*
949 F. Supp. 604 (N.D. Ill. 1996) .................................................................. 51

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,*
509 U.S. 579 (1993) ............................................................... 11, 57, 58, 69

*Davalos v. Jacobsen Div. of Textron,*
11 F. Supp. 2d 1012 (E.D. Wis. 1998) ........................................................... 52

*Delta Consulting Group, Inc. v. Randle Constr., Inc.,*
554 F. 3d 1133 (7th Cir. 2009) .................................................................. 50, 51

*Dura Auto Sys. v. CTS Corp.,*
285 F.3d 609 (7th Cir. 2002) .......................................................................... 34

*Eastman Kodak Co. of New York v. Southern Photo Materials Co.,*
273 U.S. 359 (1927) ....................................................................................... 65

*Emich Motors Corp. v. General Motors Corp.*,
340 U.S. 558 (1951) ............................................................................. 7, 8

*Ervin v. Johnson & Johnson, Inc.*,
492 F.3d 901 (7th Cir. 2007) ................................................................... 57

*Evanston Northwestern Healthcare Corporation*,
2007 WL 2286195 (F.T.C. Aug. 6, 2007) .................................................. 52

*Evanston Northwestern Healthcare Corporation*,
2007 WL 679367 (F.T.C. August 6, 2007) ................................................ 23

*F.T.C. v. H.J. Heinz Co.*,
246 F.3d 708 (D.C. Cir. 2001) ................................................................. 35

*F.T.C. v. Indiana Fed'n of Dentists*,
476 U.S. 447 (1986) ................................................................................ 19

*Farmington Dowel Products Co. v. Forster Mfg. Co.*,
421 F.2d 61 (1st Cir. 1969) ....................................................................... 8

*Federal Trade Commission v. Advocate Health Care Network*,
841 F.3d 460 (7th Cir. 2016) ............................................................. passim

*FTC v. Advocate Health Care*,
2017 WL 1022015 (N.D. Ill. Mar. 16, 2017) ....................................... 26, 28

*FTC v. Penn State Hershey Medical Center*,
838 F. 3d 327 (3rd Cir. 2016) ...................................................... 21, 22, 27

*Fuchs Sugars & Syrups, Inc. v. Amstar Corp.*,
602 F. 2d 1025 (2d Cir. 1979) ................................................................. 45

*General Electric Co v. Joiner*,
552 U.S. 136 (1997) ................................................................................ 11

*General Electronic Co. v. Joiner*,
522 U.S. 136 (1997) ................................................................................ 33

*Godix Equip. Export Corp. v. Catepillar, Inc.*,
948 F. Supp. 1570 (S.D. Fl. 1996) .......................................................... 67

*H & R Block*,
833 F. Supp.2d 36 (D.D.C. 2011) ........................................................... 34

*Illinois Brick Co. v. Illinois,*
431 U.S. 720 (1977) ............................................................................................................ 40, 44

*In re Chocolate Confectionary Antitrust Litigation,*
289 F.R.D. 200 (M.D. Penn. 2012) ........................................................................................... 62

*In re Evanston Northwestern Healthcare Antitrust Litig.,*
2016 WL 4720014 (N.D. Ill. Sept. 9, 2016) ..................................................... 28, 37, 38, 39

*In re Evanston Northwestern Healthcare Antitrust Litig.,*
2008 WL 2229488 (N.D. Ill. May 29, 2008) ......................................................................... 38

*In re Lidoderm Antitrust Litig.,*
2017 WL 679367, *7 (N.D. Cal. Feb. 21, 2017) .................................................................... 46

*In re Lorazepam & Clorazepate Antitrust Litigation,*
202 F.R.D. 12 (D.D.C. 2001) ................................................................................................... 46

*In re Polyurethane Foam Antitrust Litig.,*
314 F.R.D. 226 (N.D. Ohio 2014) ........................................................................................... 62

*In re Pressure Sensitive Labelstock Antitrust Litig.,*
No. 3:03-MDL-1556, 2007 WL 4150666 (M.D. Pa. Nov. 19, 2007) ....................................... 65

*In re Southeastern Milk Antitrust Litig.,*
739 F. 3d 262 (6th Cir. 2014) .................................................................................................. 19

*In re Static Random Access Memory (SRAM) Antitrust Litig.,*
264 F.R.D. 603 (N.D. Cal. 2009) ............................................................................................. 65

*In re Sumitomo Copper Litig.,*
182 F.R.D. 85 (S.D.N.Y. 1998) ............................................................................................... 65

*In re Wellbutrin SR Direct Purchaser Antitrust Litig.,*
No. 04-5525, 2008 WL 1946848 (E.D. Pa. 2008) .................................................................. 65

*In the Matter of Evanston Northwestern Healthcare Corp,*
2008 WL 1991994 (FTC 2008) ................................................................................................. 7

*In the Matter of Evanston Northwestern Healthcare Corp.,*
2007 WL 2286195 (FTC 2007) .......................................................................................... passim

*Lapsley v. Xtek, Inc.,*
689 F.3d 802 (7th Cir. 2012) ................................................................................................... 58

*Lewis v. Citgo Petroleum Corp.*,
    561 F.3d 698 (7th Cir. 2009) ......................................................... 10

*Manpower, Inc. v. Ins. Co. of Pa.*,
    732 F. 3d 796 (7th Cir. 2013) ......................................................... 33

*Masimo Corp. v. Tyco Health Care Group, L.P.*,
    2006 WL 123666 (C.D. Cal. 2006) .............................................. 46

*Masters v. Hesston*,
    291 F. 3d 985 (7th Cir. 2002) ......................................................... 33

*Messner v. NorthShore University HealthSystem*,
    669 F.3d 802 (7th Cir. 2012) ......................................................... 62

*Metavante Corp. v. Emigrant Savings Bank*,
    619 F.3d 748 (7th Cir. 2010) ......................................................... 60

*Michigan v. Morton Salt Co.*,
    259 F. Supp. 35 (D. Minn. 1966) ..................................................... 8

*Mid-State Fertilizer Co. v. Exchange National Bank*,
    877 F.2d 1333 (7th Cir. 1989) ....................................................... 11

*New Jersey Wood Finishing Co. v. Minnesota Mining and Mfg. Co.*,
    332 F.2d 346 (3d Cir. 1964) ............................................................ 8

*Newman by and through Newman v. McNeil Consumer Healthcare*,
    2013 WL 9936293 (N.D. Ill. Mar. 29, 2013) ............................... 68

*ProMedica Health Sys. v. FTC*,
    749 F. 3d 559 (6th Cir. 2014) ......................................................... 51

*Re/Max International, Inc. v. Realty One, Inc.*,
    173 F.3d 995 (6th Cir. 1999) ......................................................... 19

*Real Estate Value Co. v. USAir, Inc.*,
    979 F. Supp. 731 (N.D. Ill. 1997) ................................................. 11

*Rebel Oil Co. v. Atlantic Richfield Co.*,
    51 F.3d 1421 (9th Cir. 1995) ......................................................... 19

*Reed v. Advocate Health Care*,
    268 F.R.D. 573 (N.D. Ill. 2009) ..................................................... 64

*RSR Corp. v. F.T.C.*,
  602 F.2d 1317 (9th Cir. 1979) ............................................................................. 27

*Saint Alphonsus Medical Center-Nampa Inc. v. Saint Luke's Health System, Ltd.*,
  778 F. 3d 775 (9th Cir. 2015) ................................................................. 18, 19, 28, 35

*Shafer v. Kal Kan Foods, Inc.*,
  417 F.3d 663 (7th Cir. 2005) ............................................................................. 29

*Smith v. Ford Motor Co.*,
  215 F. 3d 713 (7th Cir. 2000) ........................................................................ 33, 58

*Smith v. I-Flow Corp.*,
  No. 09 C 3908, 2011 WL 1750895 (N.D. Ill. May 5, 2011) ................................... 58

*Spearman Indus., Inc. v. St. Paul Fire & Marine Ins. Co.*,
  128 F. Supp. 2d 1148 (N.D. Ill. 2001) ............................................................... 58

*State of Illinois v. General Paving Co.*,
  590 F.2d 680 (7th Cir. 1979) .............................................................................. 7

*Sugar Industry Antitrust Litigation*,
  73 F.R.D. 322  (E.D. Pa. 1977) ......................................................................... 45

*Todd v. Exxon Corp.*,
  275 F.3d 191 (2d Cir. 2001) .............................................................................. 19

*U.S. v. Aetna Inc.*,
  2017, 2017 WL 325189 (D.D.C. Jan. 23, 2017) ........................................... 28, 35

*U.S. v. Philadelphia Nat. Bank*,
  374 U.S. 321 (1963) ........................................................................................ 27

*U.S. v. Saunders*,
  826 F.3d 363 (7th Cir. 2016) ............................................................................. 58

*United States v. Anthem, Inc.*,
  2017 WL 685563 (Feb. 21, 2017) ...................................................... 26, 28, 35

*United States v. Downing*,
  753 F.2d 1224 (3d Cir. 1985) ............................................................................ 70

*United States v. E.I. du Pont de Nemours & Co.*,
  366 U.S. 316 (1961) ........................................................................................ 48

*Walker v. Soo Line R. Co.*,
    208 F.3d 581 (7th Cir. 2000) ................................................................ 71

**Statutes**

15 U.S.C. § 16(a) ........................................................................................... 8

15 U.S.C. § 16(i) ...................................................................................... 39, 40

**Rules**

Fed. R. Evid. 702 .................................................................................. passim

The uncontroverted factual evidence and law demonstrate that it is the Plaintiff Class, not NorthShore, that is entitled to summary judgment in this case. Every expert that has looked at NorthShore's pricing after the Highland Park merger, including NorthShore's experts, has found that NorthShore raised its prices faster than comparable hospitals after the merger, indicating anticompetitive market power. PSOF 15. Even NorthShore's expert here, Dr. Willig, shows it. *Id*. NorthShore primarily relies on two defenses to claim that the post-merger price increases were not anticompetitive: (1) that its quality of care rose post-merger, and (2) that it coincidentally learned it was underpricing its services. Both of these defenses were soundly rejected by the Federal Trade Commission ("FTC") when it found the merger illegal. It is questionable whether quality of care is a defense, while "learning about demand" consists of conveniently self-serving assertions meant to divert attention from the objective issue of whether NorthShore could have raised its prices without the merger.

As a result, Plaintiffs are entitled to summary judgment on the case as a whole, or, in the alternative, partial summary judgment on the following issues:

(1) That NorthShore increased its prices post-merger;

(2) That NorthShore has no evidence that it could have increased its prices without the merger;

(3) That the price increases were the result of increased market power and anticompetitive;

(4) That NorthShore cannot establish that any the merger created any efficiency, such as an increase in quality of care, which makes the merger procompetitive;

(5) That quality of care is not an actual defense;

(6) That there were no quality of care benefits attributable to the merger;

(7) That NorthShore cannot establish its statute of limitations defense;

(8) That there is no need to prove a relevant geographic or product market because the merger happened in the past and the direct effects of it can be observed;

(9)  That if it is necessary to establish a relevant geographic market, that market is the geographic triangle formed by Evanston Hospital, Highland Park Hospital, and Glenbrook Hospital, as the FTC found; and

(10)  That if it is necessary to establish a relevant product market, that market is general acute care in-patient services, as the FTC found and as NorthShore's expert here, Ms. Guerin-Calvert, agrees.

In contrast, NorthShore's arguments that it should be granted summary judgment should be rejected.  There is no question that Class Representative Painters Fund is a direct purchaser, as are the other self-insureds in the Class.  The linchpin of NorthShore's argument, that Blue Cross Blue Shield of Illinois ("BCBSI") forwarded Painters' payments to NorthShore at Painters' direction as part of its administrative services only ("ASO") contract with Painters, does nothing to change this.

Similarly, it is Plaintiffs, not NorthShore, that are entitled to summary judgment on the market definition issues.  NorthShore has not presented evidence to dispute that examination of retrospective pricing postmerger is sufficient to establish anticompetitive impact. Even if a market definition were required as an additional check, NorthShore's geographic market definition arguments rest on two errors of law, one of which NorthShore has admitted.  First, the findings of an appropriate geographic market for NorthShore's 2015 attempt to merge with Advocate has nothing to do with the merger here. It is fundamental that geographic markets be drawn as narrowly as possible, and a combination of Advocate and NorthShore today simply covers a broader geographic area than a combination of Evanston, Highland Park, and Glenbrook hospitals.

Second, NorthShore's expert opinions regarding geographic market are based on diversion ratios, a method of analysis which the Seventh and Third Circuits have found unreliable when used to predict the possible anticompetitive effects of a *prospective* merger, but which are especially unreliable when judging the anticompetitive effects of a completed merger completed in the past.

NorthShore's experts who rely on that methodology are wrong under the law in this Circuit and NorthShore knows it.[1] NorthShore's attorneys here, who also represented it in the litigation regarding NorthShore's recent attempt to merge with Advocate, argued to Judge Alonso of this Court that the use of diversion ratios should be rejected. This Court should reject them too, but it should also exclude NorthShore's experts, Dr. Willig and Ms. Guerin-Calvert, as a result. In addition, NorthShore's *Daubert* challenge to Plaintiffs' expert Dr. Vogt fails because it is based substantially on Dr. Vogt's refusal to use the unreliable diversion ratio methodology.

NorthShore's argument that damages after July 30, 2008, have been waived fails because NorthShore has not, and cannot, establish the elements of waiver. First, NorthShore's argument only applies to MCOs. However, most of the largest dollar volume MCOs have already been removed from the Class as a result of this Court's ruling on the motion to compel arbitration. As to the MCOs remaining in the Class, such as Humana and BCBSI's HMO plan, NorthShore has not shown waiver because NorthShore has not shown that the FTC's "remedy" offered any actual rights or relief. NorthShore's expert, Dr. Willig, admitted in his deposition that he did not do any analysis of whether the remedy was effective in restoring competition, and he did not know that a group of prominent healthcare economists had opposed the remedy because it would not be effective. The FTC, in ordering the remedy, acknowledged that divesture of Highland Park would be preferable, but reasoned that eight years after the merger it was impractical to unscramble the eggs and order divestiture without harming Highland Park. *In the Matter of Evanston Northwestern Healthcare Corp*., 2007 WL 2286195, **77-78 (FTC 2007).

---

[1] In an article which NorthShore's experts rely upon, diversion ratios are show to explain *only 18%* of the price variation caused by completed mergers. Christopher Garmon, The Accuracy of Hospital Merger Screening Methods, FTC Working Paper No. 326 (2016), at Table 3, $R^2$ column for Entire Sample, Product of Diversion Ratios row; -PSOF 59.

**ARGUMENT**

I. **Plaintiffs Are Entitled To Summary Judgment On Liability**

A. **There Is No Genuine Issue Of Material Fact That After The Merger ENH Raised Prices To Anticompetitive Levels Based Upon Market Power Obtained From The Merger**

There is no question of material fact that ENH raised its prices after the merger, and that it did so as a result of gaining anticompetitive market power from the merger. There is universal agreement that ENH raised its prices after the merger. Several expert economists, including those retained by ENH, have agreed on this fact. PSOF 15. Here, ENH relies upon the expert testimony of Dr. Robert Willig in its quest to avoid liability. But Dr. Willig demonstrates that ENH raised its prices post-merger, and that NorthShore did raise them faster than many other hospitals. PSOF 15. The same fact was demonstrated in the FTC proceeding by ENH's experts Dr. Baker and Dr. Noether. PSOF 15.

Plaintiffs' expert Dr. Robert Vogt demonstrates that ENH raised its prices faster post-merger than other hospitals. Dr. Vogt utilized two datasets in his regressions: data from Medicare Cost Reports, and data produced by ███████ for its ███████. Dr. Vogt's analysis of MCR inpatient data shows a substantial price increase, as shown in his Table 7 and Figure 3. The yearly overcharge ranges from a low of 16.2% to as much as 54.7%. PSOF 16.

Table 7: MCR Inpatient: Post-Merger Excess Price Increase

| Year | Excess Increase | Year | Excess Increase |
|------|-----------------|------|-----------------|
| 2000 | 16.2% | 2008 | 25.8% |
| 2001 | 36.3% | 2009 | 35.6% |
| 2002 | 54.7% | 2010 | 23.4% |
| 2003 | 52.3% | 2011 | 34.4% |
| 2004 | 43.8% | 2012 | 34.6% |
| 2005 | 43.0% | 2013 | 21.2% |
| 2006 | 29.9% | 2014 | 22.2% |
| 2007 | 32.8% | 2015 | 20.9% |

Similarly, Dr. Vogt's analysis of the ▮▮▮▮▮▮ in-patient data showed substantial overcharges, in particular once a new contract between the ▮▮▮▮▮▮ and NorthShore took effect at the beginning of 2004. Indeed, the 2001 to 2003 results are not statistically significant.[2] PSOF 17.

| Table 11: ▮▮▮▮▮▮ | Post-Merger Excess Price Increase | | |
|---|---|---|---|
| Year | Excess Increase | Year | Excess Increase |
| 2000 | ▮ | 2005 | ▮ |
| 2001 | ▮ | 2006 | ▮ |
| 2002 | ▮ | 2007 | ▮ |
| 2003 | ▮ | 2008 | ▮ |
| 2004 | ▮ | 2009 | ▮ |

For out-patient prices, Dr. Vogt found substantial overcharges in the ▮▮▮▮▮▮ data for all years, but did not find substantial overcharges for the years after 2003 in the MCR data. As a result, Dr. Lamb only calculated out-patient damages for the years 2000-2003.[3] PSOF 18.

