**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| IN RE: NORTHSHORE UNIVERSITY HEALTHSYSTEM ANTITRUST LITIGATION | No. 07-cv-04446<br>Hon. Edmond E. Chang |

**NORTHSHORE UNIVERSITY HEALTHSYSTEM'S OPPOSITION TO PLAINTIFFS'**
**MOTION TO EXCLUDE JONATHAN ORSZAG'S OPINIONS**
**REGARDING QUALITY OF CARE**

## TABLE OF CONTENTS

INTRODUCTION..............................................................................................................1

BACKGROUND.............................................................................................................2

ARGUMENT...................................................................................................................4

    I.      The Court's Quality-of-Care Decision Rejected Plaintiffs' Exclusion Request.....4

    II.     Plaintiffs Cannot Meet Their Burden to Establish Supracompetitive Prices
Accounting for Quality Differences by Excluding Criticisms of Their Missing
Quality Evidence ..................................................................................................6

          A.     Plaintiffs' Expert Does Not Dispute That Higher Quality Justifies
Higher Prices.............................................................................................6

          B.     Plaintiffs Must Prove That Higher Quality Is Not the Cause of Higher
Pricing.......................................................................................................6

          C.     Opinions of an Economist That Dr. Vogt Failed to Economically
Account for Quality Improvements Are Admissible...............................8

          D.     Plaintiffs Conflate Two Distinct Quality Issues: Plaintiffs' Burden to
Establish Market Power and NorthShore's Quality-of-Care Defense........8

    III.    Mr. Orszag's Criticism of the Validity of Dr. Vogt's Methodology Is
Admissible..........................................................................................................12

    IV.    Mr. Orszag's Quality Opinions Are Supported by Dr. Meyer and Dr. Chassin... 13

CONCLUSION.............................................................................................................15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Acad. Suppliers, Inc. v. Beckley-Cardy, Inc.*,
  922 F.2d 1317 (7th Cir. 1991) ........................................................................ 7

*Aviva Sports, Inc., v. Fingerhut Direct Mktg., Inc.*,
  829 F. Supp. 2d 802 (D. Minn. 2011) ....................................................... 12, 13

*BanxCorp v. Bankrate, Inc.*,
  847 F. App'x 116 (3d Cir. 2021) ................................................................... 7

*Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*,
  65 F.3d 1406 (7th Cir. 1995) .................................................................. 2, 7, 8

*Boim v. Holy Land Found. for Relief and Dev.*,
  549 F.3d 685 (7th Cir. 2008) ....................................................................... 10

*Caisse Nationale de Credit Agricole v. CBI Indus., Inc.*,
  90 F.3d 1264 (7th Cir. 1996) ......................................................................... 5

*Dura Auto. Sys. v. CTS Corp.*,
  285 F.3d 609 (7th Cir. 2002) .................................................................... 5, 10

*In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. and Antitrust
  Litig.*,
  No. 17-md-2785-DDC-TJJ, 2021 WL 2577490 (D. Kan. June 23, 2021) ......................... 13

*FTC v. Advocate Health Care*,
  2017 WL 1022015 (N.D. Ill. Mar. 16, 2017) ................................................... 9

*FTC v. Advocate Health Care Network*,
  841 F.3d 460 (7th Cir. 2016) ....................................................................... 7

*Harrison Aire, Inc. v. Aerostar Int'l, Inc.*,
  423 F.3d 374 (3d Cir. 2005) ...................................................................... 7, 8

*Mid-State Fertilizer Co. v. Exchange National Bank*,
  877 F.2d 1333 (7th Cir. 1989) ..................................................................... 11

*Owens v. Nat'l Collegiate Athletic Ass'n*,
  No. 11-cv-6356, 2022 WL 2967479 (N.D. Ill. July 27, 2022) ............................... 12

*Phillips v. Raymond Corp.*,
  364 F. Supp. 2d 730 (N.D. Ill. 2005) ...................................................... 10, 12

*Ploss v. Kraft Foods Grp., Inc.*,
    No. 15-cv-02937, 2022 WL 16540179 (N.D. Ill. Oct. 28, 2022) ................................. 10, 15

*Republic Tobacco Co. v. N. Atl. Trading Co.*,
    381 F.3d 717 (7th Cir. 2004) ........................................................................................ 6

*Schmucker v. Johnson Controls, Inc.*,
    No. 3:14-cv-1593-JD, 2019 WL 718553 (N.D. Ind. Feb. 19, 2019).................................. 11

*U.S. Gypsum Co. v. Lafarge North America, Inc.*,
    670 F. Supp. 2d 768 (N.D. Ill. 2009)............................................................................. 13

*United States v. Carilion Health Sys.*,
    707 F. Supp. 840 (W.D. Va. 1989) ................................................................................ 9

