**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| IN RE: NORTHSHORE UNIVERSITY HEALTHSYSTEM ANTITRUST LITIGATION | No. 07-cv-04446<br><br>Judge Edmond E. Chang |

**PLAINTIFF AND THE CLASS'S MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF AND CLASS'S UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF PROPOSED SETTLEMENT, APPROVAL OF THE FORM AND MANNER OF NOTICE TO THE CLASS, AND PROPOSED SCHEDULE FOR A FAIRNESS HEARING**

# TABLE OF CONTENTS

BACKGROUND .......... 2

I. Procedural Background. .......... 2

II. Material Terms of the Settlement. .......... 7

ARGUMENT .......... 8

I. The Settlement Satisfies the Standards for Preliminary Approval .......... 8

A. Legal Standard .......... 8

B. The Court Will Be Able To Certify The Class For Purposes Of Settlement .......... 8

C. The Settlement Is Within the Range Of Possible Approval .......... 9

1. Strength Of The Plaintiffs' Case Compared To The Settlement Offer .......... 9

2. The Complexity, Length, And Expense Of Further Litigation .......... 11

3. The Reaction Of Class Members To The Settlement .......... 11

4. The Opinion Of Competent Counsel .......... 12

5. Stage Of The Proceedings And The Amount Of Discovery Completed .......... 12

II. The Plan of Allocation is Fair, Reasonable, and Adequate. .......... 12

III. The Proposed Form and Manner of Notices Are Appropriate .......... 13

IV. The Court Should Approve A.B. Data, Ltd. as Settlement Administrator .......... 13

V. The Court Should Appoint Valley National Bank as Escrow Agent. .......... 14

VI. Proposed Schedule. .......... 15

CONCLUSION .......... 15

# TABLE OF AUTHORITIES

## Cases

*Gautreaux v. Pierce*,
690 F.2d 616 (7th Cir. 1982) .......... 9

*Hart v. RCI Hospitality Holdings, Inc.*,
2015 WL 5577713 (S.D.N.Y. Sept. 22, 2015) .......... 12

*In re Aggrenox Antitrust Litigation*,
No. 14-md-2516-SRU (D. Conn.) .......... 14

*In re Gilat Satellite Networks, Ltd.*,
2007 WL 2743675 (E.D.N.Y. Sep. 18, 2007) .......... 11

*In re Loestrin 24 FE Antitrust Litigation*,
No. 13-md-2472 (D.R.I.) .......... 14

*In re M3 Power Razor Sys. Mktg. & Sales Prac. Litig.*,
270 F.R.D. 45 (D. Mass. 2010) .......... 11

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
2007 WL 313474 (S.D.N.Y. Feb. 1, 2007) .......... 11

*In re Namenda Indirect Purchaser Antitrust Litigation*,
No. 1:15-cv-6549 (CM) (RWL) (S.D.N.Y. Mar. 23, 2023) .......... 10, 11

*In re Namenda Indirect Purchaser Antitrust Litigation*,
No. 15-cv-6549 (S.D.N.Y.) .......... 14

*In re NorthShore University HealthSystem Antitrust Litigation*,
657 F. Supp. 3d 1077 (N.D. Ill. 2023) .......... 5, 6

*In re Omnivision Techs., Inc. Sec. Litig.*,
559 F. Supp. 2d 1036 (N.D. Cal. 2008) .......... 11

*In re Outer Banks Power Outage Litig.*,
2018 WL 2050141 (E.D.N.C. May 2, 2018) .......... 13

*In re Pharm. Indus. Average Wholesale Price Litig.*,
588 F.3d 24 (1st Cir. 2009) .......... 12

*In re Restasis Antitrust Litigation*,
No. 1:18-md-02819 (E.D.N.Y.) .......... 14

*In re Solodyn Antitrust Litigation*,
No. 14-md-2503-DJC (D. Mass.) .......... 14

*In re TikTok, Inc., Consumer Privacy Litigation*,
565 F. Supp. 3d 1076 (N.D. Ill. 2021) .......... 8

*In re WorldCom, Inc. Sec. Litig.*, 388 F.Supp.2d 319 (S.D.N.Y. 2005) .......... 12