Dr. Vogt also examines the findings of Dr. Deborah Haas-Wilson, the FTC's expert in the FTC proceeding. The data used by Dr. Haas-Wilson in the FTC came from productions by MCOs and state data. Dr. Haas-Wilson found substantial price increases for most MCOs, with smaller ones for ▮▮▮. PSOF 103.

---

[2] "Statistical significance is a measure of how strong the evidence in a dataset is against a particular claim ("null hypothesis"). One way of expressing the strength of this evidence is with a "p-value." The p-value of a claim is always between 0 and 1. The closer is the p-value to 0, the stronger is the statistical evidence that the claim is false." Def. Ex. 12. "Often, effects are described as 'statistically significant' if the p-value for the claim that they are zero is below 0.10." *Id.* ¶ 140. This is referred to as statistically significant at the 90% level. The p-values for 2001 and 2003 are extremely high, at 0.862 and 0.992 respectively, meaning that the results have very little strength. *See id.* at Table A.3 (page 67). The p-value for 2002 is much better, at 0.212.

[3] Dr. Lamb adjusted all of his damages calculations to account for the Court's ruling that the Class' claims may only begin on or after February 11, 2000. 1/25/17 Lamb Reply Rep. at ¶ 24 and fn. 36, Tables 2 and 3.

Table 13: Post-Merger Excess Price Increase: Hass-Wilson

| Data Source | Inpatient | Outpatient |
|---|---|---|
| Aetna | | |
| BC/BS | | |
| Humana | | |
| United | | |
| State Data | | |

ENH's expert Dr. Willig, in analyzing the MCO data from the FTC proceeding, found results in line with the FTC experts. Specifically, he estimated price increases for four of the largest MCOs, including a price increase of ▮▮▮▮▮▮▮▮▮▮. PSOF 19.

Dr. Vogt concludes that these increases in price were the exercise of anticompetitive market power obtained in the merger. PSOF 20. Dr. Vogt analyzed data on NorthShore's pre- and post-merger, and finds that NorthShore gained market power in the merger, and excerised it to exact higher prices. PSOF 20. *Id.* ¶¶ 89-137. Dr. Vogt reviewed the reports of other experts who had studied the merger, and found that their results corroborated his. PSOF 21. *Id.* ¶¶ 142-51. Dr. Vogt found further support for his conclusions in documentary evidence. PSOF 22. *Id.* ¶¶ 152-55.

Although Dr. Vogt found that it was unnecessary to define markets because actual data showed that ENH had anticompetitively exercised market power, Dr. Vogt used the hypothetical monopolist test to see if ENH could impose a small but significant and nontransitory increase in price ("SSNIP"). PSOF 23 *Id.* ¶¶ 162-66. Applying this analysis, Dr. Vogt defined a product market of general acute-care inpatient services, and a geographic market of the triangle formed by the locations of Evanston Hospital, Glenbrook Hospital, and Highland Park Hospital. PSOF 24. *Id.* ¶¶ 168-84. Based upon Dr. Vogt's analysis, the Class' damages expert, Russell Lamb, Ph.D., calculated aggregate damages to the Class of up to $672,000,000, before trebling. PSOF 25.

### B. The Federal Trade Commission Finding That ENH Raised Its Prices In An Anticompetitive Manner Is *Prima Facie* Evidence

The FTC found that ENH instituted anti-competitive price increases after the merger. *In the Matter of Evanston Northwestern Healthcare Corp.*, 2007 WL 2286195 (FTC 2007). This finding is *prima facie* evidence in this proceeding. *See State of Illinois v. General Paving Co.*, 590 F.2d 680, 681 (7th Cir. 1979).

The FTC issued its Opinion containing its final findings of fact and conclusions of law on August 6, 2007. However, it requested further briefing from the parties as to the final remedy to impose. Therefore, it issued its Final Order on April 24, 2008, and that Order incorporated by reference the findings from the August 6, 2007 Opinion. *In the Matter of Evanston Northwestern Healthcare Corp* 2008 WL 1991994, *1 (FTC 2008). As a result, the findings of the August 6, 2007 Opinion are *prima facie* evidence here.

Section 5 of the Clayton Act, 15 U.S.C. § 16(a), provides that findings in FTC proceedings can be used in private antitrust cases as *prima facie* evidence:

> A final judgment or decree heretofore or hereafter rendered in any civil or criminal proceeding brought by or on behalf of the United States under the antitrust laws to the effect that a defendant has violated said laws shall be prima facie evidence against such defendant in any action or proceeding brought by any other party against such defendant under said laws as to all matters respecting which said judgment or decree would be an estoppel as between the parties thereto.

15 U.S.C. § 16(a).

Congress' intent in enacting § 5 of the Clayton Act, 15 U.S.C. § 16(a), was "to minimize the burdens of litigation for injured private suitors by making available to them all matters previously established by the Government in antitrust actions." *Emich Motors Corp. v. General Motors Corp.*, 340 U.S. 558, 568 (1951). Accordingly, Section 5 makes available to a private litigant as *prima facie* evidence "all matters respecting which said judgment or decree would be an estoppel" between the defendant and the United States. 15 U.S.C. § 16(a); *Emich Motors*, 340

U.S. at 568. The Supreme Court stated that a prior judgment constitutes *prima facie* evidence of "all matters of fact and law" necessarily decided by an earlier adjudication. *Emich Motors*, 340 U.S. at 568-69. *Accord New Jersey Wood Finishing Co. v. Minnesota Mining and Mfg. Co.*, 332 F.2d 346, 357 (3d Cir. 1964) ("Section 5(a) permits the use of government judgments and decrees as *prima facie* evidence, only as to matters actually decided in the government suit."). Courts are not permitted to go beyond the boundaries of what was actually determined in the Government suit for purposes of § 5(a)'s *prima facie* rule. *Michigan v. Morton Salt Co.*, 259 F. Supp. 35, 69 (D. Minn. 1966).

Importantly, the *prima facie* weighting of § 5 is not limited to court judgments, but also applies to final judgments in FTC proceedings. *Farmington Dowel Products Co. v. Forster Mfg. Co.*, 421 F.2d 61, 75-76, 79-80 (1st Cir. 1969). In *Farmington*, the First Circuit determined that findings that Forster had violated ¶ 2(a) of the Clayton Act, that Forster engaged in discriminatory price cuts which tended to lessen competition or to create a monopoly, and that the FTC's rejection of Forster's meeting competition defense were issues "necessarily decided" by the FTC and, properly could be admitted as *prima facie* evidence. *Id.* at 79-80.

Here, the FTC found that, *inter alia*:

- ENH substantially raised its prices post-merger, PSOF 2;

- ENH exercised increased market power to do so, PSOF 2;

- MCOs needed either Highland Park Hospital or Evanston and Glenbrook Hospitals in their networks in order to sell those networks, PSOF 3;

- ENH's actions were anticompetitive and illegal, PSOF 2;

- ENH's learning about demand defense did not account for the price increases, PSOF 4;

- ENH's alleged quality improvements did not rebut the anti-competitive nature of its actions, PSOF 5

- the relevant geographic market is the triangle defined by the three NorthShore hospitals, PSOF 6; and

- the relevant product market is general acute care in-patient services. PSOF 7.

Each of these findings was necessary to the FTC's judgment and is deemed *prima facie* evidence in this case.

### C. ENH's Own Documents Show That ENH Raised Its Prices Using Its New-Found Market Power

Post-merger ENH documents and testimony indicate that ENH executives believed that the merger gave ENH additional market power, and they used it to extract higher prices. PSOF 8 at ¶¶152, 155. *In re ENH*, 2007 WL 2286195 at *13. For example, on September 27, 2000, NorthShore's President Mark Neaman told the Finance Committee of NorthShore's board of directors that "the larger market share created by adding Highland Park Hospital has translated to better managed care contracts." PSOF 8. ENHCA-002-000952 (Ex. 11 at 2003 Neaman Deposition). In October 2000, Neaman issued a memorandum entitled "Final Report - Merger Integration Activities" to the Board of Directors that stated: "Some $24 million of revenue enhancements have been achieved - mostly via managed care renegotiations," and "*none of this could have been achieved by either Evanston or Highland Park alone*. The 'fighting unit' of our three hospitals and 1600 physicians was instrumental in achieving these ends." PSOF 9. ENHCA-002-000965 at ENHCA-002-000965-66 (emphasis added) (Ex. 14 at 2003 Neaman Deposition).

Mark Neaman, who was still NorthShore's CEO, admitted that that the Highland Park merger gave NorthShore market power to raise prices as recently as April 14, 2016. On that day, Mr. Neaman testified before Judge Alonso of this Court as follows:

> Q. Do you believe you could raise prices after the – after Evanston and Highland Park merged?
> * * *
> A. I would have thought back 16 years ago we would have had some opportunity to raise -- raise prices.

Q. Why is that?
A. Totally different circumstances, market was different, and there would be -- since you asked me would I have any opportunity, would NorthShore have any opportunity, I would say yes, we would have some opportunities.

PSOF 10. *FTC v. Advocate* Preliminary Injunction Hearing Transcript (Apr. 14, 2016) 721:24-722:11.

### D. ENH Could Not Have Raised Its Prices Without The Merger, And NorthShore's Learning About Demand Defense Fails

There is no evidence in the record that ENH could have raised its prices absent the merger. PSOF 40. While ENH posits a "learning about demand" defense in which it claims that it coincidentally a learned that it was pricing its services too low at the time of the merger based upon a review of Highland Park Hospital contracts and information which it received from the consulting firm Bain and Co., ENH ends its analysis there. But these self-serving statements that it suddenly discovered that it was underpricing its services do not, as an objective matter, demonstrate that it could have raised its prices without the merger. Indeed, many of the statements and documents which ENH relies upon to make its "learning about demand" defense explicitly tie ENH's ability to raise prices post-merger to additional market power gained from the merger. In addition, ENH's executives testified that before the merger ENH successfully negotiated good prices. ENH has no admissible evidence that it could have raised prices without the merger.

Critical to ENH's "learning about demand" defense is the premise that prices at Evanston Hospital were below market before the merger. But there is no admissible evidence that prices at Evanston Hospital were below market before the merger. *Lewis v. Citgo Petroleum Corp.*, 561 F.3d 698, 704 (7th Cir. 2009) ("To defeat a summary judgment motion, however, a party may rely only on *admissible* evidence.") (emphasis added). Without establishing that Evanston Hospital's prices were below market before the merger, ENH's "learning about demand" defense fails.

NorthShore cannot use a handful of Bain and Co. documents, or Dr. Willig's acceptance of them without analysis, to establish that Evanston's Hospital's prices were below market. His opinion that such prices were below market constitutes pure speculation that does not satisfy the admissibility requirements set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and should be excluded and disregarded. His opinion is not supported by scientifically reliable methodology and is thus not admissible under Fed. R. Evid. 702. *Real Estate Value Co. v. USAir, Inc.*, 979 F. Supp. 731, 744 (N.D. Ill. 1997). While Dr. Willig cites a handful of Bain documents, Dr. Willig merely assumes as true Bain's hearsay that ENH's prices were below market before the merger. Dr. Willig did not conduct any analysis to show that the Bain statements were reliable and sound. He merely adopts them without any analysis. Nor is there any admissible evidence that Bain conducted any sufficient analysis, nor was anyone at Bain identified as an expert witness. PSOF 43.

"An expert who supplies nothing but a bottom line supplies nothing of value to the judicial process." *Mid-State Fertilizer Co. v. Exchange National Bank,* 877 F.2d 1333, 1339 (7th Cir. 1989). Willig is such an expert. NorthShore has not presented any evidence to this Court that Dr. Willig's opinion concerning ENH's prices before the merger is the product of reliable principles and methods, based upon sufficient facts or data. As such, his opinion is fundamentally flawed and inadmissible as being both speculative and unhelpful to the trier of fact. *General Electric Co* v. *Joiner*, 552 U.S. 136,146 (1997) ("Nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert.")

Because there is no admissible evidence that Evanston Hospital's prices were below market before the merger, as a matter of law, ENH's "learning of demand" defense fails. Summary

judgment in favor of Plaintiffs and against ENH concerning this highly questionable defense is warranted.[4]

### 1. The Bain Documents Tie The Ability To Raise Prices To The Merger

The Bain documents that supposedly prove that ENH was underpricing its services before the merger do not indicate that Bain conducted any serious study or ever concluded that ENH could raise prices if it did not merge with Highland Park hospital.

The first document, which Dr. Willig relies upon most, Willig Rep. pp. 38-39, fn. 109, 111, 114-15, is a proposal to ENH before the merger that Bain assist ENH with certain tasks regarding the merger. In this sales proposal, Bain posits that it can help ENH raise prices post-merger. However, Bain explicitly ties the ability to raise prices post-merger to the market power caused by the merger. As Bain states,

> The merger of Highland Park into Evanston Northwestern Healthcare presents a significant opportunity for ENH. As a consequence of the merger, ENH will have broad geographic coverage on the North Shore, with three hospitals and an extensive physician network. The merger provides the opportunity to reduce costs, refocus activities at the three hospitals, shift activity from the overcrowded Evanston Hospital *and negotiate contracts with payers from a stronger position*.

ENHCA-003-014033 (emphasis added). PSOF 41.

The other Bain documents which Willig cites, Willig Rep. p. 39, fn. 110, 112-13, 116-17, also tie ENH's ability to obtain higher prices to its enhanced market power after the merger. PSOF 42. (citing increase in market share as a justification for higher rates); (citing ENH's position in marketplace as a result of the merger); (citing ENH's position in marketplace as a result of the merger); (current rates do not reflect that ENH has the largest regional network as a result of the

---

[4] Balan and Garmon, "A Critique of the 'Learning about Demand" Defense in Retrospective Merger Cases, ABA Antitrust Law Section, Economics Committee Newsletter, at pp. 5-10 (Fall 2008) (explaining why ENH's "learning of demand" defense makes no sense).

merger); (current rates do not reflect that ENH has the largest regional network as a result of the merger).

The conclusions in the Bain documents are hearsay, and there is no evidence of what, if any, analysis Bain did to make them. Dr. Willig cannot rely upon them.

### 2. ENH's Executives Testified That They Effectively Negotiated With MCO's Before The Merger

NorthShore's executives testified that they effectively negotiated with MCOs before the merger, further demonstrating that ENH's prices were not below market and that there is no evidence that NorthShore could have negotiated more favorable reimbursements with MCOs absent the merger.

Jeffrey Hillebrand and Jack Sirabian were in charge of contract negotiations for ENH before the merger. Jack Sirabian was NorthShore's primary negotiator with MCOs at that time. Mr. Sirabian reported to Mr. Hillebrand, as well as Mark Neaman. Mr. Hillebrand also would get involved in face-to-face negotiations with some MCOs, and he had overall supervisory responsibilities for contracting with MCOs from the 1990s through 2012, when he retired. PSOF 44. Mr. Hillebrand believed that he was an effective negotiator. He tried to get the best deal that he could in negotiations with MCOs. He was never criticized for how he handled managed care negotiations. PSOF 45.

Mr. Hillebrand trusted Mr. Sirabian's judgment and efforts. PSOF 46. Mr. Sirabian was not concerned that MCOs would drop pre-merger ENH from their plans because they considered themselves to be a top-tier system, and MCOs needed top-tier systems to sell their products. PSOF 47. While Mr. Sirabian thought pre-merger ENH offered a fair price for the product it was delivering, PSOF 48, Mr. Sirabian always sought to get the highest price he could for ENH. PSOF 49. Mr. Sirabian also found out how much ENH's per diem or per case costs were from ENH's

Finance Department when negotiating per diem or per case contracts. PSOF 49. Mr. Sirabian always negotiated to cover ENH's costs and receive a profit in addition. PSOF 49. Indeed, some MCOs would go over Mr. Sirabian's head and try to negotiate with Mr. Hillebrand because they thought Mr. Sirabian was being too tough. PSOF 50. *Id.* at 68:14-69:14.

### 3. Prices At Different Hospitals Cannot Be Directly Compared

NorthShore's learning about demand defense is built upon the notion that hospital prices can be directly compared to determine whether they are too high or too low. But that is not true. Hospital prices vary widely. As one recent study notes:

> Hospital prices vary considerably within local markets, even after adjustment for teaching activities and differences in the complexity of cases treated by different hospitals. Two predominant narratives have been offered to explain this disparity: First, high-price hospitals have a special mission and unique characteristics that increase their costs and for which they should be compensated; and second, some hospitals have market power that allows them to negotiate high prices with private health plans and operate under little pressure to contain costs.

> Chapin White, James D. Reschovsky and Amelia M. Bond, Understanding Differences Between High- And Low-Price Hospitals: Implications For Efforts To Rein In Costs, Health Affairs 33, no.2 (2014):324-331, at 329-30 (footnotes omitted) (hereafter "White, et al."). PSOF 26.

The market for hospital services is not like the market for Coca-Cola. Coca-Cola is a standardized good. Hospital services are highly differentiated. As the Seventh Circuit observed last year:

> [P]atients vary in their hospital preferences. Getting an appendectomy is not like buying a beer; one Pabst Blue Ribbon or Hoegaarden may be as good as another, no matter where they are bought. For surgery patients, who their surgeon will be matters, the hospital's reputation matters, and the hospital's location matters. Different patients value these and other factors differently. Capps et al., supra, at 12 ("The high degree of heterogeneity in the taste for hospital attributes and in willingness to travel highlights the key point that hospitals offer a differentiated product to a segmented market.").