*United States v. E.I. du Pont de Nemours & Co.*,
    351 U.S. 377 (1956)...................................................................................................... 7

*United States v. Grintjes*,
    237 F.3d 876 (7th Cir. 2001) ........................................................................................ 12

*Zambrano v. Sparkplug Cap., LLC*,
    No. 19-cv-00100, 2022 WL 2657224 (N.D. Ill. July 8, 2022)........................................ 12

**Other Authorities**

Fed. R. Evid. 703....................................................................................................... 10, 11

U.S. Dep't of Justice & Fed. Trade Comm'n, "Horizontal Merger Guidelines," §
    10 (2010).................................................................................................................... 9

## INTRODUCTION

Plaintiffs seek to take advantage of NorthShore's need to replace its economic expert to ask this Court to exclude the same opinion using the same argument that this Court already denied. Mr. Jonathan Orszag recently submitted his substitute report, and in it, offered the same opinions that Dr. Robert Willig offered before he passed away. Among them, he reiterated a criticism of Plaintiffs' liability expert, Dr. William Vogt—Dr. Vogt fails to control for the impact of quality improvements on NorthShore's prices over Plaintiffs' seventeen-year class period. Both sides' experts agree that higher quality allows a seller to charge higher prices. That NorthShore improved quality is also not in dispute. What is in dispute is whether Mr. Orszag may reference those quality improvements in his testimony, when he criticizes Dr. Vogt for failing to account for them in his pricing analyses. This is highly relevant testimony that the jury should be permitted to hear and weigh as it deems appropriate.

Plaintiffs offer no legitimate basis to exclude Mr. Orszag's opinion. They mistakenly suggest that this Court previously excluded all testimony relating to NorthShore's post-merger quality-of-care improvements when it excluded the testimony of Dr. Gregg Meyer, NorthShore's expert in support of its quality-of-care affirmative defense. But that ruling merely found that Dr. Meyer had not shown that NorthShore's quality improvements were *caused* by the merger. ECF No. 1144 at 42-44. It does not preclude NorthShore from offering quality-related evidence insofar as it impacts NorthShore's pricing and undermining Dr. Vogt's pricing analysis. Indeed, the Court already rejected Plaintiffs' previous request to exclude Dr. Willig's matching quality discussion because Dr. Willig does not opine on the quality-of-care defense at all. *Id.* at 44 n.27. That ruling should apply here as well.

The Court should likewise reject Plaintiffs' criticism that Mr. Orszag did not perform an econometric analysis showing what portion of NorthShore's price increases was the result of

quality improvements. NorthShore is not responsible for carrying Plaintiffs' burden of proof. *Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 65 F.3d 1406, 1411–12 (7th Cir. 1995). Plaintiffs also claim that Mr. Orszag cannot rely on Dr. Meyer's quality analyses because some of Dr. Meyer's analyses did not address quality improvements immediately after the merger or did not compare the quality improvements to peers. Pls.' Br. at 9–10. But Plaintiffs' arguments ask the Court to ignore the analyses that show exactly those things. Plaintiffs further argue that some of the quality improvements happened years after the merger, ignoring that Plaintiffs claim overcharges over a *seventeen*-year period. Quality impacts pricing whether in the first year after the merger or the seventeenth, and Dr. Vogt fails to account for it in any year. That Mr. Orszag criticizes Dr. Vogt by pointing to the robust record identifying both qualitative and quantifiable quality improvements at NorthShore over the years is hardly "prejudicial, misleading, and not helpful to the jury," *Id.* at 13—indeed, there is nothing inherently prejudicial about showing that quality increased, and there is nothing misleading or unhelpful about presenting evidence to that effect. In any event, Mr. Orszag catalogues the myriad record evidence and expert opinions—just one of which was Dr. Meyer's—showing that NorthShore improved its quality of care in the years after the merger, whether or not caused by the merger, presenting no reason to throw out Mr. Orszag's entire quality-of-care opinion addressing the considerable problem with excluding quality from the pricing analysis.

The Court should, therefore, deny Plaintiffs' motion.

## BACKGROUND

When Plaintiffs served their experts' reports in July 2016, they did not identify a quality expert. But quality was nevertheless a question that Dr. Vogt recognized he needed to address in his report in support of Plaintiffs' primary theory of liability. ECF No. 901 Ex. 12, Expert Report of William B. Vogt ("Vogt Rep.") ¶ 58 (July 28, 2016) ("Below, I will examine whether . . . there

was any increase in the quality of this care sufficient to offset the harm from higher prices."). He did so by relying entirely on the opinion of Dr. Patrick Romano—the FTC's quality expert in its administrative challenge of the merger, who had not appeared in this case at that point—to summarily dismiss consideration of quality increases in his pricing analyses because the quality increases were not *caused* by the merger (not because quality improvements did not occur). *Id.* ¶¶ 159-61.