*In re Zetia (Ezetimibe) Antitrust Litigation*, MDL NO. 2:18-md-2836 (E.D. Va.) .......... 14

*In the Matter of Evanston Northwestern Healthcare Corp.*, 2008 WL 1991994 (F.T.C. Apr. 24, 2008) .......... 2

*Int'l Union, United Auto., Aerospace, & Agric. Implement Workers of Am. v. Gen. Motors Co.*, 497 F.3d 615 (6th Cir. 2007) .......... 13

*Messner v. NorthShore University HealthSystem,* 669 F.3d 802 (7th Cir. 2012) .......... 3

*Wong v. Accretive Health, Inc.*, 773 F.3d 859 (7th Cir. 2014) .......... 9

**Statutes**

15 U.S.C. § 16(a) .......... 3

**Rules**

Fed. R. Civ. P. 23(e) .......... 12, 13

**Other Authorities**

*Manual for Complex Litigation* §§ 21.312, 21.633 .......... 13

Plaintiff David Freedman, on behalf of himself and the certified Class, submits this Memorandum of Law in Support of Plaintiff and the Class's Unopposed Motion for Preliminary Approval of Proposed Settlement, Approval of the Form and Manner of Notice to the Class, and Proposed Schedule for a Fairness Hearing.

After extensive litigation for more than 16 years, the Class has entered into a Settlement Agreement with NorthShore University HealthSystem ("NorthShore"), a copy of which is filed as Exhibit A to the accompanying motion. NorthShore has agreed to pay the Class $55,000,000, and has already deposited that amount into an escrow account.[1] The Settlement Fund will be distributed to eligible members of the Class after any Court-awarded attorneys' fees, reimbursement of expenses incurred in the prosecution of this litigation, and the payment of incentive awards for the Class Representative, and the costs of Notice and claims administration. The Class has, in turn, proposed to release and dismiss with prejudice the Class's claims against NorthShore if the proposed Settlement becomes final.

The parties agreed to the proposed Settlement after more than 16 years of extensive discovery, aggressive motion practice, including multiple summary judgment motions, *Daubert* motions, trial preparation, an interlocutory appeal of the denial of class certification, subsequent certification of the Class, denial of a motion to decertify the Class, a denial of a petition for leave to appeal the denial of decertification, and hard fought arm's-length settlement negotiations, most recently with the assistance of a respected neutral mediator, former U.S. District Judge Wayne R. Andersen (retired). Given that NorthShore denies all allegations of unlawful or wrongful conduct and believes it has meritorious defenses to this litigation, the proposed Settlement confers

[1] Declaration Of Marvin A. Miller In Support Of The Class's Motion For Preliminary Approval Of Proposed Settlement, Approval Of The Form And Manner Of Notice To The Class, And Proposed Schedule For A Fairness Hearing ("Miller Dec.") ¶ 8.

substantial all-cash benefits on the Class, while avoiding the risks and uncertainties of continued litigation, including trial and subsequent appeals. Accordingly, the Class respectfully requests that the Court enter the Proposed Preliminary Order: (i) preliminarily approving the proposed Settlement; (ii) approving the Notice Plan and proposed Notices to the Class; (iii) approving the proposed Claim Forms; (iv) appointing A.B. Data, Ltd. to serve as Notice and Claims Administrator; (v) appointing Valley National Bank to serve as the Escrow Agent; (vi) setting a schedule for Final Approval of the proposed Settlement; and (vii) granting such other and further relief as the Court may deem just and appropriate.

## BACKGROUND

### I. Procedural Background.

This case involves NorthShore's merger with Highland Park Hospital on January 1, 2000. NorthShore, which before the merger consisted of only Evanston and Glenbrook Hospitals, sought the merger as a means of increasing its bargaining power with Managed Care Organizations ("MCOs"). Miller Dec. ¶¶ 3, 15.

In February 2004, the Federal Trade Commission ("FTC") challenged the merger. *Id.* While the FTC issued an opinion on August 7, 2007, finding the merger anticompetitive, the remedy it proposed, which it formally ordered on April 24, 2008, did not provide any damages recovery for NorthShore's customers who paid overcharges for hospital services. *In the Matter of Evanston Northwestern Healthcare Corp*., 2008 WL 1991994 (F.T.C. Apr. 24, 2008).