Federal Trade Commission v. Advocate Health Care Network, 841 F.3d 460, 470 (7th Cir. 2016).

This high degree of differentiation means that the fact that one hospital can obtain higher or lower reimbursements for its services does not demonstrate that another hospital is underpricing its services. This differentiation and variation in price is similar to the differentiation and variation in price in real estate. Two houses could be built from the same plans but priced considerably differently based on their location.

ENH's expert Ms. Guerin-Calvert attempted to explain this wide price variation in a paper she wrote for the American Hospital Association. Margaret E. Guerin-Calvert and Guillermo Israilevich, Assessment of Cost Trends and Price Differences for U. S. Hospitals (March 2011), available at http://www.aha.org/content/11/11costtrendspricediffreport.pdf (visited June 9, 2017). Ms. Guerin-Calvert concluded:

- Hospital prices are directly related to an array of costs associated with labor and capital costs, and the level and type of care received by the patients treated by the hospital.

- Up to 72% of the differences across hospitals in non-Medicare prices can be explained by factors that include case mix, regional costs, hospital investments in capital and other improvements, type of hospital, and other tangible factors.

PSOF 32.. While Ms. Guerin-Calvert attempts to use tangible costs to explain differences in prices, these tangible costs could be different based on how a hospital seeks to differentiate itself. Labor costs will vary by whether the number of nurses per patient is high or low, leading to different care experiences, or whether there are concierges or valets for parking. Likewise, capital costs would not just reflect necessary equipment such as x-ray machines, but also cushier rooms and aesthetic touches like a waterfall in the lobby. Thus the differences in cost structure between hospitals can themselves reflect attempts at differentiation, and be reflected in the portion of the prices Ms. Guerin-Calvert said she could explain. And the at least 28% of the price differences

that Ms. Guerin-Calvert could not explain almost certainly reflects differentiation that Ms. Guerin-Guerin-Calvert did not measure. In any event, in this article, Ms. Guerin-Calvert does not argue that price variation is caused by hospitals being under- or over-compensated. *See*, *e.g.*, *id*. at 22 ("There is no basis to conclude that these unexplained factors are related to hospital market power."). PSOF 34.

Ms. Guerin-Calvert makes another interesting observation in the article, which tends to disprove ENH's contention that the claim that if Highland Park Hospital had better contracts, it must show that pre-merger ENH's prices were too low. Ms. Guerin-Calvert found that "[t]he coefficients for hospital utilization and size are negative and statistically significant, which shows that – after controlling for other factors – average hospital prices tend to be lower at large hospitals and hospitals with high utilization." *Id.* at 19. PSOF 33. Since Evanston Hospital was larger than Highland Park and it had greater utilization. Ms. Guerin-Calvert therefore would have expected normal prices to be higher at Highland Park than at Evanston Hospital. PSOF 31.

#### 4. Dr. Willig's Pricing Analysis Is Inadmissible

Despite hospital services being differentiated, Dr. Willig purports to conduct pricing comparisons which are flawed and which should be excluded. In these comparisons, Dr. Willig compares the raw prices at different hospitals and then draws simplistic conclusions based on the raw price levels. PSOF 35.

Ms. Guerin-Calvert's article demonstrates that Dr. Willig's comparisons are unscientific and unreliable. Ms. Guerin-Calvert cited a number factors in the article and argued that they explain hospital price variation. Dr. Willig, ignores all of those variables and simply throws raw numbers into a chart.

Since NorthShore's expert upon which Willig relies underscores that his analyses are unscientific and unreliable, they should be excluded. As the Seventh Circuit's findings about

hospital differentiation and Ms. Guerin-Calvert's paper demonstrate, raw hospital price levels are not appropriate measures for comparison. This is why healthcare economists performing studies of hospital pricing after mergers overwhelmingly use the difference-in-differences ("DID") methodology in which relative degrees of price changes are measured rather than raw prices are compared. PSOF 26. Indeed, the Garmon article upon which Dr. Willig and Ms. Guerin-Calvert rely used DID analyses of MCR data to establish the anticompetitive impact of the completed mergers being studied.[5]

### E. Dr. Vogt Properly Found Market Power From Direct Evidence, Obviating The Need To Define A Geographic Market, But If One Must Be Defined, It Is The Triangle Formed By The Three Hospitals

The Class is entitled to summary judgment that ENH gained anticompetitive market power through the merger. The economic evidence demonstrates that ENH gained the ability the raise prices after the merger, which itself is the definition of market power. As a result, either no geographic market need be defined, or that the geographic market is the area defined by ENH's three hospitals, which is the same as the FTC ruled was the appropriate geographic market.

Generally mergers are reviewed for anticompetitive effects before they occur, and the question is whether the merged firm will possess anticompetitive market power. As a result, a prediction must be made regarding whether the merger is likely to have an anticompetitive result. One means used to predict the effect of a merger is to look at how the merger would affect a particular geographic market. How the geographic market is defined often determines whether or not the merger is found to be anticompetitive.

---

[5] Christopher Garmon, The Accuracy of Hospital Merger Screening Methods, FTC Working Paper No. 326 (2016), at 14, 16-18. Dr. Garmon refers to the data he used as HCRIS data. This is the same data more commonly referred to as MCR data. PSOF 59-60.

In contrast, here the merger took place seventeen years ago. There is no need to draw a geographic market because the effects of the merger are known.

However, if the Court should find that defining a relevant geographic market is necessary, the Court should grant the Plaintiffs summary judgment that the relevant geographic market is the triangle defined by the three NorthShore hospitals, as found by the FTC. ENH cannot prove that this geographic market is wrong because its expert testimony regarding geographic markets is inadmissible.

Moreover, to the extent that there is a need to define a relevant product market, the Court should grant the Plaintiffs summary judgment that the relevant product market is general acute care in-patient services. Although Ms. Guerin-Calvert claims that there is a dispute between her and Dr. Vogt regarding the relevant product market, the reality is that none exists.

## 1. ENH Gained Market Power Through The Merger

Market power is the ability to control the pricing of a product. William M. Landes and Richard A. Posner, Market Power in Antitrust Cases, Harvard Law Review, Vol. 94, No. 5, p. 937 (Mar. 1981). The recognized method in judging a prospective merger is the hypothetical monopolist test. The hypothetical monopolist test is predictive; it "asks what would happen if a single firm became the only seller in a candidate geographic region." *FTC v. Advocate Health Care,* 841 F. 3d at 468. The gist of the test "is to find whether a hypothetical monopolist could impose a 'small but significant nontransitory increase in price' ("SSNIP") in the proposed market." *Saint Alphonsus Medical Center-Nampa Inc. v. Saint Luke's Health System, Ltd.*, 778 F. 3d 775, 784 (9th Cir. 2015).[6] If the hypothetical monopolist could profitably raise prices above competitive levels, the region is a relevant geographic market. *Advocate Health Care,* 841 F. 3d at 468. But if

---

[6] Courts generally use a SSNIP amount of about a 5% price increase. *See FTC v. Advocate Health Care,* 841 F. 3d at 465; *Matter of Evanston Northwestern Healthcare,* 2007 WL 2286195, *44.

customers could defeat the attempted price increase by buying from outside the region, it is not a relevant market and the test should be rerun using a larger region, *Saint Luke's*, 778 F. 3d at 775, 784; *In re Southeastern Milk Antitrust Litig.*, 739 F. 3d 262, 277-78 (6th Cir. 2014), until a relevant geographic market is identified. *Id.* at 278. The hypothetical monopolist test focuses on "the area of effective competition" between firms, but the market does not need to include all of the firm's competitors; rather, it need include only those competitors that would "substantially constrain [the firm's] price-increasing ability." *Advocate Health Care,* 841 F. 3d at 469.

The difference between a prospective merger case, such as the attempted NorthShore-Advocate merger, and a retrospective merger case, such as this one, is that there is no need to use circumstantial evidence to *predict* whether the merged firm could impose a SSNIP because direct evidence of what actually happened will demonstrate whether the merged firm imposed a SSNIP. ENH undoubtedly had that ability because it actually did it.

Courts have recognized that when direct evidence of market power is available, it is unnecessary to engage in more imprecise and speculative means of measuring market power, such as determining the monopolist's share of a relevant market. *F.T.C. v. Indiana Fed'n of Dentists*, 476 U.S. 447, 460–61 (1986); *Todd v. Exxon Corp.*, 275 F.3d 191, 206 (2d Cir. 2001); *Toys "R" Us, Inc. v. F.T. C.*, 221 F.3d 928, 937 (7th Cir. 2000); *Re/Max International, Inc. v. Realty One, Inc.*, 173 F.3d 995, 1016, 1018 (6th Cir. 1999); *Rebel Oil Co. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995).

Thus, in the 2010 Horizontal Merger Guidelines, the DOJ and FTC state:

The measurement of market shares and market concentration is not an end in itself, but is useful to the extent it illuminates the merger's likely competitive effects.

The Agencies' analysis need not start with market definition. . . .

> Evidence of competitive effects can inform market definition, just as market definition can be informative regarding competitive effects. . . . Such evidence also may more directly predict the competitive effects of a merger, reducing the role of inferences from market definition and market shares.

Guidelines, § 4 at p. 7. Similarly, Areeda and Hovenkamp stated, "Finding the relevant market and its structure is not a goal in itself but a surrogate for market power." Areeda and Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application*, at ¶531a (2d ed. 1995).

Direct evidence of ENH's market power is abundant in this case. Indeed, NorthShore's own documents show that increasing its market power was not only a goal of the merger, but NorthShore believed that the merger had increased its market power.

In an October 28, 1998 memorandum, Neaman, Hillebrand, and Spaeth wrote that a goal of the merger was to "[s]trengthen negotiating positions with managed care through merged entities and one voice." PSOF 11. Similarly, in a December 14, 1998 memorandum, Mr. Neaman wrote that the merger would "[s]trengthen negotiation capability with managed care companies through merged entities. Commit with single signature/one voice to marketplace. Make 'indispensable' to marketplace." PSOF 11. Likewise, a June 28. 1999 presentation to the Lakeland Health Services (Highland Park Hospital's) Board of Directors stated that the merged entity would have a 55% market share in its combined core service area. PSOF 12.

In September 29, 1999, Neaman told his managers and his Board that the merger would "[i]ncrease our leverage, limited as it might be, with the managed care players and help our negotiating posture." PSOF 13.

Most significantly, Spaeth wrote that "it would be real [sic] tough for any of the Fortune 40 companies in this area whose CEOs either use this place [Highland Park] or that place [Evanston Hospital and Glenbrook] to walk from Evanston, Highland Park, Glenbrook and 1700 of their doctors." PSOF 14.

In contrast, the only evidence proffered by NorthShore to rebut this evidence of market power is inadmissible expert analyses from Ms. Guerin-Calvert and Dr. Willig. NorthShore's experts seek to rebut the direct evidence of market power with circumstantial analyses relying on discredited methodologies. As demonstrated below, those opinions are inadmissible under *Daubert*.

### 2. Ms. Guerin-Calvert's Diversion Ratio Opinions Are Inadmissible

Margaret Guerin-Calvert submitted a report contesting whether ENH had market power relying upon patient flow analysis or "diversion ratios." Diversion ratios analyze patient flows between hospitals as circumstantial evidence of where a patient would go if his first choice hospital were unavailable. In order to do this, Ms. Guerin-Calvert had to predict what those second choice hospitals would be. If the results of all this speculation were that other hospitals were also preferred by patients, ENH would supposedly lack market power.

The use of patient flow analysis as the primary method of defining a geographic market in hospital merger cases was rejected by both the Seventh and the Third Circuits in late 2016. *Advocate Health Care*, 841 F. 3d at 471-72; *FTC v. Penn State Hershey Medical Center,* 838 F. 3d 327, 339-40 (3rd Cir. 2016). The Seventh Circuit found that diversion ratio analysis was synonymous with the discredited Elzinga-Hogarty test, and rejected it as unreliable in hospital merger cases.

The Elzinga-Hogarty test uses product or customer movement to define geographic markets. *Advocate Health Care,* 841 F. 3d at 469. In the context of hospital mergers, customer movement is referred to as patient flow, i.e. patient origin and destination. A geographic market passes the Elzinga-Hogarty test if few customers enter or leave the area. *Id.* "Put more formally, a market passes the Elzinga-Hogarty test if both: (1) a high level of sales (usually 75 or 90 percent)

is to buyers located in the market; and (2) a similarly high percentage of buyers located in the market buys within it." *Id.*

The Seventh Circuit rejected the Elzinga-Hogarty test in hospital merger-cases because it produces "geographic markets that are too large." *Id.* at 472; *see also Penn State Hershey,* 838 F. 3d at 339-40 (referring to the Elzinga-Hogarty test as "a discredited economic theory" in hospital mergers and noting "empirical research demonstrated that utilizing patient flow data to determine the relevant geographic market resulted in overbroad markets with respect to hospitals"). Indeed, in the FTC proceeding involving the Highland Park merger, Dr. Elzinga, a co-author of the Elzinga-Hogarty test, testified that it was erroneous to use it in hospital merger cases. *In the Matter of Evanston Northwestern Healthcare Corporation,* 2007 WL 2286195, at \*65-66 (F.T.C August 6, 2007) (finding "persuasive" Dr. Elzinga's testimony that "application of the [Elzinga-Hogarty] test to patient flow data would identify overly broad geographic markets").

In rejecting diversion ratio analysis, the Seventh Circuit focused on the silent majority fallacy:

The test assumes that if some patients presently travel for care, more would do so to avoid a price increase, making an increase unprofitable. But in fact, often a "silent majority" of patients will not travel, enabling anticompetitive price increases. The economic literature began describing this problem—termed the "silent majority fallacy"—as early as 2001. *Advocate Health Care,* 841 F. 3d at 470 (citations omitted); *id.* at 474-75. Because insurers, not patients, pay the bulk of hospital bills, the "geographic market question is therefore most directly about the likely response of insurers, not patients, to a price increase." *Id.* at 471 (citations and quotation marks omitted). Insurers therefore need a plan that they can market to employers, and without certain hospitals, a plan can be unmarketable, despite what the diversion ratios show. *Id.* at 474-75. Diversion ratios

are unreliable because the answer the wrong question. Indeed, NorthShore's attorneys here have filed two briefs in the Advocate merger proceedings criticizing the use of diversion ratios. *FTC v. Advocate Health Care*, 15-cv-11473 (N.D. Ill.), R. 563 at 1, 4-6, and R. 576 at 1, 3. And the Garmon article shows that diversion ratios explain *only 18% of price variation. See supra* at 61, fn. 6.

Nonetheless, Ms. Guerin-Calvert relied upon patient flow analysis in conducting her analysis of the merger. Though she professed to have used the hypothetical monopolist test, the undisputed evidence proves otherwise. PSOF 55. She concedes to have substantially relied upon the "use of patient flow data as a data source" and to have focused her analysis almost exclusively on diversion ratios. PSOF 56. Indeed, although she tries to be coy about which test she actually did rely upon, PSOF 57 ("I adopt *diversion ratio analysis* in defining the relevant geographic market and identifying competitors as a means to replicate a Hypothetical Monopolist Test" [emphasis added]), the inescapable conclusion is that by relying substantially on patient-flow data and diversion ratios, she employed the Elzinga-Hogarty test.

Ms. Guerin-Calvert's virtually exclusive reliance upon patient flow data and diversion ratios, coupled with the omission of a SSNIP analysis, is by any name – here, the "Diversion Ratio Analysis/Test" – an application of the Elzinga-Hogarty test. Since that test has been expressly rejected by the Seventh and Third Circuits, it goes without saying that she relied upon the incorrect legal standard. That reliance is fatal.

### 3. Dr. Willig's Opinions Regarding Diversion Ratios Are Inadmissible

Most of the discussion in Dr. Willig's opinions regarding geographic market analysis simply summarizes Ms. Guerin-Calvert's work. PSOF 58, Because Dr. Willig relies exclusively on Ms. Guerin-Calvert's work in these paragraphs and did not do any independent analysis, his opinions on those subjects fail for the same reasons as Ms. Guerin-Calvert's.

Dr. Willig also offers a diversion ratio analysis at ¶¶ 41-57 of his report to attempt to show that Highland Park Hospital was not a close substitute for Evanston. Because this part of Dr. Willig's analysis is limited to a diversion ratio analysis, it too is inadmissible.

### 4. The Geographic Market From The Attempted Advocate Merger Is Not Proper

NorthShore also argues that the expansive geographic market used when considering the Advocate/NorthShore merger should be used here. That proposed merger involved additional hospitals spread over a much wider area with additional hospitals located between them. In contrast, this merger formed a tighter group of hospitals with no hospital located between them. ENH does nothing to show that geographic markets for factually different mergers must be the same.

### 5. If A Geographic Market Must Be Defined, It Is the Triangle Formed By the Three Hospitals

Because there is direct evidence if market power in this case, drawing a geographic market is unnecessary. However, if it were necessary to define one, Dr. Vogt proves that the same one used by the FTC, the geographic triangle formed by the locations of the three ENH hospitals, is the correct geographic market.