In October 2016, NorthShore served its experts' reports, including one of its economic experts, Dr. Willig. He explained the importance of considering quality when analyzing hospital prices and showed that Dr. Vogt failed to properly account for NorthShore's quality improvements in his analyses. Pls.' Br.[1] Ex. C Ex. 3, Expert Report of Robert D. Willig ("Willig Rep.") ¶¶ 107–116 (Oct. 26, 2016). NorthShore also served Dr. Gregg Meyer's report, which identified and analyzed the quality improvements NorthShore implemented after the merger and sought to link the quality improvements to the merger. Pls.' Br. Ex. D, Expert Report of Gregg S. Meyer ("Meyer Rep.") ¶¶ 31–32 (Oct. 26, 2016).

In reply, Plaintiffs, for the first time, added Dr. Romano to this case, disclosing him as an expert for the limited purpose of opining that NorthShore's post-merger improvements in quality of care were not caused by the merger. But on the separate initial matter of whether NorthShore did, in fact, improve quality post-merger, Dr. Romano "agree[d] with Dr. Meyer that the overall quality of patient care has improved at both HPH and Evanston Hospital since 2000." ECF No. 901 Ex. 94, Expert Reply Report of Patrick S. Romano ("Romano Rep.") ¶ 34 (Jan. 25, 2017). And although Dr. Romano ultimately critiqued Dr. Meyer's conclusion that the merger caused

---

[1] "Pls.' Br." refers to The Plaintiff Class's Memorandum in Support of its Motion to Enforce the Court's February 20, 2023 Memorandum Opinion & Order and Exclude Those Portions of Jonathan Orszag's Subsequently Tendered Opinions Regarding Quality-of-Care, ECF No. 1161.

those quality improvements, he did not perform any analysis or provide any opinion as to whether or not quality improved at NorthShore relative to any other hospital. *See, e.g.*, *id*. ¶ 96. In response, Dr. Meyer submitted a reply report bolstering his opinions. Pls.' Br. Ex. E, Expert Reply Report of Gregg S. Meyer ("Meyer Reply Report") (Apr. 7, 2017).

Plaintiffs then moved for summary judgment against NorthShore's affirmative defense that the procompetitive benefits of its significant investments in quality improvements resulting from the merger outweighed any potential harm to competition (i.e., the quality-of-care defense). At the same time, Plaintiffs moved to exclude Dr. Meyer's opinions in support of the quality-of-care defense and the opinions of NorthShore's two other experts, Dr. Robert Willig and Ms. Margaret Guerin-Calvert, to the extent that they discuss quality of care. ECF No. 911. The Court granted Plaintiffs' motion to exclude Dr. Meyer's testimony, ruling that he did not show a "but-for" causal link between the merger and the subsequent quality improvements NorthShore made, and dismissed NorthShore's quality-of-care defense.[2] ECF No. 1144 at 43–44. However, the Court did not grant Plaintiffs' motion to exclude the quality discussions offered by NorthShore's other two experts, finding that "NorthShore does not rely on either expert's report for its *quality-of-care defense*, so the Court need not decide the admissibility of those opinions." *Id*. at 44 n.27 (emphasis added).

## ARGUMENT

### I. The Court's Quality-of-Care Decision Rejected Plaintiffs' Exclusion Request

Plaintiffs seek to exclude Mr. Orszag's valid criticism of their expert's opinion based entirely on the Court's order excluding the expert opinion of Dr. Meyer, but the Court specifically

---

[2] NorthShore moved to exclude portions of Dr. Romano's opinion as unreliable, but the Court did not reach that issue since Dr. Romano's opinion was a rebuttal to Dr. Meyer's conclusion that NorthShore's quality improvements were caused by the merger. ECF No. 1144 at 43 n.26.

rejected Plaintiffs' request to exclude NorthShore's other experts, and Plaintiffs' attempt to stretch the Court's exclusion of Dr. Meyer's opinion to apply to Mr. Orszag's opinion is akin to an improper request for reconsideration. In their combined summary judgment/*Daubert* motion, Plaintiffs asked the Court to exclude Dr. Willig's and Ms. Guerin-Calvert's quality discussion citing the same case and using the same language as here.[3] The Court rejected Plaintiffs' argument because "NorthShore [did] not rely on either expert's report for its quality-of-care *defense.*" *Id.* (emphasis added).