The original complaint in this proceeding was filed on August 8, 2007. A subsequent class action complaint was filed on behalf of Painters District Council No. 30 Health & Welfare Fund ("Painters") on May 5, 2008. *Painters* was consolidated with this case on June 12, 2008. Mary

Jane Fait and Marvin Miller were named Interim Co-Lead Counsel on June 24, 2008. Miller Dec. ¶ 15 and n. 2.

While this case followed on the FTC proceeding, Co-Lead Counsel had to substantially recreate the discovery in the FTC suit because the depositions and trial testimony from that suit were not admissible in this suit. In addition, Co-Lead Counsel had to litigate the liability suit substantially from scratch.[2] *Id.* ¶¶ 10-11. NorthShore fought Plaintiffs very aggressively, both on discovery and the merits until the proposed settlement was reached.

Plaintiffs moved for class certification on February 13, 2009. Co-Lead Counsel participated in extensive briefing and argument, worked with the Plaintiffs' class certification expert, Dr. David Dranove, and opposed the opinions of NorthShore's expert, Dr. Monica Noether, including seeking to exclude her opinions as unreliable. *Id.* ¶ 15.

After a half-day testimonial hearing, Judge Lefkow issued an opinion which found NorthShore's expert Dr. Noether unreliable, but which nevertheless relied on her opinions to deny class certification. While the Seventh Circuit had ruled in *American Honda* that a court could not rely on an unreliable plaintiff's expert to grant class certification, it had not ruled on the obverse situation presented by this case, where a court relied on an unreliable defense expert to deny class certification. Co-Lead Counsel petitioned the Seventh Circuit to review the denial of class certification so that it could fill this gap. *Id.* Our efforts resulted in the Seventh Circuit issuing its *Messner v. NorthShore University HealthSystem,* 669 F.3d 802 (7th Cir. 2012) opinion, which found that defense experts at class certification were also bound by *Daubert*, and which is broadly cited by courts and litigants across the country.

[2] Under 15 U.S.C. § 16(a), the findings in the FTC proceedings could not be used to collaterally estop NorthShore in this case. Rather, they were entitled only to very limited effect as prima facie evidence subject to rebuttal.

After the Seventh Circuit remanded, the case was assigned to this Court for final resolution of the class certification motion and what the appellate court expected would be a perfunctory determination on the remaining class certification requirement, whether maintaining a class action would be superior to individual suits. NorthShore continued its no holds barred opposition to class certification. NorthShore opposed finding that a class action was superior on various grounds, including raising arguments that the prospective class members were required to arbitrate their claims. What was normally a perfunctory superiority finding spawned a major battle. *See* Miller Dec. ¶ 15.

The Court granted the class certification motion on December 10, 2013. Mr. Miller became Class Counsel, as did Ms. Fait, who was no longer at Wolf Haldenstein and who was then a sole practitioner. *Id.* ¶ 15 and n. 1.

NorthShore subsequently filed motions to enforce its purported arbitration agreements and for summary judgment on the ground that the claims were barred by the statute of limitations. After extensive briefing on these motions, both sets of motions were granted in part and denied in part. Certain MCOs were removed from the Class due to the arbitration agreements. In response to the summary judgment motion, the Court excluded the first six weeks from the Class period. *Id.* ¶ 15.

At the same time, the remaining fact discovery was completed. Miller Law attorneys first-chaired ten of the remaining eleven fact depositions, and played a major role in reviewing the almost two million pages of documents produced by NorthShore, as well as in formulating and responding to written discovery. *Id.*

Miller Law attorneys also conducted the merits expert discovery on behalf of the Class and first-chaired all of the remaining expert depositions. The Class's expert at class certification, Dr.

Dranove, informed Class Counsel, after the Class was certified, that he could no longer serve as an expert because of a conflict. Class Counsel then retained Dr. William Vogt, a distinguished academic health economist, and Dr. Russell Lamb, a distinguished antitrust economist, as the Class's liability and damages experts, respectively. *Id.* ¶ 15 and n. 3.