Although Dr. Vogt found that it was unnecessary to define markets because actual data showed that ENH had anti-competitively exercised market power, Dr. Vogt used the hypothetical monopolist test to see if ENH could impose a small but significant and nontransitory increase in price ("SSNIP"). PSOF 23. Applying this analysis, Dr. Vogt defined a geographic market of the triangle formed by the locations of Evanston Hospital, Glenbrook Hospital, and Highland Park Hospital. PSOF 24. The Merger Guidelines state that to define a relevant market, "[t]he hypothetical monopolist test requires that a hypothetical profit-maximizing firm that was the only present or future producer of the relevant product(s) located in the region would impose at least a

SSNIP from at least one location, including at least one location of one of the merging firms."
Merger Guidelines § 4.2.1. Here, the DID analysis and data show that ENH was able to impose a
substantial price increase at all of its hospitals, and that the price increase was profitable. PSOF
51. As a result, Dr. Vogt confirmed the FTC's finding of a geographic market bounded by the
locations of the three hospitals.

### 6. If A Product Market Must Be Defined, It Is General Acute Care In-Patient Services

Just as the direct evidence of market power makes defining a geopgraphic market
unnecessary, it also makes defining a product market unneccessary. However, if one is necessary,
Dr. Vogt and the FTC agree it would be general acute care in-patient services.

Dr. Vogt reached this conclusion applying the hypothetical monopolist test and the SSNIP
test. As Dr. Vogt notes, cases analyzing hospital mergers traditionally use this product market.
PSOF 53.

Ms. Guerin-Calvert agrees, although she seeks to remove "long term acute care, MDCs 2
(eye), 19 (mental health), and 20 (behavioral health and DRGs associated with rehabilitation
services)," as well as burn care and organ transplant services furnished on an in-patient basis at
general acute care hospitals. Guerin-Calvert Rep. ¶ 92. Ms. Guerin-Calvert claims that they
should be excluded either because not all hosapitals can provide them, or because she believes that
some can be provided in non-hospital settings. But she applies no scientific method to make these
exclusions. For example, she exludes organ transplants because not all hospitals can provide them,
but she includes maternity services even though not all hospitals have maternity wards. *Id.*
Because her exclusions are based on her own *ipse dixit*, and because she fails to demonstrate that
other cases have applied them, they should be ignored.

**II.     NorthShore's Affirmative Defenses Fail As Matter of Law.**

NorthShore primarily relies on two additional defenses to claim that post-Merger price increases were not anticompetitive.  It asserts that such increases cannot be anticompetitive because quality of care improved at ENH's hospitals after the Merger.  However, there is no evidence to support either of these defenses.  Likewise, NorthShore has no factual basis to invoke its statute of limitations defense.

**A.     NorthShore's "Quality of Care" Defense Fails.**

Plaintiffs are entitled to summary judgment on ENH's quality defense for two reasons.  First, as a matter of law, quality of care is not a defense, especially as ENH frames the issue.  Second, even if it were a defense, the opinions of Dr. Meyer, ENH's quality of care expert, are inadmissible under *Daubert*.

**1.   Quality of Care Is Not A Recognized Defense**

Neither the Supreme Court nor the Seventh Circuit has formally adopted a quality of care or efficiencies defense.  *See FTC v. Advocate Health Care*, 2017 WL 1022015, at *12 (N.D. Ill. Mar. 16, 2017) (recognizing efficiencies defenses have "never been sanctioned by the Supreme Court.").  The FTC Merger Guidelines demonstrate that a defense that quality improved as a result of a merger is a form of the broader defense that a merger allegedly created efficiencies, and thus allegedly enhanced consumer welfare.[7]  *See* Merger Guidelines, § 10 (A merger may "generate significant efficiencies and thus enhance the merged firm's ability and incentive to compete, which may result in lower prices, improved quality, enhanced service, or new products.").  Moreover, the Guidelines only credit "those efficiencies likely to be accomplished with the proposed merger and

---

[7]  The Commentary to the Merger Guidelines  "describes a merger-specific efficiency as something 'that enables the combined firm to achieve lower costs for a given quantity and quality of product.'"   *United States v. Anthem, Inc*., 2017 WL 685563, at *60 (Feb. 21, 2017), *quoting* U.S. Dept. of Justice & Fed. Trade Comm'n Merger Commentary § 4 (2006) ("Merger Commentary").

unlikely to be accomplished in the absence of either the proposed merger or another means having comparable anticompetitive effects." *Id.* While the Merger Guidelines recognizes the possibility of such efficiencies enhancing consumer welfare, other Circuits have also questioned the availability of the defense. *See also*, *Federal Trade Commission v. Penn State Hershey Medical Center*, 838 F.3d 327, 347-348 (3d Cir. 2016) ("[W]e have never formally adopted the efficiencies defense. Neither has the Supreme Court...[W]e are skeptical that such an efficiencies defense even exists."); *RSR Corp. v. F.T.C.*, 602 F.2d 1317, 1325 (9th Cir. 1979) (rejecting the existence of efficiencies defense to rebut a presumptively anticompetitive merger).

In at least three opinions, the Supreme Court rejected the availability of the efficiencies defense. First, in *Brown Shoe v. United States*, 370 U.S. 294, 344 (1962), the Supreme Court held that while mergers may sometimes produce benefits that flow to consumers, "Congress appreciated that occasional higher costs and prices might result from the maintenance of fragmented industries and markets. It resolved these competing considerations in favor of *decentralization*." *Id.* (emphasis added). Similarly, in *U.S. v. Philadelphia National Bank*, the Supreme Court rejected the defense:

> We are clear, however, that a merger the effect of which 'may be substantially to lessen competition' is not saved because, on some ultimate reckoning of social or economic debits and credits, it may be deemed beneficial. A value choice of such magnitude is beyond the ordinary limits of judicial competence, and in any event has been made for us already, by Congress when it enacted the amended s 7. Congress determined to preserve our traditionally competitive economy. It therefore proscribed anticompetitive mergers, *the benign and the malignant alike*, fully aware, we must assume, that some price might have to be paid.

*U.S. v. Philadelphia Nat. Bank*, 374 U.S. 321, 371 (1963) (emphasis added). Finally, in *FTC v. Procter & Gamble Co*., the Court determined that "[p]ossible economies cannot be used as a defense to illegality." 386 U.S. 568, 580 (1967). Moreover, "Congress was aware that some

mergers which lesson competition may also result in economies but it struck the balance in favor of protecting competition." *Id.*

Courts are correct to reject an efficiencies defense because the anticompetitive effects remain. As this Court has recognized in this case, two merging parties may obtain or enhance monopoly power, but may choose to defer price increases until after the coast is clear, and the merger can no longer be scrutinized. *In re ENH Antitrust Litig.*, 2016 WL 4720014, at *10, *12 (N.D. Ill. Sept. 9, 2016). Recently, NorthShore and Advocate attempted to merge, and argued that prices would decrease and quality and efficiency would increase. *Advocate*, 2017 WL 1022015, at *15 (N.D. Ill. Mar. 16, 2017). After recognizing "the [efficiencies] defense has never been sanctioned by the Supreme Court," Judge Alonso determined that the "defendants have not carried their burden of proving that efficiencies will offset the anticompetitive effects" and entered a preliminary injunction against the merger. *Id.* Other recent high profile merger cases involving the proposed mergers of Anthem and Cigna, and Aetna and Humana also rejected the efficiencies/quality defenses, and preliminarily blocked the mergers. *U.S. v. Anthem, Inc.*, 2017 WL 685563, at *51 (D.D.C. Feb. 21, 2017); *U.S. v. Aetna Inc.*, 2017, 2017 WL 325189, at *74 (D.D.C. Jan. 23, 2017).

ENH chooses to approach the quality of care defense at some abstract level because once it is examined closely, it is insupportable. Ultimately the question is whether the merger will *enhance* competition rather than reduce it. *See, e.g.*, *Saint Alphonsus Medical Center-Nampa Inc. v. St. Luke's Health System, Ltd.*, 778 F.3d 775, 790 (9th Cir. 2015) (citing the Merger Guidelines, § 10). That question of whether competition is enhanced is measured at the level of the members of the Class in this case: the consumers of healthcare services, including MCOs, self-insured entities, and patients. NorthShore has not tendered any admissible evidence that ties the purported

quality improvements to *enhanced competition. See* PX26-70 and SOF 82 and Romano (ENH did not cite purported quality improvements in its negotiations with payers in 2000 to justify its demands for higher payment rates). PSOF 82. Even if it were a recognized defense, Plaintiffs are entitled to summary judgment on NorthShore's inchoate defense.

From the Supreme Court's perspective, the preservation of competition is paramount to any benefits that may be deemed to flow from a defendant's anticompetitive conduct. Thus, summary judgment on NorthShore's quality-of-care defense is warranted.

### 2. Dr. Meyer's Opinions Should Be Excluded For Failure To Comport With *Daubert*

In order to attempt to establish its quality of care defense, NorthShore relies upon the opinions of Dr. Gregg Meyer, its quality of care expert. But Dr. Meyer's opinions are inadmissible under *Daubert.* As a result, the defense fails.

#### a) Dr. Meyer's opinions are unreliable because they rest on the *Post Hoc Ergo Propter Hoc* Fallacy.

Dr. Meyer wholly fails to perform any serious analysis of whether the merger caused the purported quality improvements because he fails to consider what would have happened to quality if the merger had not taken place. Rather, he commits the *post hoc ergo propter hoc* fallacy, meaning that because he describes quality improvements that happened after the merger, he believes that they must have been caused by the merger. This not only fails as a scientific method; it is no method at all.

"*Post hoc ergo propter hoc* is not a good way to establish causation." *Shafer v. Kal Kan Foods, Inc.*, 417 F.3d 663, 664 (7th Cir. 2005). Dr. Meyer spends hundreds of pages describing quality measures concerning NorthShore but he fails to demonstrate any method by which he determined whether the merger *caused* quality to improve, and by how much. Healthcare in this country is generally improving. PFOF 83. Saying that NorthShore's quality improved is

meaningless by itself.  *Id.*  Rather, to the extent that quality of care is a defense, NorthShore must meet a high burden to show that large, measurable quality improvements were *caused by* the merger and that they *could not have occurred* absent the merger.  Not only are many of Dr. Meyer's analyses unquantified, Dr. Meyer has no method to show that the purported quality improvements were *caused by* the merger and that they *could not have occurred* absent the merger.  *Id.*

Indeed, at his deposition, Dr. Meyer expressly stated that he could not analyze what would have happened in the absence of the merger:

> Q. Dr. Meyer, you offer no opinion about what HPH would have done absent the merger?
> A. I haven't said anything about what HPH would or would not do after the merger; had the merger not happened.  I can't know that.  What I do know is what happened, and that's what I discuss in the report that I produced.

PSOF 67.

Central to the admissibility of expert opinion is whether the expert considered other explanations which may contradict his opinion.  In this case, because healthcare is generally improving, an expert would need to consider, *inter alia*, whether the purported quality improvements would have happened anyways, and, in the context of the defense, whether those improvements could have been attained *by any other means.  See In The Matter of ENH*, 2007 WL 2286195, at *41 and 73.  (F.T.C. Aug. 6, 2007). *See also*, PSOF77-78.  Because Dr. Meyer fails to consider other explanations or means for attaining the quality improvements, his report is unreliable and unhelpful to the trier of fact.  As a result, his opinions should be barred.

A further defect in Dr. Meyer's analysis, to the extent he purports to analyze data as support for claimed merger-specific quality increases, is that the data does not start until years after the merger took place.  See PSOF 77 and PSOF 81.  It is impossible to show an improvement from

pre-merger quality when there is no data showing what the pre-merger quality was.  *See* PSOF 69.

><b>b)     Dr. Meyer's testimony is also unreliable because his method for collecting qualitative data is unreliable and biased.</b>

Dr. Meyer's own testimony and interview notes display a pattern of biased and unreliable methods of qualitative data collection.  Indeed, his opinions heavily rely on his site visits to ENH's hospitals where Dr. Meyer conducted subjective interviews of ENH's current employees and executives beginning in November of 2014, over 14 years after the merger.  PSOF 70.  Even worse is the fact that Dr. Meyer conceded that staff from Winston and Strawn—NorthShore's attorneys— and the Defendant NorthShore ultimately contacted the individuals he interviewed for his report.  PSOF 70.  Thus,

> Any information conveyed during these initial contacts could have biased how interviewees responded to Dr. Meyer's questions.  It is precisely to avoid this type of bias that The Joint Commission prefers to conduct unannounced survey visits as part of its hospital accreditation process.

*Id*.

Surprisingly, Dr. Meyer could not answer where many of the individuals he interviewed worked at the time of the merger or even if the interviewee in question worked for *any* ENH hospital at the time of the merger.  PSOF 71.

Incredibly, Dr. Meyer testified that knowing where an interviewee worked prior to January 1, 2000 was "not important for the reviews that [he] was asked to do."  PSOF 72. While only those individuals who "actually worked at HPH before the merger in 2000, and continued to work at HPH thereafter" would have "experienced the effects of the merger at HPH" and therefore, been able to provide reliable information, many of Dr. Meyer's interviewees are recent hires of NorthShore who would have no knowledge of the pre- or post-merger quality profile of Highland Park Hospital or ENH.  See e.g., PX 13 at 185:13-16 and PX 29-30. *See also*, ¶48. Dr. Meyer's

interview notes also expose his "biased" approach to qualitative data collection. *See* PSOF 73 (Dr. Meyer's notes state: "WE SHOULD SEE IF WE CAN GET MORE DETAILS ON THAT STORY. IT MAY BE A GOOD EXAMPLE OF THE SYSTEM PUSHING QUALITY FORWARD.")

Dr. Meyer's qualitative data collection strains credulity because a NorthShore staff member accompanied Dr. Meyer during his tour of NorthShore's hospitals. "The presence of such a staff member would have had a chilling effect on the willingness of interviewees to criticize NorthShore management, especially given widespread public knowledge of this litigation." PSOF 75.

Thus, Dr. Meyer's methods of qualitative data collection are not only unreliable, but also would not assist the trier of fact in determining a fact at issue, and should be excluded.

### c) Dr. Meyer's Quantitative Analyses Are Similarly Flawed And Must Be Excluded.

Dr. Meyer's quantitative analyses suffer from many of the same infirmities as his qualitative analyses.

Dr. Meyer's statement that he took a "holistic view of the totality of evidence of the period from 2000-2016" does not resolve the but-for causation problem. PSOF 76.

The few quantitative analyses that Dr. Meyer did perform exemplify a plethora of inconsistencies in his analytic approach. PSOF 77. For example, most of his analyses do not include a control group of hospitals from Illinois or the nation as a whole. *Id.* Many of his analyses present unclear goals and benchmarks. *Id.* Moreover, "[s]ome of his analyses present NorthShore hospitals individually, but others present them in aggregate. Some of his analysis start at the time of the merger, but most start much later." *Id. PSOF 77.* As Dr. Romano cautioned:

The best evidence, based on the "difference-in-differences" analytic framework, would come from data analyses that include: (1) both pre-merger and post-merger

data, (2) enough pre-merger and post-merger data to empirically estimate trends (or trajectories, in Dr. Meyer's terminology) and how those trends changed after the merger; and (3) a plausible set of control hospitals to represent the counterfactual experience of what would have happened at HPH and Evanston without the merger. *I am unable to find a single example of an analysis in the Meyer Report that includes all three of these features.*

PSOF 77 (emphasis added). In the context of a merger quality analysis, "only comparison across merging and non-merging hospitals can help us to identify the effects of the merger." PSOF 78. Dr. Meyer never performed the necessary comparison.

Reliability is primarily a question of the validity of the methodology employed by an expert rather than the quality of the data used in applying the methodology or the conclusions produced. *Manpower, Inc. v. Ins. Co. of Pa.*, 732 F. 3d 796, 806 (7th Cir. 2013); *Masters v. Hesston*, 291 F.3d 985, 991 (7th Cir. 2002) ("To gauge reliability, the district judge must determine whether the expert is qualified in the relevant field and whether the methodology underlying the expert's conclusions is reliable."); *Smith v. Ford Motor Co*., 215 F. 3d 713, 718 (7th Cir. 2000). Dr. Meyer has consistently proven that his methodology is invalid, unreliable, and likely to confuse the trier of fact. Moreover, Dr. Meyer's opinions exhibit "too great an analytical gap between the data and opinion proffered such that the opinion amounts to nothing more than the *ipse dixit* of [Dr. Meyer]." *Id., quoting General Electronic Co. v. Joiner*, 522 U.S. 136, 146 (1997) (internal quotations omitted). Dr. Meyer's complete failure to "connect the dots" between his defective analysis and opinions supports the exclusion of his opinions in their entirety. *See C.W. ex rel. Wood v. Textron, Inc*., 807 F.3d 827, 837 (7th Cir. 2015).

Thus, Plaintiffs' motion to exclude Dr. Meyer's opinions in their entirety should be granted.

### 3. The Quality of Care Testimony Of NorthShore's Economists Should Be Excluded

NorthShore's two economic experts, Ms. Guerin-Calvert and Dr. Willig, also have quality of care discussions in their expert reports. However, neither Ms. Guerin-Calvert nor Dr. Willig, are qualified to give a quality of care opinion. PSOF 61-63

An expert, no matter how well credentialed, cannot be used as the mouthpiece for a different expert in another specialty. *Dura Auto Sys. v. CTS Corp.*, 285 F.3d 609, 614 (7th Cir. 2002). Neither Dr. Willig nor Ms. Guerin-Calvert can offer Dr. Meyer's opinions for him.