Mr. Orszag's opinion is no different from Dr. Willig's. He does not opine on the quality-of-care defense; rather, he explains that Dr. Vogt failed to account for benign reasons that explain the price differences. Plaintiffs offer no reason to reverse the Court's prior decision—no new facts, no new law, just the substitution of one expert for another. *Cf. Caisse Nationale de Credit Agricole v. CBI Indus., Inc.*, 90 F.3d 1264, 1270 (7th Cir. 1996) ("[R]econsideration is not for rehashing previously rejected arguments."). Plaintiffs cannot take a second run at this already-decided issue because of NorthShore's unfortunate need to replace Dr. Willig with Mr. Orszag. The Court should once again reject Plaintiffs' request to exclude Mr. Orszag's discussion of quality—whether or not he references Dr. Meyer's analyses finding quality improvements at NorthShore—because NorthShore is not relying on Mr. Orszag's opinion in support of the quality-of-care defense.

---

[3] *Compare* Pls.' Br. at 8 (calling economic expert a "mouthpiece" for Dr. Meyer and citing *Dura Auto. Sys. v. CTS Corp.*, 285 F.3d 609, 614 (7th Cir. 2002)), *with* ECF No. 918 at 34 (same).

II.    **Plaintiffs Cannot Meet Their Burden to Establish Supracompetitive Prices Accounting for Quality Differences by Excluding Criticisms of Their Missing Quality Evidence**

A.  Plaintiffs' Expert Does Not Dispute That Higher Quality Justifies Higher Prices

The parties' experts agree that price and quality are linked economically.  *See* ECF No. 901 Ex. 13, Deposition of Dr. William Vogt ("Vogt Dep. Tr.") at 231:5-20 (Sept. 14, 2016) (acknowledging that increases in quality are "non-merger factors that affect price at hospitals"). Customers are willing to pay for higher-quality products.  Pls.' Br. Ex. C, Expert Report of Jonathan M. Orszag ("Orszag Rep.") (Apr. 21, 2023) Ex. 3 ¶ 107.  Indeed, Plaintiffs' own expert acknowledged that he needs to show that price increases do not merely reflect quality improvements and sought to answer whether "the merger result[ed] in an increase in prices without a sufficiently compensatory increase in quality."  Vogt Rep. ¶ 71.  Plaintiffs' contradictory contention, that Mr. Orszag "fails to posit a theory of causation for how quality increases led to higher prices," Pls.' Br. at 10, is belied both by both sides' economists and conflicts with binding precedent.

B.  Plaintiffs Must Prove That Higher Quality Is Not the Cause of Higher Pricing

An essential element of Plaintiffs' claims is whether NorthShore's post-merger prices rose above the competitive level after accounting for quality improvements at NorthShore.  "[T]he class must show both monopoly power and the relevant market to prevail on its claims."  ECF No. 1144 at 24 (citing *Republic Tobacco Co. v. N. Atl. Trading Co.*, 381 F.3d 717, 736 (7th Cir. 2004)). Both elements require Plaintiffs to prove supracompetitive pricing.  First, Plaintiffs must prove the geographic market by showing that a "hypothetical monopolist could profitably raise prices *above competitive levels*."  *FTC v. Advocate Health Care Network*, 841 F.3d 460, 468 (7th Cir. 2016) (emphasis added); ECF No. 1144 at 26.  Second, Plaintiffs must prove monopoly power by showing that NorthShore has "the power to control prices or exclude competition."  *United States*

*v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956). Specifically, this power is "the power to charge a price *higher than the competitive price* without inducing so rapid and great an expansion of output from competing firms as to make the supracompetitive price untenable." *Am. Acad. Suppliers, Inc. v. Beckley-Cardy, Inc.*, 922 F.2d 1317, 1319 (7th Cir. 1991) (emphasis added); *see also Harrison Aire, Inc. v. Aerostar Int'l, Inc.*, 423 F.3d 374, 380 (3d Cir. 2005) (same); *BanxCorp v. Bankrate, Inc.*, 847 F. App'x 116, 120–21 (3d Cir. 2021) (holding that "price increases, without more, do not constitute supracompetitive pricing" sufficient to prove monopoly power or define a relevant market).

Plaintiffs seek to use Dr. Vogt's analyses comparing NorthShore's prices to other hospitals to do double duty and prove both the relevant market and monopoly power. But proving supracompetitive prices requires more than just higher pricing as Plaintiffs seek to show in this case; Plaintiffs must prove that the alleged higher prices do not merely reflect higher quality. *Marshfield Clinic*, 65 F.3d at 1411–12. "Generally you must pay more for higher quality." *Id.* at 1412. For this reason, "a reasonable finder of fact cannot infer monopoly power just from higher prices—the difference may reflect a higher quality more costly to provide." *Id.* It is *Plaintiffs'* burden then to show that higher prices are not due to quality differences. *Id.* at 1411–12. Plaintiffs' argument that the burden is on NorthShore to prove that quality increased at NorthShore at a faster rate than a control group seeks to reverse the burden. *See, e.g.*, Pls.' Br. at 7 ("Mr. Orszag utterly fails to show causation."). *Marshfield Clinic* is particularly instructive. There, the Seventh Circuit reversed a jury verdict that physicians monopolized a market when the plaintiffs relied on evidence that the defendant charged higher prices than competitors. *Marshfield Clinic*, 65 F.3d at 1411–12. In short, unless Plaintiffs produce evidence that price differences are not linked to quality differences, their claims fail. *Id.*; *see also Harrison Aire*, 423 F.3d at 380 (same).