While Dr. Dranove had demonstrated the feasibility of using class-wide methodologies to prove injury and damages at class certification, he had never conducted a full analysis of the merits of the Class's injury or damages claims because of data issues. Dr. Vogt and Dr. Lamb were constrained to conduct their empirical analyses substantially from scratch. *Id.*

NorthShore responded to Dr. Vogt and Dr. Lamb with expert reports from Dr. Robert Willig, Ms. Margaret Guerin-Calvert, and Dr. Gregg Meyer. Dr. Willig, a recognized Princeton economist, opined that the Class had suffered neither injury nor damages. Dr. Willig relied in part on Dr. Meyer, a medical doctor and quality of care expert. Ms. Guerin-Calvert, an antitrust and healthcare economist, disputed Dr. Vogt's geographic market opinion. *See In re NorthShore University HealthSystem Antitrust Litigation*, 657 F. Supp. 3d 1077, 1096-98, 1100-02 and n. 27 (N.D. Ill. 2023).

These expert issues, among others, figured prominently in the parties' cross motions for summary judgment and to exclude experts, and NorthShore's motion to decertify the Class. Hundreds of pages of briefs and thousands of pages of exhibits were submitted by each side. These motions were almost exclusively briefed by Miller Law on behalf of the Class.[3] *Id.*; Miller Dec. ¶¶ 15, 18.

The Court issued partial rulings on the motions, narrowing the Class to include only in-patient services, and interpreting the direct purchaser requirement of the class definition and

[3] Ms. Fait was allowed to withdraw her appearance on May 14, 2021. ECF 1108.

federal antitrust laws to exclude self-insured entities which used an MCO or another administrative services entity to negotiate contracts and forward payments to NorthShore. These rulings had the effect of excluding the incumbent class representatives from the Class. Fortunately for the remaining Class, rather than immediately decertifying the Class, the Court exercised its discretion to allow the Class to obtain a new class representative. Miller Dec. ¶ 15.

David Freedman stepped up as the new class representative. The Court preliminarily found Mr. Freedman adequate, but allowed NorthShore to seek to disqualify him, and seek summary judgment on his claims. After discovery limited to Mr. Freedman's claims, including a deposition, and supplemental briefing, the Court denied NorthShore's motions directed to Mr. Freedman's adequacy as a class representative and his individual injury. *Id.*

The Court issued the remainder of its rulings on the summary judgment, *Daubert*, and decertification motions on February 20, 2023. The Court granted the Class's motion to disqualify Dr. Meyer, and granted the Class summary judgment on NorthShore's affirmative efficiencies defense that the merger improved quality-of-care. The Court denied NorthShore's motion to decertify the Class, and denied the remainder of the cross motions for summary judgment that it ruled upon. *NorthShore*, 657 F, Supp. 3d 1077. NorthShore then filed a Rule 23(f) petition with the Seventh Circuit seeking review of the denial of decertification. The Class successfully opposed the petition. Miller Dec. ¶ 15.

The Court set a schedule for the pretrial order and conference and also set a trial date. The Court also allowed NorthShore to name a new economic expert in the place of Dr. Willig, who had passed away. The Class deposed that expert, Mr. Jonathan Orszag, and briefed a motion to exclude his opinions as they pertained to quality. *Id.*

During the summer and fall of 2023, the parties conducted their final trial preparations. On October 16, 2023, the parties submitted the proposed final pretrial order, which includes witness, deposition, and exhibit designations, proposed jury instructions, *voir dire* questions and a verdict slip. The parties filed and briefed 27 motions *in limine*. When the briefing on the motions *in limine* was completed on November 8, 2023, the case was substantially ready to be tried in front of a jury beginning on January 9, 2024. *Id.* ¶¶ 15, 18.