### 4. Even If A Quality of Care Defense Is Recognized, NorthShore Cannot Show Any Quality Improvements Were Merger Specific, Thus Summary Judgment Is Warranted.

Dr. Meyer concludes that ENH made post-merger quality improvements to several specific service lines, relying on self-serving statements made by NorthShore's current executives, interviews with NorthShore's current employees, and self-promoting marketing materials appearing on NorthShore's website. One such purported improvement was ENH's implementation of a system-wide electronic record—Epic—after the merger. Other examples of purported improvements cited by Dr. Meyer include improvements in cardiovascular care, nursing, and to the physical plant. However, the factual record belies Dr. Meyer's opinions that attribute quality improvements to the merger. Moreover, any alleged post-merger "quality-improvements" made by ENH do not offset the merger's anticompetitive effects. Thus, summary judgment is appropriate.

In order make a showing of merger-specific efficiencies, the bar is high. Thus, a defendant must show that their claimed efficiencies are: (1) merger specific; and (2) reasonably verifiable by an independent party. See *H & R Block*, 833 F. Supp.2d 36, 89-92 (D.D.C. 2011). Recently, another district court rejected a defendant's efficiencies defense after recognizing the defense

could not identify "a single litigated case in which the merging parties were successful in overcoming the government's case by presenting evidence of efficiencies." *Anthem*, 2017 WL 685563, at *51; *Aetna*, 2017 WL 325189, at *74. In order to show the claimed efficiencies are "merger-specific," NorthShore must demonstrate that the efficiencies claimed ***could not*** "be achieved without the concomitant loss of a competitor." *F.T.C. v. H.J. Heinz Co*., 246 F.3d 708, 722 (D.C. Cir. 2001). NorthShore has not and cannot make this showing because Dr. Meyer has entirely ignored this type of analysis. *See* PSOF 67; Px 37 at ¶¶37, 42-43.

The primary improvements claimed by Dr. Meyer involve the implementation of the Epic system of electronic medical records, the cardiac surgery program at Highland Park, nursing care at Highland Park, and certain physical plant improvements at Highland Park. None of these are sufficient to invoke the defense.

The prospective implementation of Epic was rejected as a defense in *Saint Alphonsus Medical Center-Nampa Inc. v. St. Luke's Health Syst.*, 778 F.3d 775 (9th Cir. 2015). The defendant-providers argued that the merger would benefit patients providing employed physicians with access to Epic, the electronic medical records used by St. Luke's. *Id.* at 791. The Ninth Circuit flatly rejected the defendants' defense and held:

> But even if we assume that the claimed efficiencies were merger-specific, the defense would nonetheless fail. At most, the district court concluded that St. Luke's might provide better service to patients after the merger. That is a laudable goal, but the Clayton Act does not excuse mergers that lesson competition or create monopolies simply because the merged entity can improve its operations. *See Procter & Gamble*, 386 U.S. at 580, 87 S.Ct. 1224. The district court did not clearly err in concluding that whatever else St. Luke's proved, it did not demonstrate that efficiencies resulting from the merger would have a positive effect on competition.

*Id.* at 792.

As Dr. Meyer admitted: "***healthcare information systems do not in and of themselves yield higher quality***." PX 26 ¶99. Dr. Meyer has not and cannot show that HPH would not have

acquired Epic absent the merger because he *never* analyzed any of the quality improvements Highland Park would have made had the merger with ENH not occurred. PX 13 AT 25. See also, PX 37 at ¶¶37, 42-43.

Furthermore, record evidence confirms that ENH's acquisition of EPIC was *not merger-specific*. To the contrary, an ENH internal document shows that ENH procured Epic in response the implementation of the Health Insurance Portability and Accountability Act (HIPAA) and a 2001 IOM Report. See PX 57 ("Epic: Gateway to the ENH Paperless World: Considering issues published in the 2001 *IOM Report, Crossing the Quality Chasm: A New Health System for the 21st Century*, the corporation decided that NOW is the time to act."). This document is noticeably absent from Dr. Meyer's report. Moreover, ENH did not implement Epic at HPH until the end of December 2003, almost four years after the merger. PX 13 AT 117-118.

While Highland Park Hospital opened a cardiac surgery program after the merger, in as early as 1997, ENH and HPH contemplated an open-heart surgery program and oncology program that was not dependent on the parties merging. PX 13 at 153-154 and PX 31. Meyer Ex. 17. *See also*, PX 13 at. 147 (Dr. Meyer admitted that prior to the merger, Highland Park "had plans to open a cardiac surgical program.") By February 1999, ENH and HPH had already completed the necessary "Certificate of Need" application for the program. PX 33. By April 17, 1999, ENH and HPH had already signed a "Cardiac Surgery Agreement." PX 32. Thus, the cardiac surgery program at HPH was *not* a consequence of the merger.

Similarly, Dr. Meyer cannot connect changes to Highland Park's "physical plant" to the merger. Highland Park was already required to improve the condition of its physical plant by June 29, 1999, in order to comply with Health Care Finance Administration ("HCFA") regulations to continue to receive Medicare reimbursement. PX 28. Dr. Meyer admitted that Highland fixed the

majority of the deficiencies prior to its merger with ENH. PX 13 at 18:9-21. Dr. Meyer's report also concedes that these changes "could have occurred absent a merger." PX 26 ¶48. The improvements made by HPH to its nursing staff were not merger-specific. In fact, there is no evidence that "nursing care at HPH (as perceived by patients) was poor before the merger and steadily improved thereafter." PX 37 at ¶62. "Instead, Press Ganey data suggests deterioration in the first two quarters after the merger." *Id.* PSOF 79.

Thus, there is no genuine question of material fact the improvements made at Highland Park were not merger-specific, and ENH cannot "present sufficient evidence to create a dispute of material fact regarding any essential element of [its defense]." *Burton v. Board of Regents of University of Wisconsin Sys.*, 2017 WL 1032628, at *2 (7th Cir. Mar. 17, 2017). As a NorthShore executive and physician recently testified in the *Advocate* proceeding, NorthShore has "not been successful in any care management efforts." PSOF 64 (emphasis added). Thus, summary judgment on Defendant's quality-of-care defense should be granted.

### B.  NorthShore's Statute of Limitations Defense Fails

At the time that NorthShore brought its last motion for summary judgment on the statute of limitations, this Court found that "not only must NorthShore's motion be denied, but it appears that there is no factual basis (given the legal principles that the Court has adopted) for NorthShore to assert the limitations defense; in other words, the Class might be entitled to summary judgment against the defense." *In re Evanston Northwestern Healthcare*, 2016 WL 4720014, *11 (N.D. Ill. Sept. 9, 2016). This statement remains true today. NorthShore has no factual basis to invoke the statute of limitations defense.

This Court has held three times that the filing of the FTC action could toll the statute of limitations for Plaintiffs, and Plaintiffs' case is timely so long as they did not discover the facts necessary to sue for damages before February 10, 2000. *In re ENH*, 2016 WL 4720014; R. 708 at

5-6 n. 2 (Order of May 28, 2015); *In re Evanston Northwestern Healthcare*, 2008 WL 2229488,

*7 (N.D. Ill. May 29, 2008).  As the Court wrote in its most recent Opinion:

> In analyzing whether the Class brought this case on time, the key date is February 10, 2004, because that is the date that the FTC brought its case, and the filing of that complaint tolled the statute of limitations as of that date. See infra Section III.A.1 (discussing 15 U.S.C. § 16(i)). So whatever Class claims were timely as of February 10, 2004 were preserved. Put another way, the Class claims—if any—that accrued on or after February 10, 2000 are timely.

*In re ENH*, 2016 WL 4720014 at *5.

This Court also found that the discovery rule applied to Plaintiffs' §2 and §7 claims. The question under the discovery rule is not, as NorthShore has claimed, whether the Plaintiffs knew about the merger or whether NorthShore sought to renegotiate contracts: "the fact that the Class knew about the merger before it occurred is irrelevant."  *In re ENH*, 2016 WL 4720014 at *13. Instead the issue is whether Plaintiffs knew they had been illegally overcharged: "class members could not have discovered that they suffered any injury as a result of the merger until they knew that NorthShore had illegally overcharged them for its healthcare services." *Id.* at *10.  But as the Court found, "based on the record evidence, there is nothing to suggest that the MCOs knew of NorthShore's plan to increase its prices as of February 10, 2000." *Id.*  As a result, the Plaintiffs are entitled to summary judgment on the statute of limitations defense.

In addition to the discovery rule making both the §2 and the §7 claims timely, this Court found independent bases for the timeliness of Plaintiffs' claims: (1) that under *Berkey*, the §2 claim was timely, and (2) under the hold-and-use doctrine, the §7 claim is timely.  The Court found that under *Berkey*,

> the Class's Section 2 claim based on NorthShore's post-February 10, 2000 supracompetitive price increases accrued when the Class paid those allegedly illegal prices. Those payments did not occur, based on the record evidence, until after February 10, 2000. This accrual timing, when combined with the tolling of § 16(i), renders the post-February 10, 2000 Section 2 claims timely. Put another way, § 16(i) kicked in as of February 10, 2004 when the FTC brought its action and tolled

the limitations period all the way up until the Class filed this lawsuit. On these grounds alone, NorthShore's motion for summary judgment must be denied.

*In re ENH*, 2016 WL 4720014 at *9.

Similarly, this Court found that under the hold-and-use doctrine, Plaintiffs §7 claim only accrued after February 10, 2000, when the Plaintiffs paid higher prices:

> here the Class alleges that the merger enabled NorthShore to manipulate the market for healthcare services by charging supracompetitive prices. Hold-and-use applies here: the Class seeks to recover for injuries arising from NorthShore's post-merger anti-competitive acts—increasing the price of healthcare services so as to allegedly overcharge the Class for those services. The Class's Section 7 claim thus accrued, at the earliest, sometime after February 23, 2000, once NorthShore had renegotiated its MCO contracts, PSOF ¶¶ 9, 11—not from the date of the merger that made that act possible.

*In re ENH*, 2016 WL 4720014 at *13.

Nothing has changed since this Court's rulings and as a result, the Court should enter summary judgment for the Plaintiff Class on Defendant's statute of limitations defense.

## III. ENH Is Not Entitled To Summary Judgment

For the reasons explained above, there is direct evidence establishing ENH's exercise of market power to raise hospital prices to anticompetitive levels. Because this is a retrospective merger case, Plaintiffs can (and do) rely upon such direct evidence (of market power) and are not required to define a relevant geographic or product market. But even if they were required to do so, Plaintiffs properly identify the relevant geographic market as the triangle connecting ENH's three hospitals, and identify the relevant product market as general acute care in-patient services. Accordingly, ENH is not entitled to summary judgment on the grounds that Plaintiff failed to properly define these markets.

Similarly, ENH is not entitled to entry of an Order from this Court that as a matter of law Painters Fund or any other self-insured payor is an indirect purchaser and that Plaintiffs are barred from pursuing damages after July 30, 2008.

**A. NorthShore's Motion For Summary Judgment As To Painters Fund And All Other Self-Insured Payors Should Be Denied And The Court Should Find That Painters Fund And Other Self-Insured Payors Are Direct Purchasers As A Matter of Law**

NorthShore's arguments that Plaintiff/Class Representative Painters Fund and all other self-insured payors lack standing because they are indirect purchasers should be rejected. The facts show that Painters is a direct purchaser under *Illinois Brick Co. v. Illinois,* 431 U.S. 720 (1977). And ENH has not established that any other self-insured payor is different. None of the cases on which NorthShore relies involved a self-funded ERISA health plan like Painters Fund or a scenario where the direct purchaser's payments to the health care provider were passed through a conduit – which is what Blue Cross Blue Shield of Illinois ("BCBSI") is in this case.

The Court should find that Painters Fund is a direct purchaser as a matter of law. The fact that Painters Fund contracted with BCBSI to perform administrative services for it does not affect the Fund's status as a direct purchaser. BCBSI does not resell hospital services, and Painters Fund does not purchase hospital services from BCBSI. The mere fact that BCBSI forwards Painters Fund's payments to ENH at the Fund's direction pursuant to an Administrative Services Only ("ASO") contract does not turn BCBSI into a reseller of ENH's healthcare services.

*Illinois Brick* addressed the issue of the difficulty of tracing illegal overcharges through layers of resellers between a manufacturer and the ultimate consumer. Multiple wholesalers, distributors, retailers, and other resellers may buy a good and then resell it at a different price before it reaches the ultimate consumer. That is not this case. Here, Painters Fund purchased directly from NorthShore and such transaction comports with the Supreme Court's bright-line solution of only allowing direct purchasers to sue for damages under the federal antitrust laws. *Illinois Brick*, 431 U.S. at 746.

BCBSI's performance of administrative services on behalf of Painters Fund does not implicate any of these concerns because BCBSI does not resell ENH's services to the Fund. Indeed, BCBSI does not even make the ultimate determination of how much Painters Fund will pay ENH for a service.  PSOF 87 ██████████████████████████████████████ ████████████████████████████████. Painters Fund contracts with BCBSI to provide the Fund's participants/members with a network of healthcare providers who have agreed to accept discounted payments for their services.  Painters Fund also contracts with BCBSI to provide services to help administer its plan, including certain claims processing services.  BCBSI contracts with hospitals to be included in its plans, such as its PPO and HMO plans.  This is common practice and arrangement.  *See Ball Memorial Hosp., Inc. v. Mutual Hosp. Ins., Inc.* 784 F. 2d 1325, 1330 (7th Cir. 1986) ("Employers often supply health care coverage for employees…Some large employers simply hire insurance companies to administer the employer's own plans; the administrator receives the bills, the employer determines what it will pay, and the administrator sends the money on to the providers.").  As ENH is aware, BCBSI is acting not only on behalf of itself in these negotiations, but also on behalf of self-insureds such as large employers and union health and welfare plans – like Painters Fund – in these negotiations.  *See* PX 69 - Expert Report of Dale Yamamoto Supporting [Defendant's] Opposition to Plaintiffs' Motion for Class Certification at 5-6; *see also, Id.* at 2-7 *generally.*  PSOF 85.  ENH agrees to offer discounted services to BCBSI's group in order to get more business.

When a Painters Fund member goes to ENH, ENH sends a claim to BCBSI. BCBSI then forwards the claim to Painters Fund showing the application of the discount ENH agreed to provide to BCBSI's group.  Painters Fund reviews the claim and determines whether it should be paid and how much should be paid.  The Fund then forwards the adjusted claim back to BCBSI, informs

BCBSI how much the Fund will pay on the claim, and directs BCBSI to forward payment to ENH on the Fund's behalf. PSOF 84-86, 88. . The Fund then reimburses BCBSI for the forwarded funds each week. PSOF 89.

; *see also,* PX 1 - Aaron Anderson Deposition at 165:7-167:14.[8] As payment for BCBSI's services, the Fund pays BCBSI a separate

PSOF 91.

Painters Fund also sends its member an explanation of benefits form (often referred to as an "EOB") showing the gross charges, the discounted charges, the amount Painters Fund paid ENH, and the amount that the member may need to pay ENH as a result of any deductible. PSOF 92. Painters Fund is financially responsible for the payment of all medical claims incurred by its members (in accordance with the plan's terms).[9] BCBSI does not itself pay any portion of the claim – it is merely a conduit for Painters Fund's payment of the claim. PSOF 93.

Indeed, in 2012 and 2015, ENH argued to this Court that these facts established that BCBSI was acting as the *agent* of Painters Fund, which would mean that the Fund was the direct purchaser, not BCBSI. PSOF 94 *See* R 763-1. Defendant's Omnibus Memorandum in Support of its Motions to Enforce Arbitration Clauses against the Self-Funded Entities at 2-3 ("Since the self-funded entities reaped the benefits of the MCO's contracts with [Defendant], they must be bound by the strictures of those contracts as well"); *id.* at 12 ("that same contract specifically grants agency

---

[8] The Fund's administrator explained the process: "If the [F]und owes the provider $20, then the [F]und will send the $20 to Blue Cross with the expectation that per our agreement, they're going to forward that money on to the provider." PSOF 90. PX 1. - Aaron Anderson Deposition at 196:7-197:23.

[9] Painters Fund's commitment to pay the medical expenses of its members is limitless; the Fund does not carry a stop-loss insurance. (PX 1 - Aaron Anderson Deposition at 218:11-219:5)

authority to Blue Cross…"); R 491 – Brief of Defendant in Opposition to Plaintiffs' Motion for Class Certification at 17 ("The whole point of TPA and ASO agreements is to create an express agency relationship between MCOs and self-funded subscribers."). While the evidence shows that BCBSI was not a general agent of Painters Fund for all purposes, PSOF 95 *see* R. 507 – Plaintiffs' Reply Memorandum of Law in Further Support of their Motion for Entry of an Order Certifying Class in Accordance with the Seventh Circuit Opinion at 19 ("Painters Fund's Network Administration Agreement with Blue Cross expressly *disclaims* that Blue Cross was its agent or was empowered to sign contracts in Painters Fund's name" [original emphasis]):

███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████, the ASO contract and evidence conclusively demonstrates that BCBSI forwarded Painters Fund's payments to ENH at Painters' direction and in amounts determined by the Fund. The fact that Painters Fund paid BCBSI separate fees for BCBSI's services to the Fund only reinforces the Fund's position as the direct purchaser.