C.  Opinions of an Economist That Dr. Vogt Failed to Economically Account for Quality Improvements Are Admissible

Mr. Orszag's criticisms that Dr. Vogt has failed to address a key economic (and legal) question by not accounting for post-merger quality improvements are not an attempt to circumvent the exclusion of Dr. Meyer's opinion as to the quality-of-care defense; rather, those criticisms offer an economic explanation as to why Plaintiffs cannot prove a necessary element of their case-in-chief. And whether or not Dr. Meyer sufficiently established a causal link between the merger and the quality improvements he identified, the fact of those quality improvements has been accepted even by Plaintiffs' own experts. *See* Romano Rep. ¶ 34 ("I agree with Dr. Meyer that the overall quality of patient care has improved at both HPH and Evanston Hospital since 2000."); Vogt Dep. Tr. at 36:3-19 (acknowledging that the FTC found that ENH made improvements at HPH since the merger and that Dr. Vogt has "certainly read documents that say there were such improvements"). Dr. Willig and Mr. Orszag showed that "Dr. Vogt has not accounted for any of the post-merger quality improvements" in his pricing analyses and explained that, as an economic matter, this renders Dr. Vogt's results unable to distinguish anticompetitive price increases from justified price increases. Orszag Rep. ¶ 24; *see also* Willig Rep. ¶ 8 ("[A]ny relative price increases at ENH following the Evanston/HPH merger can be explained in part by the increased value provided to patients by ENH relative to what would have been provided by Evanston and HPH on their own.").

D.  Plaintiffs Conflate Two Distinct Quality Issues: Plaintiffs' Burden to Establish Market Power and NorthShore's Quality-of-Care Defense

Separate from Plaintiffs' burden of proving the geographic market and market power (and their shortcomings) is NorthShore's quality-of-care affirmative defense. The quality-of-care defense is a specific variety of the efficiencies defense available in merger cases to rebut a prima

facie case of harm to competition.[4] *FTC v. Advocate Health Care*, 2017 WL 1022015, at *12 (N.D. Ill. Mar. 16, 2017); ECF No. 1144 at 42. It requires the defendant to show that "the merger will result in significant efficiencies"—here quality improvements—"providing substantial benefits to consumers and offsetting the anticompetitive effects." *Advocate Health Care*, 2017 WL 1022015, at *12; *see also* ECF No. 1144 at 42. Dr. Meyer identified quality improvements at NorthShore and opined that they were caused by the merger. The Court acknowledged that "[Dr.] Meyer . . . found quality improvements," but nonetheless excluded Dr. Meyer's quality-of-care defense opinions for failing to adequately explain but-for causation. ECF No. 1144 at 43. But the Court *never* ruled that NorthShore could not show quality improvements (NorthShore did) and it *never* considered whether Dr. Vogt properly accounted for quality in his pricing analysis (Dr. Vogt did not). Whether the quality improvements were caused by the merger and whether quality improvements caused price increases are simply different issues that cannot be merged. Ultimately, NorthShore's quality-of-care defense is unnecessary if Plaintiffs cannot establish NorthShore gained market power in a relevant market, which Mr. Orszag and Ms. Guerin-Calvert show they cannot.

Plaintiffs argue that Mr. Orszag's critique of Dr. Vogt is an attempt to "launder" or "recast" Dr. Meyer's opinions by passing them off as Mr. Orszag's. Pls.' Br. at 8. Not so. *First*, Dr. Willig made the same criticism of Dr. Vogt in his initial report, long before Plaintiffs moved to exclude Dr. Meyer. Willig Rep. ¶¶ 8, 107–116.

---

[4] In other cases, efficiencies defenses may take the form of more efficient production, lowering costs, or the ability to create new products. U.S. Dep't of Justice & Fed. Trade Comm'n, "Horizontal Merger Guidelines," § 10 (2010); *United States v. Carilion Health Sys.*, 707 F. Supp. 840, 849 (W.D. Va. 1989) (denying challenge to merger in part based on efficiencies, including lower prices, higher quality, and more efficient operations).

*Second*, Plaintiffs' own expert, Dr. Vogt, in his initial report, relied on Dr. Romano (who was not appearing in this case at the time) for the same purpose—to consider the link between NorthShore's quality and price.[5]  Vogt Rep. ¶¶ 159-61.