The parties also engaged in a mediation with Judge Andersen during the summer and fall of 2023. These efforts included the submission to Judge Andersen of mediation statements and background materials, an in-person mediation taking most of a day, and numerous subsequent telephonic negotiations and in-person session enabled by Judge Andersen. The parties only reached a settlement in principle in mid-November 2023, after the submission of the proposed final pretrial order and the motions *in limine* were fully briefed and were *sub judice*. The Settlement Agreement was subsequently negotiated and signed on December 13, 2023. *Id.* ¶¶ 8, 15, 18

**II. Material Terms of the Settlement.**

The Settlement terms provide, *inter alia*, that NorthShore will deposit $55,000,000 into an escrow account. NorthShore made that deposit on January 2, 2024, even before the filing of the motion seeking preliminary approval of the Settlement. Miller Dec. ¶ 8. The settlement monies in the escrow account, together with any interest thereon, will be used to pay: (i) Court-approved costs and expenses incurred and to be incurred to prosecute this litigation; (ii) taxes payable on the Settlement Fund; (iii) Court-approved administrative expenses associated with this litigation or the Settlement; and (iv) any Court-approved attorneys' fees and expenses; and (v) a Court-approved incentive award to the Class Representative. The remainder of the Settlement Fund will be distributed to eligible members of the Class according to a Court-approved Plan of Allocation.

According to the terms of the proposed Settlement, the Class has agreed to release NorthShore from liability for the claims arising from conduct alleged in the case. The parties have agreed that, pending Court approval of the proposed Settlement, all proceedings against NorthShore (other than those incident to the settlement process) will be stayed. Upon the proposed Settlement becoming final, the Class's claims against NorthShore in this action should be dismissed with prejudice.

## ARGUMENT

### I. The Settlement Satisfies the Standards for Preliminary Approval.

#### A. Legal Standard

To preliminarily approve a class action settlement, a court must consider three factors: (1) whether it will be able to certify the proposed settlement class, (2) whether the proposed settlement is "'within the range of possible approval'" under Rule 23(e)(2)'s "fair, reasonable, and adequate" standard for final approval, and (3) that adequate notice of the settlement is provided. *In re TikTok, Inc., Consumer Privacy Litigation*, 565 F. Supp. 3d 1076, 1083-84 (N.D. Ill. 2021) (citations omitted). As the following sections demonstrate, each of these factors is satisfied here.

#### B. The Court Will Be Able To Certify The Class For Purposes Of Settlement

The parties have defined the proposed settlement class as follows:

> All persons or entities in the United States of America and Puerto Rico, except those who solely paid fixed amount co-pays, uninsureds who did not pay their bill, Medicaid and Traditional Medicare patients, governmental entities, defendant, other providers of healthcare services, and the present and former parents, predecessors, subsidiaries and affiliates of defendant and other providers of healthcare services who purchased or paid for inpatient hospital services directly from NorthShore University HealthSystem (formerly known as Evanston Northwestern Healthcare), its wholly-owned hospitals, predecessors, subsidiaries, or affiliates other than those acquired as a result of the merger with Rush North Shore Medical Center from February 10, 2000 through December 31, 2015.

This definition follows the class definition certified for litigation by the Court, as adjusted

by the Court's subsequent interpretations of that definition and limitations to that definition. The only other modification to that definition is the addition of the end-date of December 31, 2015, which corresponds to the end-date of the computations by the Class's merits expert reports and which leads to a sixteen-year Class Period.[4]

Because the Class follows the contours of the certified litigation class as limited by the Court's subsequent decisions, the Court will be able to certify the Class for judgment.

### C. The Settlement Is Within the Range Of Possible Approval

The settlement is fair, reasonable, and adequate, and thus easily satisfies meets each of the Seventh Circuit's factors for final approval:

> "(1) the strength of the case for plaintiffs on the merits, balanced against the extent of settlement offer; (2) the complexity, length, and expense of further litigation; (3) the amount of opposition to the settlement; (4) the reaction of members of the class to the settlement; (5) the opinion of competent counsel; and (6) stage of the proceedings and the amount of discovery completed."

*Wong v. Accretive Health, Inc*., 773 F.3d 859, 863 (7th Cir. 2014) (quoting *Gautreaux v. Pierce*, 690 F.2d 616, 631 (7th Cir. 1982)).