Contrary to NorthShore's argument, the fact that Painters Fund *reimburses* BCBSI shortly after BCBSI forwards funds to ENH has no impact on the nature of the relationship. BCBSI's service fees to Painters Fund undoubtedly take account of any float on funds for a few hours or days. While superficially discussing the flow of cash may have some simplistic appeal, it ignores and distorts the commercial realities. We all are in the same situation whenever we use a credit card. The fact that MasterCard (or more precisely, the bank issuing a MasterCard) pays a merchant

for our purchases before we reimburse it by paying our monthly bill does not make MasterCard or the bank a reseller, or the purchaser, of what we bought.

### 1. The Primary Case on Which ENH Relies is Unavailing

ENH primarily relies on *Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic* to support its contention that BCBSI is the direct purchaser and Painters Fund merely an indirect purchaser. Citing *Marshfield Clinic*, ENH boldly proclaims that "even when an insurer pays a provider (such as a hospital) on behalf of a third party (such as an employer of pension fund), the insurer is the direct purchaser." R. 899 at 6.[10] ENH's reliance on *Marshfield Clinic* is misplaced.

In *Marshfield Clinic,* individuals who Blue Cross insured received medical services from the clinic and paid for those services on a fee-for-service basis. Blue Cross paid the clinic directly the *portion* of the fee that Blue Cross had agreed with its insureds to cover. Thus, Blue Cross was financially responsible for a portion of each insured's claim under the contract between the insured and Blue Cross, and the insured was financially responsible for a different portion under his/her fee-for-service arrangement. Here, on the other hand, the contract between Painters Fund and BCBSI does not impose any financial obligation whatsoever on BCBSI. The Fund is financially responsible for the entire cost of a member's medical services (less any out-of-pockets and deductibles). PSOF 96. *See e.g.,* ██████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████; *see also,* PX 1 - Aaron Anderson

Deposition at 54:12-55:11, 69:5-9 (plan will pay 90% of eligible expenses, and member will pay

---

[10] The few other cases ENH cites are of no substantive value, but rather merely restate the general proposition announced in *Illinois Brick.*

10%, for in-network medical).  Thus, the single case on which ENH principally relies does not support its position.

### 2. Case Law Instructs That Painters Fund And All Other Self-Insured Payor Class Members Are Direct Purchasers

Numerous cases have established have recognized that a purchaser that transmits payments to a seller through an intermediary is a direct purchaser for the purpose of establishing antitrust standing under *Illinois Brick.*  For example, in *NASDAQ Market-Makers Antitrust Litigation,* the court found that securities brokers are not direct purchasers, but rather the person on whose behalf they trade is the direct purchaser.  169 F.R.D. 493, 505-06 (S.D.N.Y. 1996).  In that case buyers and sellers of securities brought a price-fixing action against NASDAQ market makers.  The plaintiffs alleged that the market makers fixed the market spread, which was the primary source of plaintiffs' profit.  The defendants argued that plaintiff-investors who purchased securities through brokers not owned by the defendant were indirect purchasers who lacked antitrust standing under *Illinois Brick.*  The court rejected the argument and certified the class.  *Id.*  No pun intended, the court put great stock in the fact the business of securities brokers is to effect transactions "for the account of others" and, as such, the brokers did not constitute a distinct link in the chain of distribution.  *Id.* at 506.  *See also, Sugar Industry Antitrust Litigation,* 73 F.R.D. 322 n. 16 (E.D. Pa. 1977) (broker is not a separate step in the distribution from refiner to user in direct purchases); *Fuchs Sugars & Syrups, Inc. v. Amstar Corp.,* 602 F. 2d 1025, 1028, 1031 n. 5 (2d Cir. 1979) ("[S]ince the purchase of Amstar sugar through a broker was in all respects a purchase directly from Amstar, rather than representing a separate and independent step in the distribution process, the sugar broker was merely an agent.").

Like a broker, BCBSI's administrative services only ("ASO") business is to negotiate prices on behalf of self-insured payors like Painters with medical providers like ENH, bundle

additional administrative services, and then receive a service fee apart from forwarding the payment for the services for its client. Upon Painters Fund's determination of a claim, BCBSI pays the provider "for the account of" the Fund; the Fund then reimburses BCBSI weekly for the full amounts spotted by BCBSI (plus BCBSI's separately charged administrative fees). PSOF 89. BCBSI is a broker-like middleman.

Further, BCBSI effectively operates the same as a Group Purchasing Organization ("GPO") for Painters Fund. A GPO is a membership organization that negotiates contracts on behalf of its clients to secure discounted drug and/or hospital rates, *see e.g., In re Lorazepam & Clorazepate Antitrust Litigation,* 202 F.R.D. 12, 25 (D.D.C. 2001); *In re Lidoderm Antitrust Litig.,* No. 14-MD-02521, 2017 WL 679367, at * 7 (N.D. Cal. 2017), but the GPO does not itself purchase the product. *Masimo Corp. v. Tyco Health Care Group, L.P.,* 2006 WL 123666, *7-8 (C.D. Cal. 2006). In the *Lorazepam* case, buyers of generic lorazepam and clorazepate alleged the companies involved in the drugs' production conspired to monopolize, monopolized, and fixed prices of the drugs. The plaintiffs sought to certify a class consisting of 97 "invoice" customers that purchased the drugs directly from the defendants, and over 11,600 "contract" customers that, as members of various GPOs, purchased the drugs at prices negotiated by the GPOs with the defendants. The court certified the class. *Lorazepam,* 202 F.R.D. at 23-26. BCBSI is like a GPO, and Painters Fund is like a "contract" customer. BCBSI negotiated discounted prices with medical providers like ENH, and Painters Fund in turn entered into an NAA with BCBSI to obtain those discounted prices for its members. Painters Fund is wholly responsible for the payment of the medical expenses incurred by its participants. *Lorazepam* instructs that Painters Fund, not Blue Cross, is the direct purchaser. *See also Allstate Ins. Co. v. Seigel,* 312 F. Supp. 2d 260 (D. Conn. 2004) (applying standing cases under the antitrust laws to analyze standing under RICO, and holding that

Allstate was not "too remote" or "indirect" to have standing to sue under RICO for fraudulent doctor bills submitted to personal injury attorneys and ultimately paid by the attorney directly from the proceeds of any judgment or settlement paid by Allstate. *Id.* at 265. The court found "the tort victims (and their lawyers) were *mere conduits* through which [defendant] fraudulently extracted funds from Allstate." *Id.* at 267.).

BCBSI similarly is a "mere conduit" between ENH and Painters Fund. Though the route by which Painters Fund's payments get to ENH first travel through BCBSI, it is not so circuitous to deny the Fund standing as a direct purchaser to recover those monies from ENH. *See Allstate,* 312 F. Supp. 2d at 267 ("[T]he route by which Allstate's funds got into [defendant's] pockets was less direct that in *Marshfield Clinic*[,] [b]ut it was not so circuitous or contingent as to deny Allstate standing to seek to recover those funds from [defendant].").

### 3. All Other Self-Insured Payors Utilizing ASO Contracts Are Also Direct Purchasers

ENH has posited the same relationship to an MCO as Painters Fund has and has argued that all other self-insured payors are therefore indirect purchasers. As this discussion shows, self-insured payors utilizing ASO contracts are direct purchasers, not indirect purchasers. ENH's motion for summary judgment as to them should be denied.

### B. Plaintiffs Have Not Waived Damages Or Failed To Mitigate Damages After July 30, 2008

NorthShore's arguments that damages after July 30, 2008, were waived fail for numerous reasons. First, NorthShore does not demonstrate that the FTC "remedy" was any remedy at all. Plaintiffs' expert Dr. Vogt testified that it was ineffective, and a group of distinguished healthcare economists told the FTC the same thing. Indeed, ENH's expert, Dr. Willig, acknowledged that he did not determine that "remedy" would restore competition:

> Q. Okay. What analysis did you perform to test whether this 2008 FTC order restored competition?
> A. So I didn't say that it was my view that it actually restored competition because it's not my view that competition was impeded before the order by the merger or by this joint negotiating posture that the FTC had alleged.

Willig Dep at 56:6-13. PSOF 97. Instead, while Willig testified that he thought the order would address the FTC's concern about joint negotiations, he never opined that it would actually restore competition or lead to lower prices. *Id.* Indeed, Willig was unaware that a group of distinguished healthcare economists had filed an amicus brief in the FTC proceeding arguing that this "remedy" would be ineffective. PSOF 98.. *There is no reason to think that NorthShore would have willingly reduced its prices from the supracompetitive levels it had already attained because the "remedy" was to negotiate separately, not to divest Highland Park or reduce prices.*

Moreover, the "remedy" was effectively only available to MCOs. While the remedy was theoretically available to any payor, only MCOs got notice of it from NorthShore. *See* NorthShore's SOF ¶66 (demonstrating that NorthShore only sent the notice to 9 MCOs, and no other payors). The bulk of the class members in this case are self-insureds such as Painters, and individual patients, a number of whom are uninsured and have no affiliation with any MCO. The majority of the Class did not have any access to even the ineffective "remedy" which the FTC approved.

Once a merger is found illegal, "an undoing of the acquisition is a natural remedy." *United States v. E.I. du Pont de Nemours & Co.*, 366 U.S. 316, 329 (1961). Here, on October 20, 2005, a FTC Administrative Law Judge ("ALJ") found that ENH violated § 7 of the Clayton Act and ordered ENH to divest the acquired assets of Highland Park Hospital. On appeal, the full Commission affirmed the ALJ's liability finding, but reversed the divestiture order. *See In re Evanston Northwestern Healthcare,* 2007 WL 2286195 (F.T.C. Aug. 6, 2007), at *77-78. Instead,

the Commission ruled that a "conduct remedy" (rather than a structural remedy such as divestiture) was appropriate and ordered ENH to *inter alia* establish two separate and independent teams for negotiating contracts with payors – one team for Evanston Hospital and Glenbrook Hospital, and another team for Highland Park Hospital (the "hospitals").

Even so, the FTC acknowledged its decision cut against the grain: "this is a highly unusual case in which a conduct remedy, rather than divesture, is more appropriate." *See In re Matter of Evanston Northwestern Healthcare Corporation,* 2007 WL 2286195, at *77 (F.T.C. Aug. 6, 2007). The reason was that most all cases challenging hospital mergers are prospective – the merger has not been effectuated. Here, in contrast, the FTC found that it was too late to unscramble the eggs eight years after the merger had taken place and that substantial harm might occur for the provision of services at Highland Park Hospital if there was a divestiture. 2007 WL 2286195 (F.T.C. Aug. 6, 2007), at *77-78 In so finding, though, the FTC explicitly found that these were not services which had improved *as a result* of the merger, but rather the way that they had been structured for years after the merger made it possible that divesting Highland Park would lead to curtailments in Highland Park's ability to provide those serves. *Id.*

The "remedy" simply was not an effective one. Plaintiffs' expert, Dr. Vogt, explained in both his reply report and deposition that "the remedy…, even had it been exercised by MCOs, is very unlikely to have reversed the damage to competition caused by the merger." PSOF 99. He went on to note "[t]he fact that MCOs did not make use of the remedy is just as easily explained by the fact that the remedy was destined to fail: so why use it?" PSOF 100. Dr. Vogt also observed that economists who specialize in health competition agree the FTC's remedy was not effective; indeed, that the remedy would not be effective was so clearly and widely understood at the time the FTC was considering it that a group of leading academic healthcare competition economists

submitted an *amicus curiae* brief to the FTC urging the "consensus view" that the remedy was "unlikely to be effective in curbing anticompetitive behavior." PSOF 101. On the other hand, ENH's expert, Robert D. Willig, Ph.D., was not aware of any articles by economists stating the remedy was effective, nor was he aware of any other post-merger cases in which the FTC ordered the same remedy. PSOF 98  Indeed, Willig did nothing to independently analyze whether the remedy actually restored competition. PSOF 97.

ENH argues that by failing to re-negotiate their contracts the MCOs have: (1) waived any claim they have to post-July 2008 damages; (2) failed to mitigate their damages; and (3) are estopped from recovering damages. These arguments are insufficient as a matter of law because the so-called remedy ordered by the FTC is for all practical matters no remedy at all.

The notion that the MCOs waived their right to damages because they did not renegotiate separate contracts and chose to keep their then-current contracts separately with the hospitals (i.e. the allegedly express waiver) or simply did not respond to ENH's reopener letter (i.e. the allegedly implied waiver) is fundamentally insupportable.  A waiver is the voluntary and intentional relinquishment of a *known* right. *See Delta Consulting Group, Inc. v. Randle Constr., Inc.,* 554 F. 3d 1133, 1140 (7th Cir. 2009). Although the FTC remedy order stated "ENH must allow all payors [i.e. MCOs] to negotiate separate contracts," there is nothing in the order that either mandated the MCOs – none of which were parties to the underlying FTC enforcement action – to in fact renegotiate or, more importantly, addressed damages; indeed, the order does not even remotely suggest that *plaintiffs in a subsequent private enforcement action* (like this one) would be held to have waived their right to damages in the event they did not renegotiate.  *See In the Matter of Evanston Northwestern Healthcare Corporation,* 2007 WL 2286195 (Aug. 6, 2007).  The MCOs

– as non-parties to the FTC's enforcement action – could not possibly have waived that which was unknown to them – that is, the right to damages in a subsequent private enforcement action.

ENH's waiver-cases are inapposite. For example, in *Delta Consulting,* the defendant was held to have waived its counter-claim for breach of contract damages because it continued to pay (a portion of) the plaintiff's invoices as work was done, failed to demand the money paid be returned, and later acknowledged an even larger debt owed to the plaintiff for the unpaid portion. 554 F. 3d at 1140-41. The only conduct ENH complains of is the MCOs' decisions not to pursue a so-called "remedy" that: (1) the FTC later termed "disfavored," *see ProMedica Health Sys. v. FTC,* 749 F.3d 559, 573 (6th Cir. 2014); (2) leading economists have agreed was "destined to fail" and "unlikely to be effective" PSOF 100; and (3) ENH's expert admits has never been found to be an effective one, and does not appear to have been utilized in any other instance. PSOF 102. ENH's suggestion that the MCOs' actions somehow affirmed their "belief" that the contracts were fair and competitive and that they had not been damaged, simply assumes too much. To be sure, the MCOs have expressly sued to recover their damages.

ENH's argument that the MCOs failed to mitigate their damages also is a non-starter. ENH did no more than notify the MCOs that they had the right to renegotiate their contracts separately – and gave them 60-days to decide. That no MCO chose to renegotiate before the 60-day window closed is not determinative. The failure to mitigate is an affirmative defense that a defendant must prove. Here, ENH has failed to carry its burden because it has not made even a perfunctory showing the MCOs' efforts would have been fruitful. ENH has offered no evidence whatsoever that it actually offered lower prices, or would have offered lower prices, than the contracts then in place, and that any renegotiation in fact would have reduced Plaintiffs' damages in the long run. *See, e.g., Coleman v. Lane*, 949 F. Supp. 604, 614 (N.D. Ill. 1996) (finding that although plaintiff

was "undoubtedly remiss in his efforts to mitigate his damages," defendant failed to show that further efforts by plaintiff to find employment might have succeeded, failed to present evidence from any potential employer that an application from plaintiff would have resulted in an offer, and presented no evidence potential employers would have hired plaintiff, thereby awarding damages); *Davalos v. Jacobsen Div. of Textron,* 11 F. Supp. 2d 1012, 1019 (E.D. Wis. 1998) (defendant "submitted no evidence whatsoever" that plaintiff failed to mitigate her damages).

Finally, ENH's estoppel claim also must be rejected. The MCOs' actions do not rise to the level of a misleading representation. ENH's assertion that the MCOs' actions equated to an indication that the existing contracts' prices were competitive, simply assumes too much. *See* R 899 at 33. As the Class' expert made clear, the fact the MCOs chose not renegotiate merely reflects the "consensus view" among leading economists that the FTC's conduct remedy was "unlikely to be effective." PSOF 101. The notion that ENH's reliance on the MCOs' actions "reasonably" caused ENH to subsequently not reopen contract negotiations and later negotiate jointly for all three hospitals combined, and that ENH's decision to thereby "maintain the status quo" was detrimental insofar as ENH has been forced to defend this lawsuit, lacks any factual support.

## IV.    Defendants' Experts Proffered Testimony And Opinions Are Inadmissible

ENH disclosed three experts to defend against Plaintiffs' claims: Dr. Willig, Ms. Guerin-Calvert, and Dr. Meyer. Plaintiffs move to exclude each expert's opinions in their entirety because they fail to meet the requirements that expert testimony be both reliable and relevant to be admissible. Due to the nature of the liability arguments in this case, Plaintiffs have addressed the admissibility of most of those opinions above. In addition to these arguments, Plaintiffs incorporate an additional argument below into their reasons for excluding Dr. Willig's opinions in their entirety.

All of these arguments demonstrate that each of NorthShore's experts rely on junk science. As a result, all of their opinions should be excluded.

## A. Willig's Synthetic Control Analysis Is Inadmissible

Dr. Willig takes a wrong turn into junk science with his synthetic control group analysis. Dr. Willig criticizes Dr. Vogt's control group for his DID analysis and then posits that only a single hospital should be in the control group – Advocate Lutheran General. PSOF 37.