*Third*, it "is common in technical fields for an expert to base an opinion on what a different expert believes on the basis of expert knowledge not possessed by the first expert."[6]  *Dura*, 285 F.3d at 613; ECF No. 1144 at 31 (same).

*Fourth*, this Court excluded Dr. Meyer's testimony for an unrelated reason: while the Court acknowledged that Dr. Meyer "found quality improvements"—the key question here—it objected that Dr. Meyer "jumped to the conclusion that the merger led to the improvements in quality." ECF No. 1144 at 43.  Evidence admissible for one purpose but not another is generally admissible and, at most, calls for a limiting instruction.  *See Phillips v. Raymond Corp.*, 364 F. Supp. 2d 730, 741–42 (N.D. Ill. 2005) (admitting expert's opinion testimony for limited purpose, but excluding it for irrelevant purpose); *Ploss v. Kraft Foods Grp., Inc.*, No. 15-cv-02937, 2022 WL 16540179, at *8 (N.D. Ill. Oct. 28, 2022) (permitting economist's testimony in his capacity as an economic expert, noting that any risk of confusion by the jury about the nature and meaning of expert's testimony "can be addressed and mitigated through cross-examination, limiting instructions, or

---

[5] Dr. Vogt's analysis, however, does not actually do this because he only looks at quality improvements caused by the merger, not all quality improvements that could cause price increases over seventeen years.

[6] Even setting aside admissibility of Dr. Meyer's analyses findings, "the rules of evidence do not limit what type of information an expert may rely upon . . . even if that information would not otherwise be admissible in a court proceeding, [and] an expert witness may rely upon it so long as it is the type of information on which others in the field reasonably rely." *Boim v. Holy Land Found. for Relief and Dev.*, 549 F.3d 685, 703 (7th Cir. 2008).  In fact, "Rule 703 now expressly permits the expert to disclose such information to the jury, provided the court is satisfied that its helpfulness in evaluating the expert's opinion substantially outweighs its prejudicial effect." *Id.*  Mr. Orszag's reliance upon Dr. Meyer's analyses finding quality improvements at NorthShore is no different than Dr. Vogt's reliance upon Dr. Romano's opinions from the FTC case (before Dr. Romano was even disclosed as an expert in this case).

both"). Mr. Orszag's reference to Dr. Meyer's findings regarding quality improvements, and nothing more, is not improper.

*Fifth*, even if Mr. Orszag could not rely on Dr. Meyer's opinions (which, as explained above, he can), it would not justify excluding his quality opinion entirely because he can rely on the extensive facts and data cited in Dr. Meyer's reports and Dr. Romano's identification of quality improvements.[7] Fed. R. Evid. 703; Romano Rep. ¶ 34. Indeed, Plaintiffs do not dispute that economists use quality facts and data; to the contrary, they argue that Mr. Orszag should have conducted more quality analyses. *See, e.g.*, Pls.' Br. at 9–10; *see also* Vogt Rep. ¶ 71.

Plaintiffs further claim that Mr. Orszag offers nothing more than a "bottom line" conclusion, citing *Mid-State Fertilizer Co. v. Exchange National Bank*, 877 F.2d 1333, 1339 (7th Cir. 1989). Pls.' Br. at 9. But this case is nothing like *Mid-State Fertilizer*. In that case, the proffered opinion was "full of assertion but empty of facts and reasons," and contained nothing "draw[ing] on the skills of an economist." 877 F.2d at 1339–40. Here, Mr. Orszag explained the economic theory linking quality and price, cited four types of significant post-merger quality improvements at NorthShore identified and acknowledged by four different quality experts, found that Dr. Vogt failed to account for the impact of these quality improvements on pricing, and explained the economic conclusion: Dr. Vogt's failure to account for quality improvements renders his analyses not credible.[8] Orszag Rep. ¶ 24, Ex. 3 ¶¶ 8, 107–116.

---

[7] *See Schmucker v. Johnson Controls, Inc.*, No. 3:14-cv-1593-JD, 2019 WL 718553 at * 11 (N.D. Ind. Feb. 19, 2019) (rejecting motion to exclude opinions of experts who relied in part on challenged expert's opinions, noting that "each of those experts also made clear that they were relying on test results [and] not speculation about" the challenged expert's conclusion).

[8] Indeed, this is far more than Dr. Vogt did; in his initial report, Dr. Vogt entirely relied on others' quality opinions (from an entirely separate case) and made no attempt to explain why NorthShore's quality improvements would not impact pricing, and simply concluded that he agrees with Dr. Romano. Vogt Rep. ¶¶ 159–161; ECF No. 901 Ex. 92, Expert Reply Rep. of William B. Vogt ("Vogt Reply Rep.") (Jan. 25, 2017) ¶¶ 119–120.