#### 1. Strength Of The Plaintiffs' Case Compared To The Settlement Offer

The Class has a strong case. The Class was certified after a strong Seventh Circuit opinion in its favor. The Class has survived several summary motions raising various arguments, a decertification motion and attempt to appeal the failure to decertify, and an initial motion to dismiss. In addition, the Class obtained summary judgment against NorthShore on one of its primary defenses, its efficiencies defense based upon quality-of-care. Moreover, while NorthShore

---

[4] The Court certified the litigation class on December 10, 2013 with a class period of ". . . from at least as early as January 1, 2000 to the present." Class notice was sent out on December 5, 2014, and a second mailing was made on April 1, 2015. The Plaintiff Class's merits experts submitted their opening reports on July 28, 2016, and calculated overcharges and damages from January 1, 2000 through December 31, 2015. The Court subsequently granted Defendant partial summary judgment on the statute of limitations, and excluded claims accruing from January 1, 2000, to February 9, 2000. Miller Dec. ¶ 15.

sought to prohibit the Class from relying on the FTC decision, even NorthShore admitted that evidence of the existence of the FTC proceeding could not be totally excluded, and the Class was likely to get the fact and result of that proceeding before the jury.

While the Class was approaching trial in a strong position, NorthShore still retained several defenses with possible jury appeal. NorthShore retained a geographic market defense which could have led to a defense verdict on liability. NorthShore argued that the Court's quality-of-care ruling was limited in scope, and still allowed it to rely on quality-of-care as a partial defense, particularly as to damages. NorthShore planned to introduce testimony from a representative of the dominant area MCO, Blue Cross Blue Shield of Illinois ("BCBSI"), that it was not injured, and NorthShore intended to present evidence and argument that none of the remaining MCOs believed they were injured because none of them took advantage of the FTC's remedy at the end of the FTC proceeding. Despite the Court largely denying NorthShore's motion for summary judgment on the statute of limitations, NorthShore intended to present evidence related to that defense at trial. NorthShore was likely to benefit from a positive reputation, as well as the age of the case and jurors' being desensitized by many hospital mergers which occurred in the last 24 years.

In contrast to the substantial issues facing the Class at trial, the amount of the proposed settlement is an excellent outcome. The $55 million all-cash settlement represents approximately 25% of Dr. Lamb's MCO-specific damages calculation of $227 million.[5] *See In re Namenda Indirect Purchaser Antitrust Litigation*, No. 1:15-cv-6549 (CM) (RWL), ECF 967, Memorandum

[5] Supplementation Declaration of Russell L. Lamb, Ph.D., Updating Damages Calculations dated June 23, 2023, ECF 1163-1, Table 1. It also represents almost 20% of Dr. Lamb's MCR damages of $290.96 million. *Id.*, Table 2.

And Order at 11 (S.D.N.Y. Mar. 23, 2023) (approving class action settlement and noting other class action settlements of approximately 6% to 10% of estimated damages).[6]

**2. The Complexity, Length, And Expense Of Further Litigation**

A favorable plaintiff verdict after trial is unlikely to end this 16 year old saga. Even before trial, NorthShore may have appellate issues apart from how the Court may rule on the pending motions, or the conduct of the trial. In particular, NorthShore would be likely to challenge again the decisions relating to class certification and the denial of its motion to decertify the class. This case could persist for many more years at great expense and substantial diminution of Class membership, simply by attrition. This factor alone favors the substantial all-cash benefits obtained.

**3. The Reaction Of Class Members To The Settlement**

While this factor is indisputably critical to a fairness analysis, it is premature to assess this factor at this stage, as notice of the Settlement terms to members of the Class has not yet been provided. *See, e.g., In re M3 Power Razor Sys. Mktg. & Sales Prac. Litig.,* 270 F.R.D. 45, 63 (D. Mass. 2010). If the Court preliminarily approves the proposed Settlement and authorizes Notice to be sent to the Class, Lead Counsel will address any objection to the proposed Settlement in connection with the Fairness Hearing.