To obtain this nonsensical result, Willig purports to apply a relatively novel approach called synthetic control group analysis. But Willig intentionally deviates from the recognized method for conducting it by leaving out an important price variable, and by making other alterations. PSOF 38. Once Willig's deviations are corrected, the methodology delivers a more robust control group of five hospitals, and the DID analysis yields substantial overcharges. PSOF 39.

Because Dr. Willig alters the synthetic control methodology in ways that make it unreliable, this portion of his opinion is inadmissible.

## V. ENH's Daubert Motion Against Plaintiffs' Experts Should Be Denied

Dr. Vogt's, Dr. Lamb's and Dr. Romano's proffered expert reports, opinions, and testimony satisfy the set forth in *Daubert* and Fed. R. Evid. 702 standards for admissibility. The experts are qualified, their proffered opinions and testimony relate directly to issues to be decided in this case, and their respective opinions are based on reliable methods.

## A. Dr. Vogt.

Plaintiffs proffer Dr. Vogt's opinion to establish that the Merger raised prices to an anticompetitive level and resulted in injury to the Class. Dr. Vogt reaches this conclusion based upon his unchallenged knowledge of and experience studying hospital competition in the United States, by conducting a pricing analysis based on the well-recognized Differences-in-Differences

("DID") method, and based upon his review of expert reports, data, and testimony arising in this case.

Using his extensive experience in the field of healthcare competition and pricing, he first examined the nature of hospital and insurance industries to identify and account for the myriad factors that must be considered in determining whether a merger resulted in anticompetitive pricing. For instance, different hospitals often have different prices for various reasons, such as location, size, academic affiliation, and reputation. Moreover, hospital prices are rising everywhere. As a result, comparing raw prices between hospitals is uninformative. DID analysis controls for these variables by seeing whether the prices at the subject hospital rose at a fast rate than the control group. Consequently, Dr. Vogt's DID analyses involved carefully constructing an appropriate control group of hospitals to serve as the measure of how ENH's prices would have changed in the absence of the merger. In DID analysis, the actual evolution of prices at the merging hospitals is compared to the evolution of prices at similar, control group hospitals that did not experience a merger. The inference is that, in the absence of the merger, prices at the merging hospitals would have evolved in a similar way to the actual evolution of prices at the control group.

He did this by first creating an index of factors to rule out that ENH's price increase could be accounted for by factors common to all Chicago area hospitals such as changes in overall wages, costs, regulation, payor shares, etc. Through the use of controls in the DID analysis, Dr. Vogt was able to rule out that ENH's price increase could be accounted for by changes in hospital-specific factos such as case mix, payor mix, and teaching intensity. After constructing his control group, he wrote and implemented his regressions. This process included the evaluation and selection of the best available data inputs that could applied to the DID method.

Dr. Vogt spent an extensive amount of time trying to use data produced by MCOs in the FTC proceeding and in this case. Plaintiffs attempted to obtain answers to the questions he had about the datasets produced by other MCOs. However, many of his questions were not answered, it proved impossible to understand with certainty what fields in these datasets meant, and it became apparent to him that the datasets contained errors that rendered all but the MCO data produced by ███████████████████████████████████████ unusable.

Using the ████████████, Dr. Vogt implemented his first of two regressions using the DID method. He calculated substantial overcharges using this data ████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████ PSOAF 5.

Dr. Vogt used Medicare Cost Report data ("MCR Data") for his other regression using the DID method. MCR Data is used in academic studies to measure the anticompetitive effects of hospital mergers. Garmon Christopher, The Accuracy of Hospital Screening Methods, Working Paper No. 326, Feb. 2016 at p. 17(referencing academic work recognizing that post-merger price changes using [MCR] data are consistent with price changes using detailed claims data) . While it is more aggregated, MCR Data has been collected in a consistent manner for the entire Class Period. Dr. Vogt calculated substantial overcharges using MCR Data.

Dr. Vogt did not solely rely on his DID regressions in formulating his opinions on injury. Rather, Dr. Vogt also analyzed the evidence in this case, economic theory, his own and other's academic research, and the expert reports in the FTC proceeding. These different analyses independently furnished common evidence of injury. For instance, in addition to doing his own

independent analysis, Dr. Vogt reviewed a substantial body of analysis of the Merger spanning both academic literature and numerous expert reports generated both during the FTC proceeding and this case. Four previous expert reports (two by Plaintiffs' experts and two by ENH's experts) and one academic paper have found, using data sources both similar to and different from the datasets Dr. Vogt used, that the Merger results in a substantial price increase. Dr. Vogt also explained that standard economic theory of hospital mergers, along with empirical support, would lead any reasonable analysis to conclude that the Merger is the type that certainly had the potential to raise prices.

ENH argues that Dr. Vogt's testimony is inadmissible on the grounds that the MCR Data is not reliable, the █████ data is not relevant, and that the method Dr. Vogt used to define the relevant market is unreliable.

### B. Dr. Lamb

Plaintiffs proffer Dr. Lamb's testimony to establish that the damages suffered by the Class in this matter are between $544.9 million and $675 million, before trebling. His damages calculation is based on the overcharge percentages discussed in the Dr. Vogt's expert report. The overcharge percentages used by Lamb include the annual overcharge percentages for inpatient and outpatient services paid by Class members for each year during the Class Period calculated by using the █████ Data and MCR Data, as well as the overcharge percentages calculated by Deborah Haas-Wilson as part of the FTC proceedings which Dr. Vogt analyzed and which corroborate his overcharge calculations, all of which show antitrust impact on a class wide basis.

ENH asserts that Dr. Lamb's opinion is not reliable because Dr. Lamb relies upon Dr. Vogt's use of MCR data and because Dr. Lamb (and also Dr. Vogt) did not independently re-run Dr. Haas-Wilson regression. ENH argues that because Dr. Haas-Wilson was not designated as a

witness, her conclusions are inadmissible and Dr. Lamb's damages calculations are unreliable to the extent they rely upon her overcharge calculations.

### C. Dr. Romano

Plaintiff's proffer Dr. Romano's opinion to rebut ENH's proffered expert Dr. Meyer. Dr. Meyer concludes in his report that ENH's hospitals underwent significant and verifiable improvements in quality of care after the merger. But Dr. Romano explains that Dr. Meyer's claims of quality improvement rest on invalid assumptions, that Dr. Meyer failed to credibly establish that ENH's hospitals underwent significant and verifiable improvements in quality of care after the merger, and (perhaps most importantly) failed to conclude that such improvements were only obtainable as a result of the Merger.

ENH only attacks certain of Dr. Romano's opinions and argues erroneously that a draft of a publication that Dr. Romano co-authored with an economist undermines the extensive analyses he performed regarding the impact of the ENH-Highland Park merger on quality of care.

### D. Legal standard

Expert testimony is admissible under *Daubert* and Fed. R. Evid. 702 if it meets a three-part test: (1) is the expert qualified?; (2) is the expert's reasoning or methodology reliable?; and (3) does the testimony help the trier of fact understand the evidence or determine a fact in dispute? *Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007). The first two prongs of this framework evaluate the reliability of the proposed testimony and the third prong evaluates the relevance of the proposed testimony. *Ammons v. Aramark Unif. Servs.*, 368 F.3d 809, 816 (7th Cir. 2004).

The "reliability" test is lenient. It merely requires that the "reasoning or methodology underlying the testimony … [be] valid." *Daubert*, 509 U.S. at 592-03. Accordingly, the reliability test is an extremely limited inquiry:

> [T]he court's gatekeeping function focuses on an examination of the expert's methodology. The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact… .

*Smith*, 215 F.3d at 718; *see also Smith v. I-Flow Corp.*, No. 09 C 3908, 2011 WL 1750895, * 1 (N.D. Ill. May 5, 2011) ("[A party's] object[ions] to [an expert's] extrapolations from … evidence [examined], … go to the weight of [the expert's] testimony, not its admissibility.").

Expert testimony is "relevant" so long as the testimony "will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. This standard is met if the testimony at issue "will assist the trier of fact with its analysis of *any* of the issues involved in the case." *Smith*, 215 F.3d at 718 (emphasis added).

The overall approach is one that only excludes patently unreliable expert testimony but relies upon cross-examination and other traditional methods to undercut potentially shaky, but nonetheless admissible expert testimony. *Daubert*, 509 U.S. at 595. Whether this three-part test has been satisfied is based upon the preponderance of the evidence standard. *U.S. v. Saunders*, 826 F.3d 363, 368 (7th Cir. 2016).

The permissible scope of expert testimony is quite broad. *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 810 (7th Cir. 2012). Consequently, "the rejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702, Advisory Comm. Notes (2000); *see also Spearman Indus., Inc. v. St. Paul Fire & Marine Ins. Co.*, 128 F. Supp. 2d 1148, 1150 (N.D. Ill. 2001) (quoting same). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky, but admissible evidence," *Daubert*, 509 U.S. at 595.

### E.    Plaintiffs' Experts Are Qualified

ENH does not challenge Dr. Vogt's, Dr. Lamb's or Dr. Romano's qualifications, and for good reason:  each of them are eminently qualified.

Dr. Vogt is an Associate Professor of Economics at the Terry College of Business of the University of Georgia.  He received his Ph.D. from Stanford University in 1999 in Economics. Since that time, he has been employed as an economist, and his research and teaching have focused on Industrial Organization, Health Economics, and Applied Econometrics.  His substantial research has focused on the hospital industry, and he has published multiple papers on hospital competition, hospital pricing, hospital costs, and hospital entry and exist.  He is also co-author of a chapter in the Handbook of Health Economics on the antitrust analysis of health care markets. A detailed description of his unchallenged qualifications are laid out if fuller detain in his Curriculum Vitae, which is attached to Appendix C of his report.

At the time of his report, Dr. Lamb was a Senior Vice President at Nathan Associates Inc. where he directed the litigation activities in the Arlington, VA office.  Dr. Lamb has studied the economics of markets and prices for more than 25 years and have consulted on these issue for over 20 years.  He has repeatedly been asked to opine on a variety of economic issues, including the existence of cartel behavior in various markets, damages arising from anti-competitive conduct, and class-wide injury arising from alleged anticompetitive conduct.  A detailed description of his unchallenged qualifications are attached to his report as Appendix A.

Dr. Romano is a Professor of General Medicine and Pediatrics at the School of Medicine and the Center for Healtcare Policy and Research at the University of California Davis.  He is also on the medical staff of the UC David Medical Group, which is an arm of UC Davis Health.  Much of his research over the past 25 years has been focused on developing, refining, applying, and validating quality measures, especially related to inpatient care.  His particular expertise involves

measures based on administrative data, which are data that hospitals routinely submit to state health data agencies, Medicare, and other insures. His expertise in health care quality evaluation has resulted in over 20 Federal and state grants and contracts, 178 peer-reviewed publications, 15 book chapters, 32 invited pubications, and 33 reports to governmental and quasi-governmental agencies. He has repeatedly been asked to server as a consultant concerning claims made by hospitals regarding purported pro-competitive quality benefits of mergers and the appropriate research framework for evaluating those claims in a manner consistent with Federal antitrust policy. In fact, he previously evaluated the quality-related effects of the Merger in this case by acting as a consult to the Federal Trade Commission. A detailed description of his unchallenged qualifications are attached to his report.

### F. Dr. Vogt's and Dr. Lamb's Use of MCR Data Does Not Render Their Opinions Unreliable Or Irrelevant.

Dr. Vogt properly uses MCR data to show antitrust impact. Dr. Lamb then properly relies upon computations of overcharge percentages based on Dr. Vogt's use of MCR data to arrive at a reasonable estimate of classwide damages using ENH billing data. Their respective testimony will certainly help the trier of fact determine both liability and damages in this case. Thus there is little doubt that their opinions and testimony based on MCR Data satisfies *Daubert*'s lenient relevancy test. Their use of and reliance on MCR Data also satisfies *Daubert*'s (also lenient) reliability requirement in several ways. For instance, an expert's testimony does not need to be founded on data, or any particular type of data for that matter, to be reliable. *See Metavante Corp. v. Emigrant Savings Bank*, 619 F.3d 748, 761 (7th Cir. 2010) ("An expert's testimony is not unreliable simply because it is founded on his experience rather than on data....").

Data, if used, merely needs to be of a type "reasonably relied upon" by experts in the applicable field. MCR data are collected by the Center for Medicare and Medicaid Services as

part of its administration of the Medicare program. These data have been collected in a uniform manner for decades and are used by federal agencies, academics, and others to study the hospital industry. Not surprisingly, therefore, MCR Data has been used repeatedly in academic literature in substantially the same way and for the same purpose used by Dr. Vogt—*i.e.*, to evaluate the effects of hospital mergers on price. PSOF 59-60.

Here, Dr. Vogt reliably used MCR Data because the use of such data in retrospective merger studies is supported by applicable academic literature. Garmon's 2016 article at p. 17 (recognizing that "some merger retrospective studies find that post-merger price changes estimated using HCRIS data [a/k/a MCR data] are consistent with price changes estimated using detailed claims data."). MCR data was also used by Dr. Noether, ENH's expert in the FTC proceeding. PSOF 28.

As Dr. Vogt testified during his deposition, the MCR data was the best data available to him. Dr. Vogt and the analysts working at his direction spent a considerable amount of time trying to make the different datasets produced by MCOs other than ████ in this case and in the FTC proceeding usable. The experts had to not only understand how the datasets worked and exactly what the fields meant, but they also had to try to marry different datasets produced from different platforms for each MCO. Despite spending a considerable amount of time and effort trying to get it to work, Dr. Vogt was unable to use the data produced by the MCOs in the FTC and in this proceeding because of inadequate explanations of how to interpret the data, problems with marrying multiple productions for MCOs together, and apparent errors in the data itself. PSOF 30. Def. Ex. 12 at p.2, fn. 1; PX 18, 92:18-94:23, 143:21-147:12, 154:2-10. Plaintiffs served discovery on NorthShore seeking information NorthShore learned about the datasets produced in the FTC proceeding so that Plaintiffs could use the datasets. PSOF 30. NorthShore objected to each and

every one of these discovery requests, and refused to comply with any of them. *Id.* Indeed, when NorthShore sought to make limited use of the FTC datasets in this proceeding, it turned back to one of its experts in the FTC proceeding, Dr. Noether, and Dr. Noether's staff, who had previously used the datasets, to make the datasets usable for its current experts. Willig Rep. p49, fn. 144. NorthShore used only the limited datasets previously processed and analyzed by its experts in the FTC proceeding, and did not attempt to use to use the datasets produced by those same MCOs in this proceeding. NorthShore has not even attempted to prove that Dr. Vogt could have successfully married the different datasets for each MCO and used them here.

Courts have endorsed the use of publicly available data to show classwide injury despite similar arguments that more detailed transactional data had been produced in the case. *See In re Polyurethane Foam Antitrust Litig.*, 314 F.R.D. 226, 282 (N.D. Ohio 2014) ("courts have deemed impact to be susceptible of classwide proof even though a plaintiff's showing on that point does not incorporate data for all defendants or for all of a defendant's challenged conduct."); *In re Chocolate Confectionary Antitrust Litigation*, 289 F.R.D. 200, 225 (M.D. Penn. 2012) (finding reliable a method used to determine class-wide damages based in part on publically available data). Thus, while ENH suggests that actual transactional data must be used to show impact, courts (and academic literature) simply do not mandate the use of a specific dataset (such as actual MCO data for the entire Class Period in this case) to assess antitrust impact or damages in a reliable manner. *Id.*; *see also Messner v. NorthShore University HealthSystem*, 669 F. 3d 802, 808 (7th Cir. 2012) ("[I]t is important not to let a quest for perfect evidence become the enemy of good evidence.").

Dr. Vogt's analysis shows consistent injury for in-patient services. His analysis is consistent with that of Dr. Haas-Wilson in the FTC proceeding who worked with individual MCO data. Indeed, the injury was so pervasive that it was apparent in the MCR data. The fact that the

MCR data included Medicare and Medicaid payments meant that the payment amounts shown in it were lowered by these payments, thus reducing the appearance of overcharges in the data. Despite this downward bias of payment amounts, injury was observable.

Dr. Vogt's use of MCR data is reliable even though Dr. Willig claims that his overcharge estimates differ from ENH's actual prices. Because hospital services are differentiated goods and different hospitals thus have different prices, see pp. 15-16 *supra*, the Difference-in-Differences method of analysis does not compare absolute numerical price levels against absolute numerical price levels, but it instead compares the rates of change in prices between the subject and the control. 7/28/16 Vogt Rep. ¶ 78. Thus it does not directly compare whether NorthShore's price was $100 and a control group hospital's price was $50 in 2000, but it instead compares whether NorthShore's price went up 30% in 2001 versus 5% at the control hospital. As a result, what is important is the trend of the price changes, not the absolute numerical prices themselves. Def. Ex. 12 at ¶¶ 76-86. Pltfs' Oppos. to ENH SOF ¶ 85.