### III. Mr. Orszag's Criticism of the Validity of Dr. Vogt's Methodology Is Admissible

Because the Court ruled that the jury should decide whether Dr. Vogt properly performed the hypothetical monopolist test and how much weight to accord NorthShore's criticism that he failed to demonstrate that it increased prices above competitive levels—ECF No. 1144, at 29-30— Plaintiffs cannot hide from the jury Mr. Orszag's criticisms that Dr. Vogt's economic analysis lacks credibility because of his failure to control for the effect quality improvements had on NorthShore's pricing. *Phillips*, 364 F. Supp. at 741 ("It will be up to the trier of fact to assess, in light of the flaws [defendant] believes it has identified, what significance to place on [plaintiff's expert's] testimony."). And NorthShore need not offer credence to Dr. Vogt's fundamentally flawed analyses by offering alternative calculations. Mr. Orszag is a rebuttal witness; his function "is to contradict, impeach, or defuse the impact of the evidence offered by" Dr. Vogt. *United States v. Grintjes*, 237 F.3d 876, 879 (7th Cir. 2001) (cleaned up). Mr. Orszag's criticism that Dr. Vogt's methodology is unpersuasive and fails to prove any price increases were not merely reflecting the effects of improved quality does not thrust upon NorthShore the burden of proving affirmatively, instead, that quality improvements account for all, or a particular portion, of price increases Dr. Vogt found.[9]

*U.S. Gypsum Co. v. Lafarge North America, Inc.* is instructive. 670 F. Supp. 2d 768 (N.D. Ill. 2009). There, the defendant's rebuttal expert witness opined "primarily on the validity of [plaintiff's expert's] methods and conclusions." *Id*. at 776. The court ruled that, to the extent the rebuttal expert's opinions "are limited to pointing out the methodological shortcomings . . . in [the

---

[9] Courts have long held that a rebuttal expert "may criticize other experts' theories and calculations without offering alternatives." *Aviva Sports, Inc., v. Fingerhut Direct Mktg., Inc.*, 829 F. Supp. 2d 802, 834–35 (D. Minn. 2011) (collecting cases); *see also Owens v. Nat'l Collegiate Athletic Ass'n*, No. 11-cv-6356, 2022 WL 2967479, at *15 (N.D. Ill. July 27, 2022); *Zambrano v. Sparkplug Cap., LLC*, No. 19-cv-00100, 2022 WL 2657224, at *4 (N.D. Ill. July 8, 2022).

plaintiff's expert's] work," the rebuttal expert's "testimony is reliable and will assist the trier of fact." *Id*.[10] The court reasoned that because the subject matter was "a highly complicated area, the jury will benefit from having access to criticism from another expert in the field," as it would "highlight areas of disagreement and better equip the jury to make informed evaluations of the evidence and [the plaintiff's expert's] testimony." *Id*. at 776–77. The jury here must also make informed evaluations of complex economic analyses underpinning Plaintiffs' case against NorthShore; it should have the opportunity to better understand the evidence by considering Mr. Orszag's testimony explaining why Dr. Vogt's methodology is flawed.

## IV. Mr. Orszag's Quality Opinions Are Supported by Dr. Meyer and Dr. Chassin

Plaintiffs' claims that Dr. Meyer's reports do not support Mr. Orszag's opinions are based on a selective and incorrect reading of his reports. *First*, Plaintiffs complain that some of the merger improvements were years after the merger. Pls.' Br. at 4. But Plaintiffs claim injury and damages over *seventeen* years. If quality improvements at NorthShore after the merger caused patients and insurers to value NorthShore more, Plaintiffs must account for any price increases tied to this increased value in the class period. Plaintiffs claim that Dr. Meyer did not "comprehensively" analyze quality in the years immediately before and after the merger. *Id*. at 10. But Dr. Meyer, despite the merger being seventeen years earlier at the time, performed numerous analyses of quality in the years leading up to and after the merger. *E.g.*, Meyer Rep. Figs. 29, 36-38, 47-53.

---

[10] *See also In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. and Antitrust Litig.*, No. 17-md-2785-DDC-TJJ, 2021 WL 2577490, at *12 (D. Kan. June 23, 2021) (denying motion to exclude defendants' rebuttal expert who criticized plaintiffs' expert's methodology for resting on a flawed assumption because it would "assist the [jury's] efforts to understand the evidence at issue," and ruling that plaintiffs' criticisms of the rebuttal expert's analysis "go to his opinion's weight," and "don't preclude the court from admitting the opinion"); *Aviva Sports*, 829 F. Supp. 2d at 835 (holding that the role of rebuttal experts is "to critique plaintiffs' experts' methodologies and point out potential flaws in [their] reports," which would help "the jury . . . weigh the evidence presented at trial").