---

[6] As the *Namenda* court stated,

> The range of potential damages was vast and in the discretion of the jury. Given the complexity and risk, the $56,438,000 all-cash settlement represents an excellent recovery. *See In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 2007 WL 313474, at *10 (S.D.N.Y. Feb. 1, 2007) (approving $40.3 million settlement with a recovery of approximately 6.25% of estimated damages); *In re Gilat Satellite Networks, Ltd.*, 2007 WL 2743675, at *11-12 (E.D.N.Y. Sep. 18, 2007); (approving $20 million settlement representing 10.6% of maximum damages); *In re Omnivision Techs., Inc. Sec. Litig.*, 559 F. Supp. 2d 1036, 1042 (N.D. Cal. 2008) ($13.75 million settlement yielding 6% of potential damages after deducting fees and costs).

*Namenda*, ECF 967 at 11.

**4. The Opinion Of Competent Counsel**

The Settlement is the result of 16 years of very contested litigation and extensive arm's-length negotiations. Settlement negotiations have occurred sporadically since the 2012 remand of the case. Those negotiations only bore fruit as trial became imminent and the parties obtained the assistance of retired Judge Andersen as a mediator.

Lead Counsel, with many years of antitrust experience, has carefully evaluated the strengths and weakness of the case and believes that the proposed settlement is an excellent outcome for the Class given the substantial risks at trial and on appeal.

**5. Stage Of The Proceedings And The Amount Of Discovery Completed**

Extensive fact and expert discovery was undertaken and completed in this case. The parties are fully cognizant of the strengths and weakness of their respective merits as they intensively prepared for trial. With the trial is imminent, there can be no doubt that the parties entered into the proposed Settlement with extensive knowledge of the case and its risks.

## II. The Plan of Allocation is Fair, Reasonable, and Adequate.

The standard for approving a Plan of Allocation for a settlement fund in a class action, like the one governing approval of the settlement as a whole, is that the plan must be fair, reasonable, and adequate. *See* Fed. R. Civ. P. 23(e)(l). *See also In re Pharm. Indus. Average Wholesale Price Litig.,* 588 F.3d 24, 32-33, 37 (1st Cir. 2009); *Hart v. RCI Hospitality Holdings, Inc.*, 2015 WL 5577713, *12 (S.D.N.Y. Sept. 22, 2015). The plan of allocation "'need only have a reasonable, rational basis, particularly if recommended by experienced and competent class counsel.'" *Id.* (quoting *In re WorldCom, Inc. Sec. Litig*., 388 F.Supp.2d 319, 344 (S.D.N.Y. 2005)).

The proposed Plan of Allocation (attached as Exhibit D to the accompanying motion) was developed in consultation with the economics expert, Miller Dec. ¶ 19, and meets this standard.

The proposed Plan of Allocation suggests that the Settlement Fund, net of Court-approved attorneys' fees, expenses, incentive award, and costs of notice and administration, should be distributed *pro rata* to each eligible member of the Class based on the amount paid to NorthShore.[7]

## III. The Proposed Form and Manner of Notices Are Appropriate

Members of the Class are entitled to reasonable notice of the Settlement Agreement before the Court decides whether to grant Final Approval, including notice of the Fairness Hearing. *See Manual for Complex Litigation* §§ 21.312, 21.633. Rule 23(e)(1) requires notice in a reasonable manner to all members of the Class who would be bound by the settlement. *Id.* To meet the requirements of Rule 23(e) and Due Process, the notice apprises the "'members of the class of the terms of the proposed settlement so that class members may come to their own conclusions about whether the settlement serves their interests.'" *In re Outer Banks Power Outage Litig.*, 2018 WL 2050141, at *6 (E.D.N.C. May 2, 2018) (quoting *Int'l Union, United Auto., Aerospace, & Agric. Implement Workers of Am. v. Gen. Motors Co*., 497 F.3d 615, 630 (6th Cir. 2007)).

Working together with A.B. Data, the Class has developed a robust notice plan. Based on NorthShore's database of patients who satisfy the class definition, the plan provides for direct mail and electronic notice, and provides access to the detailed notice and material court documents on a dedicated website at www.NorthShoreAntitrustLitigation.com. A telephone bank will also be available for members of the Class to make inquiry. See Declaration of Elaine Pang at ¶¶30-31, 33, attached as Exhibit C to the accompanying motion.