Dr. Willig's Figure 6 shows that his calculation of ENH prices versus Dr. Vogt's MCR prices show the same trend. Indeed, the proof that the data issues about which Dr. Willig complains do not materially affect Dr. Vogt's demonstration of the existence of injury is that Dr. Willig does not argue that they would cause a different result. Moreover, while Dr. Lamb's calculation of damages uses Dr. Vogt's overcharge percentages derived from the MCR data, he calculates damages by multiplying those overcharges against the prices in the ENH billing data. Thus even if the MCR price data were higher than the NorthShore billing data prices, it would not inflate the damages which Dr. Lamb calculates.[11]

---

[11] Likewise, Dr. Willig's arguments that "[Dr. Vogt's] prices and actual prices often change at dramatically different rates and even in opposite direction," or that ████ prices and Dr. Vogt's prices do not move in tandem, is a misleading trick employed by Dr. Willig to obscure what the data indicates which emphasizes what could be otherwise minor differences in the data. Def. Ex. 87 ¶125 Dr. Vogt looked at

Likewise, just because MCR data includes pricing averages does not render it an unreliable or irrelevant data source for determining antitrust impact. Pls' Resp. In Opposition To ENH's Motion To Decertify at pp. 12-16. The evidence in this case, and the nature of hospital contracting in general, indicate that there is no reason to expect that NorthShore applied its market power selectively – i.e., to some services and not to others. Indeed, ENH has failed to come forward with actual evidence that ENH selectively applied its market power as to only some hospital services or with respect to only some MCO plans. *Id.* Moreover, NorthShore has failed to demonstrate any instance where Dr. Vogt's use of the MCR data masked lack of injury. While NorthShore relies on the *Reed v. Advocate* case when arguing hypothetically that uninjured class members could be present, in *Reed*, the defendants showed actual evidence of class members whom they argued were not injured, not a hypothetical possibility. *See Reed v. Advocate Health Care*, 268 F.R.D. 573, 591-92 (N.D. Ill. 2009). The court relied on this actual evidence in making its findings. Such evidence is absent here.

Therefore, Dr. Vogt's use of MCR data to measure impact from this single merger reliably forecasts injury across the entire class because the DID methodology measures *relative* prices against a carefully selected control group. Pls' Resp. In Opposition To ENH's Motion To Decertify at pp.12-13. If, as the evidence shows in this case, ENH exercised its market power

---

the rate of change of NorthShore's prices in his DID analysis, not absolute numerical prices. PSOF 16. Dr. Willig here compares the rate of change of the rate of change. Thus if both said the overcharge was 20% in one year, and one index showed the overcharge going to 21% the next year (a positive 5% rate of change), and the other showed the overcharge going to 22% (a positive 10% rate of change), this portion of Dr. Willig's report would argue that there is a 50% difference in the rate of change reported, when in fact there is only a minor difference reported in the overcharge itself. Similarly, if both said the overcharge was 20% in one year, and one index showed the overcharge going to 21% the next year (a positive 5% rate of change), and the other showed the overcharge going to 19% (a negative 5% rate of change), this portion of Dr. Willig's report trumpets this as rates of change going in opposite directions, when again there is only a minor difference reported in the overcharge itself. Pltfs' Oppos. to ENH SOF ¶ 86.

indiscriminately, then *all* services in *all* plans were impacted by its indiscriminate use of market power even though the extent of harm may have varied. *Id*. In this way, Dr. Vogt satisfactorily establishes that all or substantially all members of the Class suffered antitrust injury. *Id*. And while Dr. Lamb's reliance on Dr. Vogt's use of MCR data may result in an aggregate damages estimate that simply averages the extent of harm suffered by all members of the Class, doing so is perfectly appropriate. *In re Pressure Sensitive Labelstock Antitrust Litig*., No. 3:03-MDL-1556, 2007 WL 4150666, at *19 (M.D. Pa. Nov. 19, 2007); *In re Wellbutrin SR Direct Purchaser Antitrust Litig*., No. 04-5525, 2008 WL 1946848, at *9 (E.D. Pa. 2008); *Eastman Kodak Co. of New York v. Southern Photo Materials Co*., 273 U.S. 359, 379 (1927); *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264-65 (1946); *In re Sumitomo Copper Litig.*, 182 F.R.D. 85, 92-93 (S.D.N.Y. 1998); and *In re Static Random Access Memory (SRAM) Antitrust Litig*., 264 F.R.D. 603, 614 (N.D. Cal. 2009).

**G.      Dr. Vogt's And Dr. Lamb's Opinions Based Upon ███████████ Data Are Relevant.**

ENH does not challenge the reliability of Dr. Vogt's use of ███████ Data as a data input for his DID analysis. Rather, it argues that because the ███████ Data relates only to one MCO, ████, who itself not a class member, that it can in no way assist the trier of fact in concluding (based upon all the evidence) whether ENH's post-Merger exercise of market power caused injury to the Class. However, ENH coyly attempts to mislead the Court by ignoring the fact that much of the payments made through ███████ are made by self-insured entities where ███████ contracts have been used to set prices, but ███████ is merely providing ASO services, and the self-insured entity is the primary direct payor. No self-insured entity, whether it takes advantage of the ███████ contract or any other MCO's contract, has been excluded from the class because it contracts through an MCO that has been compelled to engage in arbitration. All

of these self-insureds are direct purchasers, and are properly part of the class. *See supra* at 45. In addition, many thousands of class members are individual patients family members who were covered directly by the ███████ or a self-insured entity utilizing the ███████ contract who paid coinsurance based upon the terms of the ███████ contract. NorthShore's attempt to obtain a ruling effectively dismissing these claims through sleight of hand should be denied.

Moreover, even apart from the basic facts that thousands, if not tens or even hundreds of thousands of Class members' damages directly depend of the ███████ contract, Dr. Vogt's overcharge percentages based on the ███████ Data are relevant because they will help the trier of fact determine this question.

As ENH admits, ██████████████████████████████████████. Because of this, as ENH also concedes, ██████████████████████████████████ ███████████████████████. Accordingly, based on the ███████ data and the resulting overcharge calculated using this data, a jury could reasonably conclude that other MCOs (███████████ █████████████████) would have at least been injured to the same extent as ███████.

**H.    Dr. Vogt's Opinions Regarding the Need to Define a Relevant Geographic Market, and What the Geographic Market Definition Should Be, Are Reliable**

This Court should reject ENH's contention that Dr. Vogt should not be permitted to testify on the grounds that his opinions regarding the relevant geographic market are unreliable. Dr. Vogt explains that drawing a geographic market is necessary in a prospective merger case because one needs to predict what would happen to prices if the parties merged. However, in a retrospective merger case such as this one, what actually did happen to prices can be directly observed. Thus Dr. Vogt uses the DID analysis to determine whether the prices at NorthShore rose faster than the prices at similar nearby hospitals.

The cases cited by ENH to suggest that Dr. Vogt failed to identify a competitive price are all distinguishable because none of them involve retrospective merger cases or use of the DID method in conjunction with the SSNIP test. In fact, *Godix Equip. Esport Corp.*, 948 F. Supp. 1570, 1582 (S.D. Fl. 1996), expressly supports Dr. Vogt's market definition analysis based upon ENH's post-Merger price increases *relative to* the price increases seen at control group hospitals. In *Godix*, the court held that to show market power increased prices of the alleged monopolist must be compared with "increase[d] prices in relation to the rest of the market."). The DID analysis does just that.

Accordingly, this Court should reject ENH's argument that Dr. Vogt should not be permitted to testify on the false grounds that he had to, but failed to, properly define the relevant market.

## I. Dr. Romano's Analysis of whether the merger caused quality to improve is reliable

As explained above, ENH's quality improvement defense fails as a matter of law because it cannot establish that quality of patient care verifiably improved at ENH as a result of the Merger. ENH narrowly moves to exclude only some of Dr. Romano's opinions based on several flawed assumptions that are unsupported by the Record. First, Plaintiffs proffer Dr. Romano to testify at trial only the extent Plaintiffs' request that this Court rule that this ENH defense fails as a matter of law. His testimony rebuts the opinions and testimony of ENH's retained expert Dr. Meyer who concludes that quality improved at ENH hospitals after the Merger. As Dr. Romano explained in his report, Dr. Meyer's methods rest upon invalid assumptions and fail to establish verifiable quality improvement, or that those improvements could have only been achieved as a result of the Merger. PSOF 66-70. Oddly, NorthShore's papers fail to include a single citation to either of Dr. Meyer's two reports or the sworn testimony he gave during two depositions. In fact, NorthShore

does not even mention Dr. Meyer. Thus, instead of using their own quality expert's opinions to rebut Dr. Romano's opinions, NorthShore's attorneys assume the role of expert and conclude that some of Dr. Romano should be excluded.

NorthShore's primary criticism of Dr. Romano is that Dr. Romano purportedly relied on flawed statistical calculations of patient safety and inpatient quality indicators and that his results have "unexpectedly high error rates and do not achieve statistical significance." Def. Br. at 53. Even if this were true—which it is not—this District has held that a "lack of statistical significance" does not "yield the conclusion that [an expert's] approach was inappropriate or that he utilized unreliable methods or data." *See Newman by and through Newman v. McNeil Consumer Healthcare*, 2013 WL 9936293, at *15 (N.D. Ill. Mar. 29, 2013). *See also*, Plaintiffs' Response to DSOF ¶¶ 113, and 115.

NorthShore criticizes Dr. Romano's DID analysis, the results of which initially appeared in the reports he provided as an expert on behalf of the FTC in the FTC's challenge of this merger and were incorporated into his 2017 reply report,[12] through a 2010 working draft of a study commissioned by the FTC that Dr. Romano authored with Dr. David Balan titled: "A Retrospective Analysis of the Clinical Quality Effects of the Acquisition of Highland Park Hospital by Evanston Northwestern Healthcare." See NorthShore Ex. 95.[13]

While the main purpose of the Romano-Balan article was to describe the analyses that Drs. Balan and Romano performed in the FTC proceeding regarding this merger, "some of [their] analyses relied on confidential data provided by the merging parties" and could ***not*** be disclosed

---

[12] See PX 37.
[13] Curiously, NorthShore did not introduce or inquire about this draft at Dr. Romano's deposition. Instead, NorthShore questioned Dr. Romano for over an hour on the final Romano-Balan article that was published in the International Journal of the Economics of Business in February 2011, which NorthShore did not attach to their pending motions or even reference. PX 58..

in the publication. Thus, the Romano-Balan article *only* represents a snapshot of the full analysis Dr. Romano performed as a quality expert on behalf of the FTC during the FTC's prosecution of this merger.[14] *See, e.g.*, PX 16 at 268:19-25 ("…there is a lot of other analyses that…I relied on in this case because the parties provided boxes full of proprietary information from the STS registry, from the NRME registry, from the NPIC, from Press Ganey, and that was all incorporated into my 2004 [FTC] analysis."). Moreover, while Dr. Romano's analyses utilize the Agency for Healthcare Research and Quality ("AHRQ") Inpatient Quality Indicators ("IQI") and Patient Safety Indicators ("PSI") as *one* determinant of whether quality improved at HPH as a result of the merger, Dr. Romano did *not*:

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████ PX 37, Appendix 13 at 16. (internal quotations omitted).

Thus, NorthShore's entire critique of portions of Dr. Romano's opinions rests on the incorrect assumption that the findings contained in Dr. Romano's draft publication encompass the full analyses that he performed in both the ENH FTC proceeding and this case. Yet *Daubert* requires a court to focus "solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595. Dr. Romano's principles and methodology are sound.

Moreover, the AHRQ continues to promote the use of IQIs and PSIs to measure healthcare quality and "experts in the [quality] field" continue to adopt administrative data measures.[15]

---

[14] For example, ███████████████████████████████████████, Dr. Romano's FTC report ███████████████████████████████████████████████████████████
███████. PX 37, Appendix A. These results were not reported in his publication with Dr. Balan due to the proprietary nature of the data. Similarly, Dr. Romano's ████████████████████████████
*Id.*

[15] https://www.qualityindicators.ahrq.gov.

Romano Dep. Tr. 254. In fact, Dr. Meyer used administrative data, including, Patient Safety Indicators ("PSIs"), for several of his own analyses in this case. See PSOF 81 and PX 26, Figures 24-28.

NorthShore's reliance on *ATA Airlines, Inc. v. Federal Exp. Corp*., 665 F.3d 882 (7th Cir. 2011) is entirely misleading. In *ATA*—a breach of contract case—a jury awarded a plaintiff damages in the full amount demanded based entirely on a regression analysis presented by the plaintiff's sole expert witness. There, the district court judge failed "to evaluate in advance of trial a challenge to the admissibility of an expert's proposed testimony," after deeming it too technical. *Id.* at 889. The Seventh Circuit reversed after determining because the defendant tendered "no estimate of damages and because neither [plaintiff's expert] nor the lawyers nor the judge presented an intelligible damages analysis to the jury, it is no surprise that, having decided that ATA should win, the jury simply awarded the exacted figure that [the plaintiff] had asked for in damages." *Id.* at 896. Thus, by not considering the defendant's challenge to the plaintiff's expert's report, the district court essentially blessed the plaintiff's "failure to prove damages." *Id*. NorthShore's citation to *United States v. Downing*, 753 F.2d 1224 (3d Cir. 1985)—a criminal case outside this District—is equally misplaced. In *Downing*, the Third Circuit determined the district court erred when it failed to admit testimony of a defense psychologist in the field of human perception and memory, testimony concerning the reliability of eyewitness identifications, where the defendant was convicted solely on the basis of eyewitness testimony. *Id*.

NorthShore's attacks on Dr. Romano are meritless and ignore the totality of his analyses, which are based on the *extensive* research he conducted in 2004 on the quality effects of ENH's acquisition of Highland Park Hospital in 2000, as well as his review of data, documents, expert

reports, and deposition testimony in this case. Therefore, NorthShore's motion to exclude specific portions of Dr. Romano's opinions should be denied.

## VI. Dr. Vogt's and Dr. Lamb's Reference To Dr. Haas-Wilson's Testimony In The FTC Proceeding Should Not Be Excluded

Fed. R. Evid. 702 and 703 expressly permit an expert to rely upon "facts or data" that are "of the type reasonably relied upon by experts in the field." *See* Fed. R. Evid. 702 & 703. Here, Dr. Vogt and Dr. Lamb are permitted to reference the data collected and evaluated by Dr. Haas-Wilson because clearly MCO-specific data is the type of data "reasonably relied upon by experts" who study the hospital competition and the anticompetitive effects (if any) of hospital mergers. A testifying expert is permitted to rely on the opinion of another expert as long as the testifying expert is qualified to understand and validate the work of the expert upon whom the testifying expert (or experts) rely. *See Walker v. Soo Line R. Co., 208 F.3d 581, 589* (7th Cir. 2000).

Dr. Vogt did not simply review Dr. Haas-Wilson's conclusions. PSOF 30, PSOAF 4. He studied each of her submissions in the FTC proceedings: both her expert report dated September 21, 2014 and her rebuttal report. *Id.* Still further, he reviewed and examined her published academic work on the Merger. *Id.* He not only confirmed and validated that she used the standard and preferred DID method, but he also examined the dataset she used. He explains in his report that she used claims data from four MCOs: ████████████████████████████ ██████. *Id.* In studying her work, he also determined that she employed MCR data in her analysis. *Id.* He confirmed that she correctly used the DID method to "compare price increases at the ENH hospitals to price increases at a control group of non-merging Chicago-area hospitals. *Id.* He also recognized that Haas-Wilson considered several different possible control groups, and stated that "her results are similar for each control group." He further commented on

her results and recognized that she reported price increases for each of the three different plan types for each MCO. *Id.*

ENH points to no case law that suggests that a testifying expert's validation of another expert's work requires the testifying expert to recreate the methods or regressions employed by the prior expert. Indeed, requiring Dr. Vogt and Dr. Lamb to completely and fully recreate and redo what Dr. Haas-Wilson did would swallow the above-stated rule that one expert can rely upon the opinion of another expert.

NorthShore and its attorneys conducted substantial discovery of Dr. Haas-Wilson's opinions in the FTC proceeding, including cross examination. ENH had every opportunity to cross-examine Dr. Vogt and Dr. Lamb to confirm that they understood and were able to validate Dr. Haas-Wilson's opinion.

## Conclusion

For the foregoing reasons, Plaintiffs respectfully request that the Court deny ENH's motion for summary judgment, and grant theirs.

Dated:  June 29, 2017                    Respectfully submitted,
                                         Plaintiffs


                                    By: /s/ Marvin A. Miller
                                        Marvin A. Miller
                                        Matthew E. Van Tine
                                        Andrew Szot
                                        Kathleen E. Boychuck
                                        **MILLER LAW LLC**
                                        115 S. LaSalle Street
                                        Suite 2910
                                        Chicago, IL 60603
                                        Tel: (312) 332-3400
                                        Fax: (312) 676-2676

                                        /s/ Mary Jane Fait
                                        Mary Jane Fait
                                        Law Offices of Mary Jane Fait
                                        115 S. LaSalle Street, Suite 2910
                                        Chicago, Il 60603
                                        Tel: (847) 922-6729

                                        ***Plaintiffs' Class Counsel***

                                        Joseph M. Burns
                                        William Leathem
                                        Jacobs, Burns, Orlove &
                                        Hernandez
                                        150 North Michigan Avenue
                                        Suite 1000
                                        Chicago, IL 60601
                                        Tel: (312) 372-1646

                                        ***Counsel for Plaintiffs***

## CERTIFICATE OF SERVICE BY ELECTRONIC MEANS

I, Marvin A. Miller, one of the attorneys for plaintiffs, hereby certify that on June 22, 2017,

service of the foregoing document was accomplished pursuant to ECF as to Filing Users and I

shall comply with LR 5.5 as to any party who is not a Filing User or represented by a Filing

User.

*/s/ Marvin A. Miller*
Marvin A. Miller