13

*Second*, Plaintiffs claim that "Dr. Meyer did not show that ENH's quality improved at a faster rate than its peers," Pls.' Br. at 9, overlooking instances when he did just that.[11] Dr. Meyer compared quality metrics in the years after NorthShore's quality improvements against peer hospitals and found that NorthShore outperformed 70 percent of its peer group. Meyer Reply Rep. ¶¶ 43–44 (Apr. 7, 2017). Dr. Meyer also compared NorthShore's quality versus peers over time, finding that it had lower mortality rates and readmission rates than many other area hospitals for pneumonia, heart failure, and heart attacks. Meyer Rep. App. M at 26–27, 29–30. And, importantly, NorthShore implemented the Epic electronic medical records system more quickly than its peers, fully implementing Epic and leaving its peers a decade or more behind. *Id*. ¶ 102, App. H; Romano Dep. Tr. at 124:25–125:5, 211:21–212:7.

*Third*, Plaintiffs argue that Dr. Chassin "focused" on whether Highland Park Hospital's quality improved after the merger as opposed to NorthShore as a whole. Pls.' Br. at 11. But Plaintiffs concede that Dr. Chassin found that the installation of Epic was a systemwide quality improvement. *Id*. at 11 n.8. Besides, even if quality improvements occurred at just one hospital, when negotiating as a system, this would increase demand and prices for the whole system, just as remodeling the kitchen increases the value of the whole house.

Fundamentally, even if Plaintiffs' complaints were supported, they would simply go to the weight of Mr. Orszag's quality opinion and be subjects for cross-examination. Indeed, numerous courts, including the Supreme Court and the Seventh Circuit, have confirmed that such methodological criticisms normally go to the "probative weight of the analysis" as opposed to its

---

[11] Perplexingly, Plaintiffs complain that a chart doing exactly what they complain Dr. Meyer didn't do— compare ENH's performance to its peers, *including every single hospital in Dr. Vogt's control group*— lacks "granular measurement" and does not "comprehensively" analyze ENH compared to its peer group despite showing 19 quality measurements against 30 hospitals. *Compare* Pls.' Br. at 5, *with* Meyer Reply Report Ex. 3.

14

admissibility, and "are more appropriately addressed . . . through vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Ploss*, 2022 WL 16540179, at *8 (cleaned up; internal quotations and citations omitted).

More importantly, however, Plaintiffs never introduced any evidence on any of these criticisms. Plaintiffs' experts never examined whether quality improved at NorthShore in each of the years immediately after the merger, whether quality improved at NorthShore in any of the years in which they found overcharges, or whether quality improved at NorthShore relative to any peer group, let along the control group used by Dr. Vogt in his pricing analyses. Instead, Dr. Vogt and Dr. Romano only opine on whether the quality improvements were caused by the merger—an irrelevant consideration in the examination of whether some or all of NorthShore's price increases could be attributed to the quality improvements. What Plaintiffs are left with is an inflated claim of overcharges spanning a seventeen-year period that utterly fails to account for the quality changes over that seventeen-year period.

## CONCLUSION

For the reasons stated above, NorthShore respectfully requests that the Court deny Plaintiffs' motion.

Dated: August 4, 2023            Respectfully submitted,

                                     /s/ *Conor A. Reidy*
                                     Conor A. Reidy
                                     Dan K. Webb
                                     James F. Herbison
                                     Michael P. Mayer
                                     **WINSTON & STRAWN LLP**
                                     35 West Wacker Drive
                                     Chicago, IL 60601
                                     Tel.: (312) 558-5600
                                     creidy@winston.com

                                     *Counsel for Defendant NorthShore*
                                     *University HealthSystem*

## CERTIFICATE OF SERVICE

I certify that on August 4, 2023, I electronically filed a true and correct copy of the foregoing *Opposition to Plaintiffs' Motion to Exclude Jonathan Orszag's Opinions Regarding Quality of Care* with the Clerk of Court using the CM/ECF system, and served the foregoing via email on the below-listed counsel of record:

Marvin A. Miller
Matthew E. Van Tine
Andrew Szot
Kathleen E. Boychuck
Lori Ann Fanning
**MILLER LAW LLC**
145 S. Wells Street, Suite 1800
Chicago, IL 60606
Tel.: (312) 332-3400
mmiller@millerlawllc.com
mvantine@millerlawllc.com
aszot@millerlawllc.com
kboychuck@millerlawllc.com
lfanning@millerlawllc.com

Dated: August 4, 2023

/s/ *Conor A. Reidy*
Conor A. Reidy

*Counsel for Defendant NorthShore*
*University HealthSystem*