## IV. The Court Should Approve A.B. Data, Ltd. as Settlement Administrator.

Lead Counsel requests that the Court reappoint A.B. Data, Ltd. as the Notice and Claims Administrator in connection with the proposed Settlement Agreement. In so doing, A.B. Data will

---

[7] For administrative purposes, Class members must meet a minimum threshold of an entitlement to payment of at least $10.00 to receive a settlement payment. *See* Plan of Allocation § IV.2.

be tasked with: (i) providing direct mail and email notice to each member of the Class; (ii) disseminating and effectuating notice in accordance with the Notice Plan; (iii) providing each member of the Class with a Claim Form should the Court grant Final Approval of the proposed Settlement Agreement; (iv) determining the proper share of the Settlement to be paid to each member of the Class; and (v) effectuating distribution of the net Settlement Fund after approval by the Court. *Id.* at ¶¶ 6-16, 34-42.

Appointment of A.B. Data will be cost-effective and promote efficiency in the dissemination of Notice, as A.B. Data previously served class certification notice. Retaining A.B. Data for further notice and the administration of claims in this case will also promote efficiency given its involvement in these types of cases over the past two decades.[8]

## V. The Court Should Appoint Valley National Bank as Escrow Agent.

Lead Counsel requests that the Court approve Valley National Bank (formerly Bank Leumi USA) to serve as Escrow Agent for the settlement funds. Valley National has been approved as the Escrow Agent in numerous complex antitrust cases, including several recent settlements by Lead Counsel.[9] Defendants have agreed to the appointment of Valley National Bank as Escrow Agent in this settlement.

[8] A.B. Data was appointed to serve as the Claims Administrator in a number of recent healthcare antitrust cases. *E.g.*, *In re Namenda Indirect Purchaser Antitrust Litigation*, No. 15-cv-6549 (S.D.N.Y.), ECF No. 959; *In re Zetia (Ezetimibe) Antitrust Litigation*, MDL NO. 2:18-md-2836 (E.D. Va.), ECF 2151; *In re Restasis Antitrust Litigation*, No. 1:18-md-02819 (E.D.N.Y.), ECF No. 656; *In re Aggrenox Antitrust Litigation*, No. 14-md-2516-SRU (D. Conn.), ECF No. 766; *In re Solodyn Antitrust Litigation*, No. 14-md-2503-DJC (D. Mass.), ECF No. 1145; and *In re Loestrin 24 FE Antitrust Litigation*, No. 13-md-2472 (D.R.I.), ECF No. 1427.

[9] *Namenda*, No. 15-cv-6549 (S.D.N.Y.), ECF No. 959; *Loestrin*, No. 13-md-2472 (D.R.I.), ECF No. 1427; *Zetia*, MDL NO. 2:18-md-2836 (E.D. Va.), ECF 2151.

**VI. Proposed Schedule.**

Should this Court grant Preliminary Approval of the proposed Settlement, Lead Counsel has submitted a proposed Preliminary Approval Order, attached as Exhibit A to the Settlement Agreement, which details a proposed schedule. This proposed schedule is fair to members of the Class and provides each member of the Class an opportunity to review the Preliminary and Final Approval papers, the proposed Settlement, the requested attorneys' fees, reimbursement of expenses, and incentive award requested before an objection is due.

## CONCLUSION

For the above-stated reasons, the Class respectfully requests that the Court enter an Order: (i) preliminarily approving the proposed Settlement; (ii) approving the proposed Notice Plan and Notices to the Class; (iii) approving the proposed Claim Forms; (iv) appointing A.B. Data to serve as Notice and Claims Administrator; (v) appointing Valley National Bank to serve as the Escrow Agent; (vi) setting a schedule for Final Approval of the proposed Settlement; and (vii) granting such other and further relief as the Court may be deemed just and proper.

Dated: January 17, 2024

Respectfully submitted,

s/*Marvin A. Miller*

Marvin A. Miller
Matthew E. Van Tine
Kathleen E. Boychuck
Andrew Szot
Lori A. Fanning
Miller Law LLC
53 W. Jackson Blvd.
Suite 1320
Chicago, IL 60604
312.332.3400